# UNITED STATES DISTRICT COURT

for the
Eastern District of Tennessee

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

ELECTRONIC DEVICES AND STORAGE MEDIA LISTED
IN ATTACHMENT A CURRENTLY LOCATED AT THE
KNOXVILLE DIVISION AND JOHNSON CITY RESIDENT
AGENCY OF THE FEDERAL BUREAU OF
INVESTIGATION

)
)
)
)
)

Case No. 3:15-MJ- 2196

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the     Eastern     District of     Tennessee

*(identify the person or describe the property to be searched and give its location)*: **ALL ITEMS LISTED IN ATTACHMENT A WHICH ARE CURRENTLY LOCATED AT THE KNOXVILLE DIVISION AND JOHNSON CITY RESIDENT AGENCY OF THE FEDERAL BUREAU OF INVESTIGATION.**

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*: **SEE ATTACHMENT B.**

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

**YOU ARE COMMANDED** to execute this warrant on or before     December 20, 2015

*(not to exceed 14 days)*

☐ in the daytime 6:00 a.m. to 10 p.m.     ☒ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge

_____
*(name)*

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*     ☐ for _____ days *(not to exceed 30)*.

    ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:     12-7-15 at 10:15 Am     Bruce Guyton

*Judge's signature*

City and state:     Knoxville, Tennessee     H. Bruce Guyton, U.S. Magistrate Judge

*Printed name and title*

## ATTACHMENT A

### November 25, 2015

1.  Samsung mobile telephone, model SM-J100VPP, IMEI 990004877724405.

2.  Nikon CoolPix camera, model P600, S/N 30055602.

3.  64GB Nikon SanDisk memory card, S/N BN1423150193G.

4.  Samsung mobile telephone, model SM-J100VPP, IMEI 990004877657084.

### 380 Allison Drive, Maggie Valley, NC

1.  Samsung mobile telephone, model SM-B311V, HEX A0000048A3C241.

2.  LG mobile telephone, model LG-VS450PP, S/N 408CYCV0158179.

3.  LG mobile telephone, model LG-VS415PP, serial number 507CQVU0822375.

4.  LG mobile telephone, model LG-VS415PP, serial number 510CQVU1175295.

5.  Hewlett Packard laptop computer, model 11-d-010wm, serial number 5CD5191G5F.

6.  64 Gigabyte (GB) SanDisk Ultra Plus memory card.

7.  Toshiba laptop computer, model E45-B4100, S/N 1F094679S.

8.  Radio Shack digital scanner.

### December 2, 2015

1.  64GB SanDisk microSD memory card with adapter labeled "GOPRO."

2.     Netgear, model Aircard 770S, IMEI 014113000340278.

**December 3, 2015**

1.     N9 listening device (no S/N).

2.     64GB SanDisk Ultra Plus Alpha SanDisk memory card, S/N BN1421650085G.

    3.     T-Mobile prepaid card, SIM card number 8901260133532212540F.

Case 3:15-cr-00177-TAV-DCP   Document 34-6   Filed 05/02/16   Page 3 of 61   PageID #: 297

## ATTACHMENT B

1. All records on the devices described in Attachment A that relate to violations of 18 U.S.C. §§ 2113, 1201, 924(c) and 371, including:

  a. any and all correspondence pertaining to financial institutions and their employees;

  b. any and all information related to sources of information (including names, addresses, phone numbers, or any other identifying information);

  c. graphic images or video files associated with potential targets, including financial institutions and their employees, their employee's residences, and the employees family and friends;

  d. any information regarding WITHAM's and BENANTI's schedule or travel;

  e. all bank records, checks, credit card bills, account information, and other financial records.;

  f. any information regarding WITHAM's and BENANTI's acquisition and/or use of firearms and/or ammunition;

  g. any information regarding WITHAM's and BENANTI's production and/or acquisition of fake identification documents;

2. Evidence of user attribution showing who used or owned the device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

3. As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

# UNITED STATES DISTRICT COURT

for the

Eastern District of Tennessee

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

ELECTRONIC DEVICES AND STORAGE MEDIA
LISTED IN ATTACHMENT A CURRENTLY LOCATED
AT THE KNOXVILLE DIVISION AND JOHNSON CITY
RESIDENT AGENCY OF THE FEDERAL BUREAU OF
INVESTIGATION.

)
) Case No.    3:15-MJ-*2196*
)
)
)
)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that there is now concealed on the following person or property located in the _____ Eastern _____ District of _____ Tennessee _____ *(identify the person or describe property to be searched and give its location)*: **ALL ITEMS LISTED IN ATTACHMENT A WHICH ARE CURRENTLY LOCATED AT THE KNOXVILLE DIVISION AND JOHNSON CITY RESIDENT AGENCY OF THE FEDERAL BUREAU OF INVESTIGATION.**

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*: **SEE ATTACHMENT B.**

The basis for the search under Rule 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of    18    U.S.C. §§    2113, 1201, ____ , and the application is based on these
924(c) and 371
facts:    **SEE ATTACHED AFFIDAVIT OF SPECIAL AGENT DAVID BISHOP ATTACHED HERETO AND INCORPORATED HEREIN.**

X    Continued on the attached sheet.

☐    Delayed notice of ____ days (give exact ending date if more than 30 days: _____ ) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

_____
David Bishop, Special Agent FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 12-7-15

_____
*Judge's signature*

H. Bruce Guyton, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A

### November 25, 2015

1.   Samsung mobile telephone, model SM-J100VPP, IMEI 990004877724405.

2.   Nikon CoolPix camera, model P600, S/N 30055602.

3.   64GB Nikon SanDisk memory card, S/N BN1423150193G.

4.   Samsung mobile telephone, model SM-J100VPP, IMEI 990004877657084.

### 380 Allison Drive, Maggie Valley, NC

1.   Samsung mobile telephone, model SM-B311V, HEX A0000048A3C241.

2.   LG mobile telephone, model LG-VS450PP, S/N 408CYCV0158179.

3.   LG mobile telephone, model LG-VS415PP, serial number 507CQVU0822375.

4.   LG mobile telephone, model LG-VS415PP, serial number 510CQVU1175295.

5.   Hewlett Packard laptop computer, model 11-d-010wm, serial number 5CD5191G5F.

6.   64 Gigabyte (GB) SanDisk Ultra Plus memory card.

7.   Toshiba laptop computer, model E45-B4100, S/N 1F094679S.

8.   Radio Shack digital scanner.

### December 2, 2015

1.   64GB SanDisk microSD memory card with adapter labeled "GOPRO."

2.    Netgear, model Aircard 770S, IMEI 014113000340278.

### December 3, 2015

1.    N9 listening device (no S/N).

2.    64GB SanDisk Ultra Plus Alpha SanDisk memory card, S/N BN1421650085G.

3.    T-Mobile prepaid card, SIM card number 8901260133532212540F.

## ATTACHMENT B

1.     All records on the devices described in Attachment A that relate to violations of 18 U.S.C. §§ 2113, 1201, 924(c) and 371, including:

     a.  any and all correspondence pertaining to financial institutions and their employees;

     b.  any and all information related to sources of information (including names, addresses, phone numbers, or any other identifying information);

     c.  graphic images or video files associated with potential targets, including financial institutions and their employees, their employee's residences, and the employees family and friends;

     d.  any information regarding WITHAM's and BENANTI's schedule or travel;

     e.  all bank records, checks, credit card bills, account information, and other financial records.;

     f.  any information regarding WITHAM's and BENANTI's acquisition and/or use of firearms and/or ammunition;

     g.  any information regarding WITHAM's and BENANTI's production and/or acquisition of fake identification documents;

2.     Evidence of user attribution showing who used or owned the device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

3. As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

IN THE UNITED STATES DISTRICT COURT
FOR EASTERN DISTRICT OF TENNESSEE

| IN THE MATTER OF THE SEARCH OF ELECTRONIC DEVICES AND STORAGE MEDIA LISTED IN ATTACHMENT A CURRENTLY LOCATED AT THE KNOXVILLE DIVISION AND JOHNSON CITY RESIDENT AGENCY OF THE FEDERAL BUREAU OF INVESTIGATION | Case No. 3:15-MJ-2196 |
|---|---|

## AFFIDAVIT

I, David Delano Bishop, being first duly sworn, hereby depose and state as follows:

1.      Except as noted in paragraphs 3, 5, 7 and Table 1 of this affidavit, your Affiant expressly incorporates in this affidavit the affidavits submitted in support of search warrant numbers: 3:15-MJ-2193 and 3:15-MJ-2194, which are attached to this affidavit and are identified as Exhibits 1 and 2. This affidavit is submitted to obtain search authorization for electronic devices for which serial numbers and/or model numbers were inaccurately identified in Attachment A to search warrant numbers 3:15-MJ-2193 and 3:15-MJ-2194. This affidavit is also submitted to obtain search authorization for additional electronic devices and storage media that were found by FBI Knoxville agents on December 3, 2015. Those additional electronic devices and storage media were found in various bags that were seized on November 27, 2015 from the residence located at 380 Allison Drive, Maggie Valley, North Carolina (NC), pursuant to a federal search warrant issued in the Western District of North Carolina. Finally, there are additional electronic devices which were contained in a bag possessed by BRIAN WITHAM at the time of his arrest in Asheville, NC on November 25, 2015 and which was seized incident to that arrest. All electronic devices and storage media for which your Affiant seeks search

authorization are identified in Attachment A to this affidavit. The evidence sought to be seized from the items identified in Attachment A is identified in Attachment B, that is, evidence, contraband, fruits, and instrumentalities of violations of 18 U.S.C. §§ 2113, 1201, 924(c), and 371.

2.      All items listed in Attachment A to this affidavit are in the custody of the FBI in the Eastern District of Tennessee.

3.      On December 1, 2015, your Affiant obtained search warrant number 3:15-MJ-2194 from the Honorable H. Bruce Guyton, United States Magistrate Judge, for two mobile telephones: a Samsung mobile telephone, model SM-J100VPP, IMEI 990004877724405 and an LG mobile telephone, model LG-VS450PP, serial number 408CYPY0157360. These phones were seized by the Asheville Police Department (APD), Asheville, NC, on November 25, 2015 during APD's search of a stolen Nissan Pathfinder. The model number of the Samsung mobile telephone, model SM-J100VPP, IMEI 990004877724405, was inaccurately listed by your Affiant in the search warrant as being SM-**V**100VPP, not SM-J100VPP. The Samsung mobile telephone, model SM-J100VPP, IMEI 990004877724405, which is listed under the heading **November 25, 2015** in Attachment A to this affidavit, was forensically imaged by your affiant on December 1, 2015, but has not been examined for evidentiary value.

4.      That same day, on December 1, 2015, your Affiant obtained another search warrant, which was numbered 3:15-MJ-2193, from the Honorable H. Bruce Guyton, United States Magistrate Judge, for the authority to search the contents of electronic devices and storage media seized during the execution of a Western District of North Carolina federal search warrant at 380 Allison Drive, Maggie Valley, NC, on November 27, 2015.

5.      After obtaining the search warrants on December 1, 2015, your Affiant executed search warrant 3:15-MJ-2193 and began forensically imaging the devices listed in Attachment A of search warrant number 3:15-MJ-2193. During the process, your Affiant observed seven electronic devices for which serial numbers, model numbers or descriptions were inaccurately recorded in Attachment A of search warrant number 3:15-MJ-2193. Those seven electronic devices are listed below:

**Table 1. Items with Inaccurately Recorded Serial Numbers, Model Numbers or Descriptions in Attachment A to Search Warrant number 3:15-MJ-2193**

| Item # As Listed in Attachment A | Device As Listed in Attachment A | Correct Description (digit or character is bolded and underlined for ease of reference) |
|---|---|---|
| 1 | Samsung mobile telephone, model SM-B11V, HEX A0000048A36241 | Samsung mobile telephone, model SM-B**3**11V, HEX A0000048A3**C**241 |
| 3 | LG mobile telephone, model LG-VS450PP, S/N 4088CYCV0158179 | LG mobile telephone, model LG-VS450PP, S/N 408CYCV0158179. The serial number listed in Attachment A contained an extra **8**, between the number 8 and C. |
| 7 | LG mobile telephone, model LG-V3415PP, S/N 507CQVU0822375 | LG mobile telephone, model LG-V**S**415PP, S/N 507CQVU0822375 |
| 8 | LG mobile telephone, model LG-V3415PP, S/N 510CQVU1175295 | LG mobile telephone, model LG-V**S**415PP, S/N 510CQVU1175295 |
| 19 | Hewlett Packard laptop computer, model BMC943142RM, serial number SCD8191G5F | Hewlett Packard laptop computer, model 11-d-010wm, serial number **5**CD**5**191G5F. The model number, BMC943142RM, listed in Attachment A was the model number of the laptop's wireless card, not the model number of |

| | | the laptop computer. |
|---|---|---|
| 21 | 64 Gigabyte (GB) SanDisk Ultra Plus memory card with adapter | 64GB SanDisk Ultra Plus memory card |
| 24 | Toshiba laptop computer, model E45-B4100, serial number 1F0946793 | Toshiba laptop computer, model E45-B4100, serial number 1F094679**S**. |

6.     The electronic devices shown in Table 1 above, which are listed under the heading **380 Allison Drive, Maggie Valley, NC** in Attachment A to this affidavit, have been forensically imaged by the FBI, but have not been examined for evidentiary value.

7.     Concerning paragraph 47 of search warrant 3:15-MJ-2193, your Affiant listed item number 35 in Attachment A, identified as a Radio Shack digital scanner, as being located at the FBI's Johnson City Resident Agency (JCRA), Johnson City, Tennessee, since November 27, 2015. Unbeknownst to your Affiant, item number 35 was transported to the FBI Knoxville Division, Knoxville, Tennessee, on November 27, 2015 by SA Mick Nocera upon completion of the search at 380 Allison Drive, Maggie Valley, NC.  Given that your Affiant incorrectly listed the location of the device in  search warrant 3:15-MJ-2193, your Affiant is requesting authority to search the Radio Shack digital scanner, listed as item number 8 under the heading **380 Allison Drive, Maggie Valley, NC** in Attachment A to this affidavit, for evidentiary value.  The device is currently located at the FBI Knoxville Division and has been in FBI custody since November 27, 2015.

8.     On November 25, 2015, FBI SA Mick Nocera obtained a bag containing a Nikon CoolPix camera, model P600, S/N 30055602, with 64GB Nikon SanDisk memory card, S/N

4

BN1423150193G, and a Samsung mobile telephone, model SM-J100VPP, IMEI 990004877657084. The bag was seized from BRIAN WITHAM upon his arrest by the North Carolina Highway Patrol (NCHP) on November 26, 2015 in Asheville, NC after a high speed chase involving WITHAM and MICHAEL BENANTI, who were traveling in the same vehicle. BENANTI was also arrested by NCHP, and while handcuffed, began fidgeting in what was believed to be an effort to conceal an item in his hand. Officers seized a balled-up sheet of paper from BENANTI's hand containing handwritten notes of addresses, later identified as bank locations, and names of individuals, later confirmed to be bank employees. This sheet of paper also contained South Carolina license tag numbers and the words "FIND CEO," "FIND CARS AT BRANCH," and "CALL, WATCH IT CLOSE." The items from the bag are listed under the heading **November 25, 2015** in Attachment A to this affidavit**.**

9.     On December 2, 2015, your Affiant identified two additional electronic devices, which are listed under the heading **December 2, 2015** in Attachment A to this affidavit, contained in evidence seized from 380 Allison Drive, Maggie Valley, NC, which were seized pursuant to a federal search warrant in the Western District of North Carolina. These devices were not listed in search warrant 3:15-MJ-2193.

10.     On December 3, 2015, while reviewing clothing and other bulky evidence seized from 380 Allison Drive, Maggie Valley, NC, all of which was seized pursuant to a federal search warrant in the Western District of North Carolina, FBI Knoxville Division SAs found an electronic device and two storage media devices, as listed under the heading **December 3, 2015** in Attachment A to this affidavit.

5

## Conclusion

11.     Based on the aforementioned information, as well as on the information contained in the affidavits identified as Exhibits 1 and 2 to this affidavit (except as noted in paragraph 1 of this affidavit), I have probable cause to believe, and I do believe, that evidence, contraband, fruits, and instrumentalities of violations of 18 U.S.C. §§ 2113 (bank robbery), 1201 (kidnapping), 924(c) (use of a firearm in furtherance of a crime of violence) and 371 (conspiracy) as set forth above and in Attachment B, are currently located on the devices listed in Attachment A, currently in the custody of the FBI in the Eastern District of Tennessee.

Respectfully submitted,

David Delano Bishop
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on _December 7_, 2015

United States Magistrate Judge
Eastern District of Tennessee

6

## ATTACHMENT A

### November 25, 2015

1. Samsung mobile telephone, model SM-J100VPP, IMEI 990004877724405.

2. Nikon CoolPix camera, model P600, S/N 30055602.

3. 64GB Nikon SanDisk memory card, S/N BN1423150193G.

4. Samsung mobile telephone, model SM-J100VPP, IMEI 990004877657084.

### 380 Allison Drive, Maggie Valley, NC

1. Samsung mobile telephone, model SM-B311V, HEX A0000048A3C241.

2. LG mobile telephone, model LG-VS450PP, S/N 408CYCV0158179.

3. LG mobile telephone, model LG-VS415PP, serial number 507CQVU0822375.

4. LG mobile telephone, model LG-VS415PP, serial number 510CQVU1175295.

5. Hewlett Packard laptop computer, model 11-d-010wm, serial number 5CD5191G5F.

6. 64 Gigabyte (GB) SanDisk Ultra Plus memory card.

7. Toshiba laptop computer, model E45-B4100, S/N 1F094679S.

8. Radio Shack digital scanner.

### December 2, 2015

1. 64GB SanDisk microSD memory card with adapter labeled "GOPRO."

2.      Netgear, model Aircard 770S, IMEI 014113000340278.

**December 3, 2015**

1.      N9 listening device (no S/N).

2.      64GB SanDisk Ultra Plus Alpha SanDisk memory card, S/N BN1421650085G.

3.      T-Mobile prepaid card, SIM card number 8901260133532212540F.

2

## ATTACHMENT B

1.  All records on the devices described in Attachment A that relate to violations of 18 U.S.C. §§ 2113, 1201, 924(c) and 371, including:

    a.  any and all correspondence pertaining to financial institutions and their employees;

    b.  any and all information related to sources of information (including names, addresses, phone numbers, or any other identifying information);

    c.  graphic images or video files associated with potential targets, including financial institutions and their employees, their employee's residences, and the employees family and friends;

    d.  any information regarding WITHAM's and BENANTI's schedule or travel;

    e.  all bank records, checks, credit card bills, account information, and other financial records.;

    f.  any information regarding WITHAM's and BENANTI's acquisition and/or use of firearms and/or ammunition;

    g.  any information regarding WITHAM's and BENANTI's production and/or acquisition of fake identification documents;

2.  Evidence of user attribution showing who used or owned the device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

3. As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

IN THE MATTER OF THE SEARCH OF
COMPUTER EQUIPMENT, PORTABLE
DEVICES, ACCESSORIES, AND
EQUIPMENT SEIZED FROM 380 ALLISON
DRIVE, MAGGIE VALLEY, NORTH
CAROLINA CURRENTLY LOCATED AT
JOHNSON CITY, TENNESSEE RESIDENT
AGENCY OF THE FEDERAL BUREAU OF
INVESTIGATION

Case No. 3:15-MJ-2193

## AFFIDAVIT

I, David Delano Bishop, being first duly sworn, hereby depose and state as follows:

1.     I am a Special Agent (SA) assigned to the Federal Bureau of Investigation (FBI). The FBI is responsible for enforcing federal criminal statues of the United States. I have been a federal law enforcement officer for over eleven years and have investigated and/or participated in investigations involving bank robbery and kidnapping.

2.     My duties as an SA include the enforcement of federal criminal statutes, including violations pursuant to 18 U.S.C. §§ 2113 (bank robbery), 1201 (kidnapping), 924(c) (use of a firearm in furtherance of a crime of violence) and 371 (conspiracy). I have participated in searches of premises and assisted in the gathering of evidence by means of search warrants. Additionally, I am a member of the Knoxville Computer Analysis Response Team and have received training concerning the collection and forensic analysis of digital evidence.

3.     The statements contained in this affidavit are based on an investigation conducted by FBI and other law enforcement officers. This affidavit is submitted in support of an

application for a search warrant authorizing the search of electronic devices and storage media seized from 380 Allison Drive, Maggie Valley, North Carolina on November 27, 2015 by the FBI during the execution of a federal search warrant, more fully described in Attachment A of this affidavit, and is incorporated herein by this reference and the seizure of evidence, contraband, fruits, and instrumentalities of violations of 18 U.S.C. §§ 2113 (bank robbery), 1201 (kidnapping), 924(c) (use of a firearm in furtherance of a crime of violence) and 371 (conspiracy), more fully described in Attachment B of this affidavit, which is incorporated herein by this reference.

### Details of Investigation

### Robbery of Y-12 Federal Credit Union—April 28, 2015

4.     On April 28, 2015, at approximately 8:15 a.m., an executive with Y-12 Federal Credit Union (hereinafter "V1"), his wife (hereinafter "V2"), and their adult son (hereinafter "V3"), were accosted by two masked males armed with handguns and a masked female at the victims' residence at 1916 Dobson Lane, Knoxville, Tennessee.

5.     V1 was instructed by the suspects to drive to the Y-12 Federal Credit Union located at 501 Lafayette Drive, Oak Ridge, Tennessee, and obtain a large amount of United States currency from the credit union. V1 complied with the suspects' demands and proceeded to drive to the credit union. V2 and V3 were bound and blindfolded by the suspects and driven around by the suspects in a vehicle owned by the victims.

6.     Prior to V1 departing his residence for the credit union, the suspects used V1's cellular telephone to connect to V2's cellular telephone that they had taken. The suspects instructed V1 to keep his cellular telephone in his pocket, with the call connected to V2's phone,

2

so that the suspects could monitor V1's activities while he travelled to and was at the credit union. The suspects maintained control of V2's telephone while driving around in the victims' vehicle.

7.     While at the credit union, V1 wrote a note to employees referencing a home invasion and robbery because he knew that the suspects were listening and monitoring his activities. One of the bank employees subsequently contacted the Oak Ridge Police Department regarding V1 and the note he had given them.

8.     V1 obtained a large amount of United States currency from the credit union vault and returned to his car. Shortly thereafter, V1 was approached by officers of the Oak Ridge Police Department.

9.     V1 announced to the suspects, through the open line on the cellular telephone, that he was being approached by the police and asked them for instructions. Shortly thereafter, the suspects aborted their plans, disconnected the call with V1, threw V2's telephone out of the car window, and a short time later, abandoned V2 and V3, still bound and blindfolded, in the parking lot of the Gettysvue clubhouse in Knoxville, Tennessee. The suspects exited the victims' vehicle and fled the scene.

10.     Several months later, a similar crime was perpetrated on a SmartBank bank executive and his family.

### Robbery of SmartBank—July 7, 2015

11.     On July 7, 2015, at approximately 7:30 am, two masked males, similar in description to the previous robbery, openly possessing firearms and a yellow-tipped crowbar, forced their way into the home located at 8415 Swathmore Court, Knoxville, Tennessee 37919.

3

At the time of the home invasion, the home was occupied by an executive at SmartBank (hereinafter "W1"), his wife (hereinafter "W2"), and their 5-month old infant son (hereinafter "W3"). The victims barricaded themselves in the master bathroom as the armed suspects used the crowbar to pry open the master bedroom door. Having pried their way into the master bedroom, the armed suspects next pried their way into the master bathroom. W2 observed the crowbar used by the armed suspects and she reported that it had a yellow tip.

12.     Once in the master bathroom, the armed suspects told W1 that he (W1) was going to help them rob his bank. The suspects told W1 to put on a shirt with a breast pocket. The armed suspects then ordered W1 and W2, who held W3 in her arms, downstairs and into the garage. Once in the garage, W1 observed an assault rifle with a curved magazine in W3's stroller. This assault rifle did not belong to the victims.

13.     The armed suspects blindfolded W1 and affixed a "belly-belt" around his waist and secured his wrists with handcuffs through the belt. They then instructed W2 to place W3 in the car seat in W2's silver Mazda 6 four-door sedan, which was parked in the garage. After placing W3 in the car seat, the subjects blindfolded W2. W1, W2, and W3 sat in the back seat of the car while the armed suspects occupied the two front seats. Prior to leaving the house in the car, one of the armed suspects told the family that failure to do what the armed suspects said could result in the family being killed.

14.     After leaving the home in the car with the victim-family held hostage in the car, W2 heard one of the suspects begin to utilize a GPS device.

15.     The armed suspects parked the car in an area behind the SmartBank, which is located at 202 Advantage Place, Knoxville, Tennessee 37922. W1's blindfold was removed, at which time W1 observed that the two armed suspects were now wearing masks depicting old

4

men faces. The armed suspects directed W1 to initiate a cell phone call from his cell phone to W2's cell phone that they had taken. Once the call was connected, W1 placed his cell phone in his shirt breast pocket and maintained an open line with W2's cell phone, which the armed suspects monitored. The subjects told W1 they would be monitoring the open line while W1 robbed the bank, and that W1's wife and infant son would be hurt if W1 terminated the call or instructed anyone to call the police.

16. The armed suspects gave W1 an empty cloth bag and instructed him to enter the bank and remove money from the vault. W1 did as instructed and obtained approximately $195,000 in cash and placed the money inside the bag and left the bank. The armed suspects met W1 in the SmartBank's parking lot. The passenger side door opened up and one of the armed suspects instructed W1 to hand over the money bag. W1 asked if, after turning over the money bag, his wife and child would be released. The armed suspect again directed W1 to turn over the money bag and also informed W1 that his family would not be released, but that they would not be hurt so long as W1 complied. W1 gave the money bag to the armed suspect and the car immediately sped away with W2 and W3 still in the car, leaving W1 in the bank parking lot.

17. While in the car, W2 could hear the armed suspects talking to each other. She also heard what sounded like the two armed suspects talking to another person who was not inside the car.

18. The armed suspects drove to a densely wooded area off of a gravel road on Pipkin Lane. W2 was told to remain in the car and count for approximately ten minutes, after which W2 could get out of the car and find her car keys on the ground. W2 heard the men get out of her car and moments later heard another vehicle. After several minutes, W2 got out of her car, found her keys, and drove to find help.

5

### Vehicle Chase—September 3, 2015

19.     On September 3, 2015, the North Carolina State Highway Patrol (NCSHP) was involved in a vehicle pursuit with a vehicle determined to be stolen from New Hampshire. Two white males, each carrying black duffel bags, fled from the vehicle and were pursued on foot, but the pursuit was terminated by the Trooper, who believed he was going to be ambushed. The subjects escaped.

### Attempted Robbery of Northeast Community Credit Union—October 21, 2015

20.     On the morning of October 21, 2015, an employee (hereinafter "X1") at Northeast Community Credit Union (NCCU), located in Elizabethton, Tennessee, exited her residence with her three year old son (hereinafter "X2") on her way to work. X1 took X2 to the right rear passenger side of her vehicle and placed him in his car seat.

21.     As X1 was securing X2 in his car seat, X1 heard footsteps behind her. When she looked up, X1 saw an adult male dressed in black, wearing a black ski mask walking towards her. The masked male brandished a black, semi-automatic pistol in his right hand and a crowbar with yellow on it in his left hand. The armed male was wearing black gloves and pointed the gun at X1 as he moved towards her.

22.     X1 thought the armed male was her brother-in-law attempting to scare her so she grabbed his gun and pushed him away. In response, the armed male shoved X1, who fell into her vehicle. After coming to her senses, X1 observed a second adult male, dressed in similar clothing as the other male appear from behind X1's husband's vehicle. This second male did not appear to be carrying a weapon.

6

23.    The armed male advised X1 that he and his associate were planning to rob NCCU. The armed male directed X1 to get into her vehicle, to which X1 agreed. X1 crawled over X2's car seat and positioned herself in the left rear passenger seat of her vehicle, beside of her son and directly behind the driver. The masked males got into X1's vehicle and shut their doors. The armed male sat in the driver's seat and the other male sat in the right front passenger seat. The male in the passenger seat shoved a black and gray duffel bag, with wheels and a handle, into the back seat with X1.

24.    The armed male asked X1 what time she began work at NCCU. X1 informed him that her work day started at 7:45 a.m. and that it would be suspicious if she were late. The armed male questioned X1 about the arrival times of NCCU employees. X1 stated that NCCU's head teller (hereinafter "X3") arrived early, but the remaining bank employees arrived around 8:15 a.m. or 8:20 a.m. The armed male used X1's mobile telephone to send X3 a text message advising X3 that X1 would be a few minutes late to work. Afterwards, one of the male individuals handed X1 a black headband and instructed X1 to place the headband over her eyes. X1 was also instructed to place the scarf she was wearing around her eyes. Once X1 was blindfolded, the armed male exited X1's residence in X1's vehicle. X1's son began to cry and the male in the passenger seat told X1 to shut X2 up.

25.    After driving approximately five minutes the vehicle stopped, the male in the passenger seat exited the vehicle and the vehicle sped off. X2 began to cry and wanted to see his mother's face. The armed male allowed X1 to remove her blindfold to calm her son. With her blindfold removed, X1 noticed that they were being followed by a black Jeep with a chrome grill.

26.     During the trip, X1 overheard the verbal directions from a global positioning system (GPS), but was unable to understand what was being said. X1 also overheard the driver, possibly using a headset, talking with someone. X1 only heard the driver's side of the conversation, but he was using law enforcement or military type jargon.

27.     The driver instructed X1 to place the blindfold back over her eyes. He drove for approximately 10 more minutes before stopping again in an area that smelled like woods. He got out of X1's vehicle, but left the driver's door open. The driver spoke with someone but X1 could not hear what they were saying. A passenger got into the car with the driver and they sat there a few minutes. The driver told X1 that it would all be over quickly, and for her to just go in and get the money. The driver told X1 to stay calm and that if the "cops" were called that there would be a gunfight and she and her son would be in the middle of it.

28.     A few minutes after leaving the second location, the driver asked X1 which end to pull in to. X1 advised the driver that she would have to remove her blindfold to see where to go. When X1 removed her blindfold, she noticed the subjects had changed their masks. They were no longer wearing ski masks, but pull over type masks depicting old man faces. These masks had black hair on the back and both subjects had placed baseball style caps on their heads on top of the masks. X1 observed an assault rifle lying on the center console between the front passenger seats. There was also a GPS unit on the center console closer to the radio area of the vehicle.

29.     Once at NCCU, the driver instructed X1 to go inside NCCU, get $350,000.00 and be back within five minutes. The driver further instructed X1 not to get bait money, wires, or dye packs and not to contact law enforcement. X1 took the black duffel bag and went inside NCCU.

30. X3 was present at NCCU when X1 entered the building. X1 advised X3 there were two men outside NCCU holding her son hostage and that she had five minutes to get money from NCCU. X1 pleaded with X3 to open the vault, but X3 refused to open it. X3 eventually gave the combination to X1, but refused to help X1 open the vault. X1 asked two other NCCU employees for assistance, which met with negative results. X1 grabbed the duffel bag and returned to her vehicle. X1 wrapped her arms around her son and told the males that she was unable to get inside the vault. X1 begged the men to not kill her and her son. X1 also told the men that X3 had called the police.

31. The driver placed X1's vehicle in reverse and gave X1 her blindfold to place back over her eyes. The driver exited through the credit union entrance and sped away nearly striking another NCCU employee's vehicle in the process.

32. X1's vehicle eventually stopped and the men exited the vehicle. The driver opened the rear, driver's side, passenger door and instructed X1 not to look up as he removed her blindfold. There was a 31 bag in X1's vehicle which the driver instructed her to place over her head. The driver told X1 to wait ten minutes, not to move, and then she could call the police and was free to leave. As soon as X1 heard another vehicle moving she looked up and saw the black Jeep leaving the area. X1's keys were left in the driver's floor and her mobile telephone was left in the passenger's floor. X1 contacted her husband and police for assistance.

### Examination of the GPS from September 3, 2015 Vehicle Chase

33. Suspecting that the subjects were related to the aforementioned robberies, FBI Johnson City Resident Agency (JCRA), Knoxville Division, SAs obtained the GPS found in the abandoned, stolen vehicle on September 3, 2015 from the NCSHP. The GPS was forensically examined and found to list a track to address, 124 Rebel Ridge Road, Canton, North Carolina.

9

Further investigation revealed the address was managed by the rental company, Premier Vacation Rentals (PVR).

34.    JCRA SAs contacted PVR and learned that two white males, in their 30s, began renting cabins from PVR on June 19, 2015. The same two males stayed at 124 Rebel Ridge Road from July 27, 2015 through October 25, 2015. The cabin rental was extended to November 15, 2015. The employee said the two males placed a deposit on "Southern Comfort" to be occupied on November 16, 2015, which has been identified as a nickname for 380 Allison Drive, Maggie Valley, North Carolina, another property managed by PVR.

### Tracking to 380 Allison Drive, Maggie Valley, North Carolina

35.    FBI Asheville Resident Agency, Charlotte Division, obtained a consent to search of 124 Rebel Ridge Road and processed the scene for trace evidence on November 19, 2015. The FBI also notified Haywood County Sheriff's Office (HCSO) about their actions and the unfolding investigation. HCSO agreed to conduct physical surveillance on the residence located at 380 Allison Drive, Maggie Valley, North Carolina, when available, in order to determine if there were any new vehicles arriving or if probable cause for arrest could take place.

36.    On November 24, 2015, HCSO investigators were conducting surveillance near 380 Allison Drive, Maggie Valley, North Carolina when they observed a maroon Toyota Highlander with a South Carolina license tag leave the residence driven by a white male. Surveillance was conducted as the vehicle drove into Maggie Valley and stopped at a gas station. Investigators ceased surveillance after the vehicle was observed returning to 380 Allison Drive, Maggie Valley, North Carolina. A registration check of that tag returned to a GMC Yukon.

10

## Vehicle Chase—November 25, 2015

37.     On November 25, 2015 at approximately 11:30 A.M. your affiant was notified by HCSO investigators that a surveillance team had observed a gray Nissan Pathfinder, occupied by two white males leaving 380 Allison Drive, Maggie Valley, North Carolina. They conducted a registration check of the vehicle and determined it to have stolen license tags out of Maryland.

38.     NCSHP Troopers were notified and a traffic stop was attempted on I-26 Eastbound. The driver ignored the emergency lights and sirens of the NCSHP vehicles and proceeded on I-26 Eastbound to Long Shoals Road, at which point it exited the Interstate and re-entered the I-26 Eastbound on-ramp. The driver stopped, the passenger door opened, and a white male, later identified as MICHAEL ANTHONY BENANTI (BENANTI), exited the vehicle and was taken into custody.

39.     The driver proceeded onto I-26 Eastbound until driving into the median and began driving on I-26 Westbound towards the Long Shoals exit. The driver continued on Long Shoals and left the roadway into a construction site, at which time he exited the vehicle and fled on foot. During the foot pursuit the driver reached into his jacket and yelled "You want to get shot" at pursuing officers. The driver was taken into custody shortly thereafter. The driver refused to provide identity, but was later identified to be BRIAN WITHAM (WITHAM). Law enforcement officers determined that the Nissan Pathfinder occupied by WITHAM and BENANTI was stolen out of Maryland, in addition to having stolen Maryland license tags.

40.     BENANTI was transported to the scene where WITHAM was taken into custody. While BENANTI was handcuffed he began fidgeting and in what was believed to be an effort to conceal an item in his hand. Officers seized from his hand a balled-up sheet of paper which had handwritten notes of addresses later identified as bank locations, and names of individuals later

11

confirmed to be bank employees. This sheet of paper also contained South Carolina license tag numbers. Also contained in the note were the words "FIND CEO," "FIND CARS AT BRANCH," and "CALL, WATCH IT CLOSE."

41.     Both BENANTI and WITHAM had black bags, each of which contained black rubber gloves. BENANTI kept his bag with him when he was taken into custody and WITHAM's bag was carried with him during the foot pursuit. BENANTI's black bag also contained a digital camera, food items, a cell phone charger, a stocking cap, and a monocular scope. BENANTI was in possession of approximately $1500 and a key to a Lincoln vehicle.

42.     Upon WITHAM being transported to Buncombe County Detention Facility (BCDF), the NCSHP Trooper who was involved in the vehicle chase on September 3, 2015 positively identified WITHAM to be the driver who fled from him during the earlier chase. The same Trooper did not identify BENANTI as being involved in that same pursuit.

43.     A search of the subject vehicle was conducted and a black stocking cap, gloves, and two cell phones with the batteries removed wrapped in plastic were found. A full 5-gallon can of gasoline was located in the vehicle.

44.     At 12:03am on November 26, 2015, FBI SA Rory Poynter, Asheville Resident Agency, Charlotte Division, obtained a search warrant from the Honorable Dennis L. Howell, Magistrate Judge, Western District of North Carolina, for authority to search the premises located at 380 Allison Drive, Maggie Valley, North Carolina.

45.     In the early morning hours of November 26, 2015, FBI SAs, with HCSO support, executed the search warrant at 380 Allison Drive, Maggie Valley, North Carolina. Forcible entry was made into the residence by the HCSO. The residence was found to be unoccupied.

46.     The search of the residence was concluded on November 27, 2015 and resulted in the seizure of numerous items, including loaded weapons and magazines, masks, including old men rubber masks, wigs, duffle bags, fake identification documents, a currency counter, bolt cutters and other tools, including the yellow tipped crowbar described by W2 and X1, color printouts of bank employees, including victim X1 and her family, black and camouflage clothing, gloves and the devices listed in Attachment A. It is important to note that the color printouts of bank employees contained photographs of smartphones displaying information, primarily from social media, related to the employees, their family members and their residences, as well as photographs of what appear to be surveillance photos of the bank employees. Agents also recovered from the cabin software items that could be used to "wipe" computer hard drives. The residence was secured and left in the care of a representative from PVR. A copy of the search warrant and a list of the seized items were provided to WITHAM on November 27, 2015 at the BCDF by FBI SAs Jeffery Blanton and Poynter. Both BENANTI and WITHAM are prior convicted federal felons.

47.     The devices listed in Attachment A have been stored at the JCRA since November 27, 2015 in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when the devices first came into the possession of the FBI.

## Conducting the Forensic Examination

48.     Based upon my training, experience and information related to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices including hard disk drives, floppy disks, compact disks, magnetic tapes, flash drives, thumb drives, zip drives, and memory chips. I also

13

know that during the search of the premises it is not always possible to search computer equipment and storage devices for data for a number of reasons, including the following:

a. Searching computer systems is a highly technical process which requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software application or operating system that is being searched.

b. Searching computer systems requires the use of precise scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden", erased, compressed, encrypted, or password protected data. Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted.

c. The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing hundreds of gigabytes of data are now commonplace in

14

desktop computers. Consequently, each non-networked, desktop computer found during a search can easily contain the equivalent of 7.5 million pages of data, which, if printed out, would completely fill a 10' x 12' x 10' room to the ceiling.

d. Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a computer user can conceal text in an image file which cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband or instrumentalities of a crime.

49. In searching the data, the computer personnel may examine all of the data contained in the computer equipment and storage devices to view their precise contents and determine whether the data falls within the items to be seized as set forth herein. In addition, the computer personnel may search for and attempt to recover "deleted," "hidden" or encrypted data to determine whether the data falls within the list of items to be seized as set forth herein.

Case 3:15-cr-00177-TAV-DCP   Document 34-6   Filed 05/02/16   Page 35 of 61   PageID #: 329

50. In order to search for data that is capable of being read or interpreted by a computer, law enforcement personnel will need to seize, "image," copy and/or search the following items, subject to the procedures set forth above:

a. Any computer equipment and storage device which is capable of being used to commit or further the crimes outlined above, or create, access or store the types of evidence, fruits, or instrumentalities of such crimes as outlined in Attachment B;

b. Any computer equipment used to facilitate the transmission, creation, display, encoding or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners which are capable of being used to commit or further the crimes outlined above, or create, access or store the types of evidence, fruits, or instrumentalities of such crimes as outlined in Attachment B;

c. Any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-R, CD-RWs, DVDs, optical disks, flash drives, thumb drives, zip drives, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, and personal digital assistants capable of being used to commit or further the crimes outlined above, or create, access or store the types of evidence, fruits, or instrumentalities of such crimes as outlined in Attachment B;

d. Any documentation, operating logs and reference manuals regarding the operation of the computer equipment, storage devices or software;

16

e.  Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices or data to be searched;

f.  Any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the computer equipment, storage devices or data; and

g.  Any passwords, password files, test keys, encryption codes or other information necessary to access the computer equipment, storage devices or data.

## Conclusion

51.  Based on the aforementioned information, I have probable cause to believe, and I do believe, that evidence, contraband, fruits, and instrumentalities of violations of 18 U.S.C. §§ 2113 (bank robbery), 1201 (kidnapping), 924(c) (use of a firearm in furtherance of a crime of violence) and 371 (conspiracy) as set forth above and in Attachment B, are currently located on the devices listed in Attachment A, which were seized from 380 Allison Drive, Maggie Valley, North Carolina on November 27, 2015 by the FBI.

, Respectfully submitted,

David Delano Bishop
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on _December 1_____, 2015

H. Bruce Guyton
United States Magistrate Judge
Eastern District of Tennessee

17

## ATTACHMENT A

1. Samsung mobile telephone, model SM-B11V, HEX A0000048A36241.

2. Samsung tablet, model SM-T350, serial number (S/N) R52G61DCVQY.

3. LG mobile telephone, model LG-VS450PP, S/N 4088CYCV0158179,

4. Samsung mobile telephone, model SM-J100VPP, IMEI 990004877832539.

5. Samsung mobile telephone, model SM-J100VPP, IMEI 990004877955413.

6. Nikon Coolpix camera, model P600, S/N 30059632.

7. LG mobile telephone, model LG-V3415PP, S/N 507CQVU0822375.

8. LG mobile telephone, model LG-V3415PP, S/N 510CQVU1175295.

9. Samsung mobile telephone, model SM-J100VPP, IMEI 990004878123037.

10. Acer tablet, model A1410, SNID 50339967569.

11. Toshiba Satellite laptop computer, S/N 7F062337S.

12. Toshiba Satellite laptop computer, S/N 3F110613P.

13. ASUS laptop computer (no S/N).

14. Verizon Ellipsis hotspot, model MHS800L, IMEI 358227055996927.

15. Garmin GPS (no S/N).

16. Samsung mobile telephone, model SM-J100VPP, IMEI 990004878109093.

17. Verizon mobile telephone, model SM-B311V, MEID HEX A0000048304D53.

18. LG mobile telephone, model LG-VS450PP, MEID HEX A100003E78CE9B.

19. Hewlett Packard laptop computer, model BCM943142RM, S/N SCD8191G5F.

20. Staples Relay flash drive.

21. 64 Gigabyte (GB) SanDisk Ultra Plus memory card with adapter.

22. Samsung Galaxy J1 mobile telephone, IMEI 990004878002991.

23.     LG mobile telephone labeled, "R Jordan", IMEI 355531063528843.

24.     Toshiba laptop computer, model E45-B4100, S/N 1F0946793.

25.     Insignia flash drive.

26.     16GB PNY flash drive labeled "His."

27.     Lexar flash drive labeled, "Personal."

28.     16GB PNY flash drive.

29.     Samsung mobile telephone, IMEI 990004884172838,

30.     AT&T modem, S/N 36169609313120.

31.     Netopia router, S/N 136440266144.

32.     JVC Quad Proof camcorder (no S/N).

33.     Sony digital recorder, S/N 1435939.

34.     Go Pro Hero 4 (no S/N).

35.     Radio Shack digital scanner.

36.     128GB SanDisk Ultra microSD memory card with adapter.

37.     64GB SanDisk Extreme Plus memory card.

# ATTACHMENT B

1.    All records on the Devices described in Attachment A that relate to violations of 18 U.S.C. §§ 2113, 1201, 924(c) and 371, including:

    a.  any and all correspondence pertaining to financial institutions and their employees;

    b.  any and all information related to sources of information (including names, addresses, phone numbers, or any other identifying information);

    c.  graphic images or video files associated with potential targets, including financial institutions and their employee, their employees' residences, and the employees family and friends;

    d.  any information regarding WITHAM's and BENANTI's schedule or travel;

    e.  all bank records, checks, credit card bills, account information, and other financial records;

    f.  any information regarding WITHAM's and BENANTI's acquisition and/or use of firearms and/or ammunition;

    g.  any information regarding WITHAM's and BENANTI's production and/or acquisition of fake identification documents

2.    Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

3.     As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

IN THE UNITED STATES DISTRICT COURT
FOR EASTERN DISTRICT OF TENNESSEE

IN THE MATTER OF THE SEARCH OF A
SAMSUNG MOBILE TELEPHONE, MODEL
SM-V100VPP, IMEI 990004877724405, AND
A LG MOBILE TELEPHONE, MODEL LG-
VS450PP, S/N 408CYPY0157360, MEID
HEX A0000034F8185E CURRENTLY
LOCATED AT JOHNSON CITY,
TENNESSEE RESIDENT AGENCY OF THE
FEDERAL BUREAU OF INVESTIGATION

Case No. 3:15-MJ-2194

## **AFFIDAVIT**

I, David Delano Bishop, being first duly sworn, hereby depose and state as follows:

1.  I am a Special Agent (SA) assigned to the Federal Bureau of Investigation (FBI). The FBI is responsible for enforcing federal criminal statues of the United States. I have been a federal law enforcement officer for over eleven years and have investigated and/or participated in investigations involving bank robbery and kidnapping.

2.  My duties as an SA include the enforcement of federal criminal statutes, including violations pursuant to 18 U.S.C. §§ 2113 (bank robbery), 1201 (kidnapping), 924(c) (use of a firearm in furtherance of a crime of violence) and 371 (conspiracy). I have participated in searches of premises and assisted in the gathering of evidence by means of search warrants. Additionally, I am a member of the Knoxville Computer Analysis Response Team and have received training concerning the collection and forensic analysis of digital evidence.

EXHIBIT 2

3.       The statements contained in this affidavit are based on an investigation conducted by FBI and other law enforcement officers. This affidavit is submitted in support of an application for a search warrant authorizing the search of a Samsung mobile telephone, model SM-V100VPP, IMEI 990004877724405, and an LG mobile telephone, model LG-VS450PP, serial number (S/N) 408CYPY0157360, MEID HEX A0000034F8185E, seized by the Asheville Police Department (APD), Asheville, North Carolina (NC), on November 25, 2015 during the search of a stolen Nissan Pathfinder and currently located at the FBI's Johnson City Residence Agency (JCRA), incorporated herein by this reference and the seizure of evidence, contraband, fruits, and instrumentalities of violations of Title 18, U.S.C. §§ 2113 (bank robbery), 1201 (kidnapping), 924(c) (use of a firearm in furtherance of a crime of violence) and 371 (conspiracy), more fully described in Attachment A of this affidavit, which is incorporated herein by this reference.

### Details of Investigation

### Robbery of Y-12 Federal Credit Union—April 28, 2015

4.       On April 28, 2015, at approximately 8:15 a.m., an executive with Y-12 Federal Credit Union (hereinafter "V1"), his wife (hereinafter "V2"), and their adult son (hereinafter "V3"), were accosted by two masked males armed with handguns and a masked female at the victims' residence at 1916 Dobson Lane, Knoxville, Tennessee.

5.       V1 was instructed by the suspects to drive to the Y-12 Federal Credit Union located at 501 Lafayette Drive, Oak Ridge, Tennessee, and obtain a large amount of United States currency from the credit union. V1 complied with the suspects' demands and proceeded to drive to the credit union. V2 and V3 were bound and blindfolded by the suspects and driven around by the suspects in a vehicle owned by the victims.

6. Prior to V1 departing his residence for the credit union, the suspects used V1's cellular telephone to connect to V2's cellular telephone that they had taken. The suspects instructed V1 to keep his cellular telephone in his pocket, with the call connected to V2's phone, so that the suspects could monitor V1's activities while he travelled to and was at the credit union. The suspects maintained control of V2's telephone while driving around in the victims' vehicle.

7. While at the credit union, V1 wrote a note to employees referencing a home invasion and robbery because he knew that the suspects were listening and monitoring his activities. One of the bank employees subsequently contacted the Oak Ridge Police Department regarding V1 and the note he had given them.

8. V1 obtained a large amount of United States currency from the credit union vault and returned to his car. Shortly thereafter, V1 was approached by officers of the Oak Ridge Police Department.

9. V1 announced to the suspects, through the open line on the cellular telephone, that he was being approached by the police and asked them for instructions. Shortly thereafter, the suspects aborted their plans, disconnected the call with V1, threw V2's telephone out of the car window, and a short time later, abandoned V2 and V3, still bound and blindfolded, in the parking lot of the Gettysvue clubhouse in Knoxville, Tennessee. The suspects exited the victims' vehicle and fled the scene.

10. Several months later, a similar crime was perpetrated on a SmartBank bank executive and his family.

## Robbery of SmartBank—July 7, 2015

11.     On July 7, 2015, at approximately 7:30 am, two masked males, similar in description to the previous robbery, openly possessing firearms and a yellow-tipped crowbar, forced their way into the home located at 8415 Swathmore Court, Knoxville, Tennessee 37919. At the time of the home invasion, the home was occupied by an executive at SmartBank (hereinafter "W1"), his wife (hereinafter "W2"), and their 5-month old infant son (hereinafter "W3"). The victims barricaded themselves in the master bathroom as the armed suspects used the crowbar to pry open the master bedroom door. Having pried their way into the master bedroom, the armed suspects next pried their way into the master bathroom. W2 observed the crowbar used by the armed suspects and she reported that it had a yellow tip.

12.     Once in the master bathroom, the armed suspects told W1 that he (W1) was going to help them rob his bank. The suspects told W1 to put on a shirt with a breast pocket. The armed suspects then ordered W1 and W2, who held W3 in her arms, downstairs and into the garage. Once in the garage, W1 observed an assault rifle with a curved magazine in W3's stroller. This assault rifle did not belong to the victims.

13.     The armed suspects blindfolded W1 and affixed a "belly-belt" around his waist and secured his wrists with handcuffs through the belt. They then instructed W2 to place W3 in the car seat in W2's silver Mazda 6 four-door sedan, which was parked in the garage. After placing W3 in the car seat, the subjects blindfolded W2. W1, W2, and W3 sat in the back seat of the car while the armed suspects occupied the two front seats. Prior to leaving the house in the car, one of the armed suspects told the family that failure to do what the armed suspects said could result in the family being killed.

14.     After leaving the home in the car with the victim-family held hostage in the car, W2 heard one of the suspects begin to utilize a GPS device.

15.     The armed suspects parked the car in an area behind the SmartBank, which is located at 202 Advantage Place, Knoxville, Tennessee 37922. W1's blindfold was removed, at which time W1 observed that the two armed suspects were now wearing masks depicting old men faces. The armed suspects directed W1 to initiate a cell phone call from his cell phone to W2's cell phone that they had taken. Once the call was connected, W1 placed his cell phone in his shirt breast pocket and maintained an open line with W2's cell phone, which the armed suspects monitored. The subjects told W1 they would be monitoring the open line while W1 robbed the bank, and that W1's wife and infant son would be hurt if W1 terminated the call or instructed anyone to call the police.

16.     The armed suspects gave W1 an empty cloth bag and instructed him to enter the bank and remove money from the vault. W1 did as instructed and obtained approximately $195,000 in cash and placed the money inside the bag and left the bank. The armed suspects met W1 in the SmartBank's parking lot. The passenger side door opened up and one of the armed suspects instructed W1 to hand over the money bag. W1 asked if, after turning over the money bag, his wife and child would be released. The armed suspect again directed W1 to turn over the money bag and also informed W1 that his family would not be released, but that they would not be hurt so long as W1 complied. W1 gave the money bag to the armed suspect and the car immediately sped away with W2 and W3 still in the car, leaving W1 in the bank parking lot.

17.     While in the car, W2 could hear the armed suspects talking to each other. She also heard what sounded like the two armed suspects talking to another person who was not inside the car.

18.     The armed suspects drove to a densely wooded area off of a gravel road on Pipkin

Lane. W2 was told to remain in the car and count for approximately ten minutes, after which

W2 could get out of the car and find her car keys on the ground. W2 heard the men get out of

her car and moments later heard another vehicle. After several minutes, W2 got out of her car,

found her keys, and drove to find help.

### Vehicle Chase—September 3, 2015

19.     On September 3, 2015, the North Carolina State Highway Patrol (NCSHP) was

involved in a vehicle pursuit with a vehicle determined to be stolen from New Hampshire. Two

white males, each carrying black duffel bags, fled from the vehicle and were pursued on foot, but

the pursuit was terminated by the Trooper, who believed he was going to be ambushed. The

subjects escaped.

### Attempted Robbery of Northeast Community Credit Union—October 21, 2015

20.     On the morning of October 21, 2015, an employee (hereinafter "X1") at Northeast

Community Credit Union (NCCU), located in Elizabethton, Tennessee, exited her residence with

her three year old son (hereinafter "X2") on her way to work. X1 took X2 to the right rear

passenger side of her vehicle and placed him in his car seat.

21.     As X1 was securing X2 in his car seat, X1 heard footsteps behind her. When she

looked up, X1 saw an adult male dressed in black, wearing a black ski mask walking towards

her. The masked male brandished a black, semi-automatic pistol in his right hand and a crowbar

with yellow on it in his left hand. The armed male was wearing black gloves and pointed the gun

at X1 as he moved towards her.

22. X1 thought the armed male was her brother-in-law attempting to scare her so she grabbed his gun and pushed him away. In response, the armed male shoved X1, who fell into her vehicle. After coming to her senses, X1 observed a second adult male, dressed in similar clothing as the other male appear from behind X1's husband's vehicle. This second male did not appear to be carrying a weapon.

23. The armed male advised X1 that he and his associate were planning to rob NCCU. The armed male directed X1 to get into her vehicle, to which X1 agreed. X1 crawled over X2's car seat and positioned herself in the left rear passenger seat of her vehicle, beside of her son and directly behind the driver. The masked males got into X1's vehicle and shut their doors. The armed male sat in the driver's seat and the other male sat in the right front passenger seat. The male in the passenger seat shoved a black and gray duffel bag, with wheels and a handle, into the back seat with X1.

24. The armed male asked X1 what time she began work at NCCU. X1 informed him that her work day started at 7:45 a.m. and that it would be suspicious if she were late. The armed male questioned X1 about the arrival times of NCCU employees. X1 stated that NCCU's head teller (hereinafter "X3") arrived early, but the remaining bank employees arrived around 8:15 a.m. or 8:20 a.m. The armed male used X1's mobile telephone to send X3 a text message advising X3 that X1 would be a few minutes late to work. Afterwards, one of the male individuals handed X1 a black headband and instructed X1 to place the headband over her eyes. X1 was also instructed to place the scarf she was wearing around her eyes. Once X1 was blindfolded, the armed male exited X1's residence in X1's vehicle. X1's son began to cry and the male in the passenger seat told X1 to shut X2 up.

25.     After driving approximately five minutes the vehicle stopped, the male in the passenger seat exited the vehicle and the vehicle sped off. X2 began to cry and wanted to see his mother's face. The armed male allowed X1 to remove her blindfold to calm her son. With her blindfold removed, X1 noticed that they were being followed by a black Jeep with a chrome grill.

26.     During the trip, X1 overheard the verbal directions from a global positioning system (GPS), but was unable to understand what was being said. X1 also overheard the driver, possibly using a headset, talking with someone. X1 only heard the driver's side of the conversation, but he was using law enforcement or military type jargon.

27.     The driver instructed X1 to place the blindfold back over her eyes. He drove for approximately 10 more minutes before stopping again in an area that smelled like woods. He got out of X1's vehicle, but left the driver's door open. The driver spoke with someone but X1 could not hear what they were saying. A passenger got into the car with the driver and they sat there a few minutes. The driver told X1 that it would all be over quickly, and for her to just go in and get the money. The driver told X1 to stay calm and that if the "cops" were called that there would be a gunfight and she and her son would be in the middle of it.

28.     A few minutes after leaving the second location, the driver asked X1 which end to pull in to. X1 advised the driver that she would have to remove her blindfold to see where to go. When X1 removed her blindfold, she noticed the subjects had changed their masks. They were no longer wearing ski masks, but pull over type masks depicting old man faces. These masks had black hair on the back and both subjects had placed baseball style caps on their heads on top of the masks. X1 observed an assault rifle lying on the center console between the front

8

passenger seats. There was also a GPS unit on the center console closer to the radio area of the vehicle.

29.    Once at NCCU, the driver instructed X1 to go inside NCCU, get $350,000.00 and be back within five minutes. The driver further instructed X1 not to get bait money, wires, or dye packs and not to contact law enforcement. X1 took the black duffel bag and went inside NCCU.

30.    X3 was present at NCCU when X1 entered the building. X1 advised X3 there were two men outside NCCU holding her son hostage and that she had five minutes to get money from NCCU. X1 pleaded with X3 to open the vault, but X3 refused to open it. X3 eventually gave the combination to X1, but refused to help X1 open the vault. X1 asked two other NCCU employees for assistance, which met with negative results. X1 grabbed the duffel bag and returned to her vehicle. X1 wrapped her arms around her son and told the males that she was unable to get inside the vault. X1 begged the men to not kill her and her son. X1 also told the men that X3 had called the police.

31.    The driver placed X1's vehicle in reverse and gave X1 her blindfold to place back over her eyes. The driver exited through the credit union entrance and sped away nearly striking another NCCU employee's vehicle in the process.

32.    X1's vehicle eventually stopped and the men exited the vehicle. The driver opened the rear, driver's side, passenger door and instructed X1 not to look up as he removed her blindfold. There was a 31 bag in X1's vehicle which the driver instructed her to place over her head. The driver told X1 to wait ten minutes, not to move, and then she could call the police and was free to leave. As soon as X1 heard another vehicle moving she looked up and saw the black

Jeep leaving the area. X1's keys were left in the driver's floor and her mobile telephone was left in the passenger's floor. X1 contacted her husband and police for assistance.

## Examination of the GPS from September 3, 2015 Vehicle Chase

33.     Suspecting that the subjects were related to the aforementioned robberies, FBI Johnson City Resident Agency (JCRA), Knoxville Division, SAs obtained the GPS found in the abandoned, stolen vehicle on September 3, 2015 from the NCSHP. The GPS was forensically examined and found to list a track to address, 124 Rebel Ridge Road, Canton, North Carolina. Further investigation revealed the address was managed by the rental company, Premier Vacation Rentals (PVR).

34.     JCRA SAs contacted PVR and learned that two white males, in their 30s, began renting cabins from PVR on June 19, 2015.  The same two males stayed at 124 Rebel Ridge Road from July 27, 2015 through October 25, 2015. The cabin rental was extended to November 15, 2015. The employee said the two males placed a deposit on "Southern Comfort" to be occupied on November 16, 2015, which has been identified as a nickname for 380 Allison Drive, Maggie Valley, North Carolina, another property managed by PVR.

## Tracking to 380 Allison Drive, Maggie Valley, North Carolina

35.     FBI Asheville Resident Agency, Charlotte Division, obtained a consent to search of 124 Rebel Ridge Road and processed the scene for trace evidence on November 19, 2015. The FBI also notified Haywood County Sheriff's Office (HCSO) about their actions and the unfolding investigation. HCSO agreed to conduct physical surveillance on the residence located at 380 Allison Drive, Maggie Valley, North Carolina, when available, in order to determine if there were any new vehicles arriving or if probable cause for arrest could take place.

36.     On November 24, 2015, HCSO investigators were conducting surveillance near 380 Allison Drive, Maggie Valley, North Carolina when they observed a maroon Toyota Highlander with a South Carolina license tag leave the residence driven by a white male. Surveillance was conducted as the vehicle drove into Maggie Valley and stopped at a gas station. Investigators ceased surveillance after the vehicle was observed returning to 380 Allison Drive, Maggie Valley, North Carolina. A registration check of that tag returned to a GMC Yukon.

### Vehicle Chase—November 25, 2015

37.     On November 25, 2015 at approximately 11:30 A.M. your affiant was notified by HCSO investigators that a surveillance team had observed a gray Nissan Pathfinder, occupied by two white males leaving 380 Allison Drive, Maggie Valley, North Carolina. They conducted a registration check of the vehicle and determined it to have stolen license tags out of Maryland.

38.     NCSHP Troopers were notified and a traffic stop was attempted on I-26 Eastbound. The driver ignored the emergency lights and sirens of the NCSHP vehicles and proceeded on I-26 Eastbound to Long Shoals Road, at which point it exited the Interstate and re-entered the I-26 Eastbound on-ramp. The driver stopped, the passenger door opened, and a white male, later identified as MICHAEL ANTHONY BENANTI (BENANTI), exited the vehicle and was taken into custody.

39.     The driver proceeded onto I-26 Eastbound until driving into the median and began driving on I-26 Westbound towards the Long Shoals exit. The driver continued on Long Shoals and left the roadway into a construction site, at which time he exited the vehicle and fled on foot. During the foot pursuit the driver reached into his jacket and yelled "You want to get shot" at pursuing officers. The driver was taken into custody shortly thereafter. The driver refused to provide identity, but was later identified to be BRIAN WITHAM (WITHAM). Law

11

enforcement officers determined that the Nissan Pathfinder occupied by WITHAM and BENANTI was stolen out of Maryland, in addition to having stolen Maryland license tags.

40.     BENANTI was transported to the scene where WITHAM was taken into custody. While BENANTI was handcuffed he began fidgeting and in what was believed to be an effort to conceal an item in his hand. Officers seized from his hand a balled-up sheet of paper which had handwritten notes of addresses later identified as bank locations, and names of individuals later confirmed to be bank employees. This sheet of paper also contained South Carolina license tag numbers. Also contained in the note were the words "FIND CEO," "FIND CARS AT BRANCH," and "CALL, WATCH IT CLOSE."

41.     Both BENANTI and WITHAM had black bags, each of which contained black rubber gloves. BENANTI kept his bag with him when he was taken into custody and WITHAM's bag was carried with him during the foot pursuit. BENANTI's black bag also contained a digital camera, food items, a cell phone charger, a stocking cap, and a monocular scope. BENANTI was in possession of approximately $1500 and a key to a Lincoln vehicle.

42.     Upon WITHAM being transported to Buncombe County Detention Facility (BCDF), the NCSHP Trooper who was involved in the vehicle chase on September 3, 2015 positively identified WITHAM to be the driver who fled from him during the earlier chase. The same Trooper did not identify BENANTI as being involved in that same pursuit.

43.     At NCSHP's request, a search of the stolen Nissan Pathfinder was conducted by the APD. During the search, the APD recovered a black stocking cap, gloves, a Samsung mobile telephone, model SM-JV100VPP, IMEI 990004877724405, and an LG mobile telephone, model LG-VS450PP, S/N 408CYPY0157360, MEID HEX A0000034F8185E, with batteries removed and wrapped in plastic. A full 5-gallon can of gasoline was located in the vehicle.

12

44.     On November 25, 2015, the APD provided the Samsung mobile telephone, model SM-JV100VPP, IMEI 990004877724405, and LG mobile telephone, model LG-VS450PP, S/N 408CYPY0157360, MEID HEX A0000034F8185E, found inside the stolen Nissan Pathfinder, to FBI SA Jeffery Blanton. The mobile telephones remained in SA Blanton's custody until the devices were transported to the JCRA on November 27, 2015 and placed into evidence.

45.     The Samsung mobile telephone, model SM-V100VPP, IMEI 990004877724405, and LG mobile telephone, model LG-VS450PP, S/N 408CYPY0157360, MEID HEX A0000034F8185E, have been in FBI custody since November 25, 2015. The mobile telephones have been stored at the JCRA since November 27, 2015.

### Conducting the Forensic Examination

46.     Based upon my training, experience and information related to me by agents and others involved in the forensic examination of computers and mobile devices, I know that computer data can be stored on a variety of systems and storage devices including hard disk drives, floppy disks, compact disks, magnetic tapes, flash drives, thumb drives, zip drives, and memory chips. I also know that during the searches it is not always possible to search computer related equipment and storage devices for data for a number of reasons, including the following:

a. Searching computer systems is a highly technical process which requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software application or operating system that is being searched.

13

b. Searching computer systems requires the use of precise scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden", erased, compressed, encrypted, or password protected data. Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted.

c. The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing hundreds of gigabytes of data are now commonplace in desktop computers. Consequently, each non-networked, desktop computer found during a search can easily contain the equivalent of 7.5 million pages of data, which, if printed out, would completely fill a 10' x 12' x 10' room to the ceiling.

d. Computer users and mobile device users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users and mobile device users can also attempt to conceal data by using encryption, which

14

means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, computer users and mobile device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a computer user and mobile device users can conceal text in an image file which cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband or instrumentalities of a crime.

47. In searching the data, the computer personnel may examine all of the data contained in the computer equipment, mobile devices and storage devices to view their precise contents and determine whether the data falls within the items to be seized as set forth herein. In addition, the computer personnel may search for and attempt to recover "deleted," "hidden" or encrypted data to determine whether the data falls within the list of items to be seized as set forth herein.

48. In order to search for data that is capable of being read or interpreted by a computer, law enforcement personnel will need to seize, "image," copy and/or search the following items, subject to the procedures set forth above:

      a. Any computer equipment, mobile device and storage device which is capable of being used to commit or further the crimes outlined above, or create, access or store the types of evidence, fruits, or instrumentalities of such crimes as outlined in Attachment A;

      b. Any computer equipment or mobile device used to facilitate the transmission, creation, display, encoding or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical

15

scanners which are capable of being used to commit or further the crimes outlined above, or create, access or store the types of evidence, fruits, or instrumentalities of such crimes as outlined in Attachment A;

c. Any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-R, CD-RWs, DVDs, optical disks, flash drives, thumb drives, zip drives, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, and personal digital assistants capable of being used to commit or further the crimes outlined above, or create, access or store the types of evidence, fruits, or instrumentalities of such crimes as outlined in Attachment A;

d. Any documentation, operating logs and reference manuals regarding the operation of the computer equipment, storage devices or software;

e. Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices or data to be searched;

f. Any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the computer equipment, storage devices or data; and

g. Any passwords, password files, test keys, encryption codes or other information necessary to access the computer equipment, storage devices or data.

## Conclusion

49.    Based on the aforementioned information, I have probable cause to believe, and I do believe, that evidence, contraband, fruits, and instrumentalities of violations of Title 18, U.S.C. §§ 2113 and Title 18, U.S.C. §§ 1201 as set forth above and in Attachment A, are currently located on the Samsung mobile telephone, model SM-V100VPP, IMEI 990004877724405, and LG mobile telephone, model LG-VS450PP, S/N 408CYPY0157360, MEID HEX A0000034F8185E, seized by the APD during the search of a stolen Nissan Pathfinder on November 25, 2015. Accordingly, I seek permission to search the Samsung mobile telephone, model SM-V100VPP, IMEI 990004877724405, and LG mobile telephone, model LG-VS450PP, S/N 408CYPY0157360, MEID HEX A0000034F8185E for evidence of a crime, contraband, fruits of crime, or other items illegally possessed, and property designed for use, intended for use, or used in committing a crime.

Respectfully submitted,

David Delano Bishop
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on _December 4_, 2015

H. Bruce Guyton
United States Magistrate Judge
Eastern District of Tennesse

17

## ATTACHMENT A

1.    All records on the Devices described in Attachment A that relate to violations of 18, U.S.C. §§ 2113, 1201, 924(c) and 371, including:

    a.  any and all correspondence pertaining to financial institutions and their employees;

    b.  any and all information related to sources of information (including names, addresses, phone numbers, or any other identifying information);

    c.  graphic images or video files associated with potential targets, including financial institutions and their employee, their employees' residences, and the employees family and friends;

    d.  any information regarding WITHAM's and BENANTI's schedule or travel;

    e.  all bank records, checks, credit card bills, account information, and other financial records;

    f.  any information regarding WITHAM's and BENANTI's acquisition and/or use of firearms and/or ammunition;

    g.  any information regarding WITHAM's and BENANTI's production and/or acquisition of fake identification documents

2.    Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

3.      As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

2.  Netgear, model Aircard 770S, IMEI 014113000340278.

## December 3, 2015

1.  N9 listening device (no S/N).

2.  64GB SanDisk Ultra Plus Alpha SanDisk memory card, S/N BN1421650085G.

3.  T-Mobile prepaid card, SIM card number 8901260133532212540F.

2