# UNITED STATES DISTRICT COURT

for the
Eastern District of Tennessee

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

**ALL CELLULAR TELEPHONES, ELECTRONIC**
**DEVICES, PORTABLE STORAGE DEVICES, AND**
**EQUIPMENT LISTED IN ATTACHMENTS A, B AND C,**
**WHICH ARE CURRENTLY IN THE POSSESSION OF**
**THE FEDERAL BUREAU OF INVESTIGATION, WITHIN**
**THE EASTERN DISTRICT OF TENNESSEE.**

)
)
)
)
)
)
)

Case No. 3:16-MJ- 1036

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the        Eastern        District of        Tennessee

*(identify the person or describe the property to be searched and give its location)*:  **ALL CELLULAR TELEPHONES, ELECTRONIC DEVICES, PORTABLE STORAGE DEVICES, AND EQUIPMENT LISTED IN ATTACHMENTS A, B AND C, WHICH ARE CURRENTLY IN THE POSSESSION OF THE FEDERAL BUREAU OF INVESTIGATION, WITHIN THE EASTERN DISTRICT OF TENNESSEE.**

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:  **SEE ATTACHMENT D.**

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

**YOU ARE COMMANDED** to execute this warrant on or before        April 13, 2016
                                                                                                *(not to exceed 14 days)*

☒ in the daytime  6:00 a.m. to 10 p.m.        ☐ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge
C. Clifford Shirley, Jr.
                        *(name)*

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*  ☐ for _____ days *(not to exceed 30).*
                                                ☐ until, the facts justifying, the later specific date of _____

Date and time issued:    3/30/16  3:34 pm        *C. Clifford Shirley, Jr.*
                                                                                *Judge's signature*

City and state:    Knoxville, Tennessee            C. Clifford Shirley, Jr., U.S. Magistrate Judge
                                                                        *Printed name and title*

# ATTACHMENT A

1. iPhone 4, Model MC924LL/A, S/N C8PHHMAL, white with purple case, cellular telephone number 516-356-0276 (Bogoev's iPhone) ~~s

2. Flash Drive (found on dresser in Michael Benanti bedroom)

3. Brookstone HD Video Pen, 4GB USB

4. Mini Digital Video Camera in black case

5. Verizon Samsung flip cellular telephone, MEID A00000458EiAF0, cellular telephone number 862-309-1216

6. iPhone 4, Model MC924LL/A, S/N C8PHHM9TDTD0, white, cellular telephone number 570-510-8794

7. AT T LG cellular telephone, black S/N 310KPPB279720

8. Manilla envelope containing six (6) flash drives and three (3) SD cards

9. LG cellular telephone, S/N 401KPYR210322, black, cellular telephone number 570-580-8861

10. Two (2) USB Flash Drives labeled "Prisoner Assistant"

11. iPad, S/N DLXFR57KDKPJ

12. USB 8GB Flash Drive

13. LG cellular telephone, IMEI 013695000342560, black, cellular telephone number 570-580-2626

14. LG cellular telephone, S/N 310KPKN171157, white, cellular telephone number (570) 580-8862

15. iPhone 6, IMEI 35690006128902 (Benanti's phone) cw PIN# 1650

# ATTACHMENT B

1.    One black Verizon LG cellular telephone, Serial Number 50BCQA51131136

2.    i-Phone, IMEI 356990060427129

## <u>ATTACHMENT C</u>

1.      White i-Pad, MDL: A1459, Serial Number: DMPJL5HSF18D

# ATTACHMENT D

(Items to be seized)

1.   Any and all computer correspondence pertaining to the target offenses.

2.   Evidence of criminal activity, in whatever form, as defined in the target offenses.

3.   Any and all computer correspondence (1) offering to transmit through interstate commerce, including by United States mail or by computer, any visual depiction of violations of the target offenses.

4.   Any and all electronic communications pertaining to the target offenses.

5.   Photographs, pictures, and movies, depicting evidence of the target offenses.

6.   Information leading to the identity and location of victims or other co-conspirators, pertaining to the target offenses.

7.   Electronic writings including but not limited to diaries, ledgers, letters, or other correspondence pertaining to the target offenses.

8.   Electronic correspondence identifying persons transmitting through the United States mail, or by computer, any visual depiction of the target offenses.

9.   Address books and phone books that might contain information on other subjects and/or victims, pertaining to the target offenses.

10.  Information evidencing the disposition of any money obtained via the commission of any of the target offenses.

11.  Evidence of user attribution for all devices.

# UNITED STATES DISTRICT COURT

for the

Eastern District of Tennessee

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

Case No. 3:16-MJ-__1036__

**ALL CELLULAR TELEPHONES, ELECTRONIC DEVICES, PORTABLE STORAGE DEVICES, AND EQUIPMENT LISTED IN ATTACHMENTS A, B AND C, WHICH ARE CURRENTLY IN THE POSSESSION OF THE FEDERAL BUREAU OF INVESTIGATION, WITHIN THE EASTERN DISTRICT OF TENNESSEE.**

)
)
)
)
)
)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that there is now concealed on the following person or property located in the ___Eastern___ District of ___Tennessee___ *(identify the person or describe property to be searched and give its location):* **ALL CELLULAR TELEPHONES, ELECTRONIC DEVICES, PORTABLE STORAGE DEVICES, AND EQUIPMENT LISTED IN ATTACHMENTS A, B AND C, WHICH ARE CURRENTLY IN THE POSSESSION OF THE FEDERAL BUREAU OF INVESTIGATION, WITHIN THE EASTERN DISTRICT OF TENNESSEE.**

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized):* **SEE ATTACHMENT D.**

The basis for the search under Rule 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

*for list of statutory violations* *KCN* *(JCS)*

The search is related to a violation of __ (see paragraph 3 of attached affidavit), and the application is based on these facts: **SEE ATTACHED AFFIDAVIT OF SPECIAL AGENT KRISTINA L. NORRIS ATTACHED HERETO AND INCORPORATED HEREIN.**

X Continued on the attached sheet.

☐ Delayed notice of ___ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_Applicant's signature_

Kristina L. Norris, Special Agent FBI
_Printed name and title_

Sworn to before me and signed in my presence.

Date: __3/30/16__

_Judge's signature_

C. Clifford Shirley Jr., U.S. Magistrate Judge
_Printed name and title_

City and state: ___Knoxville, Tennessee___

## ATTACHMENT A

1. iPhone 4, Model MC924LL/A, S/N C8PHHMAL, white with purple case, cellular telephone number 516-356-0276 (Bogoev's iPhone) [w]

2. Flash Drive (found on dresser in Michael Benanti bedroom)

3. Brookstone HD Video Pen, 4GB USB

4. Mini Digital Video Camera in black case

5. Verizon Samsung flip cellular telephone, MEID A00000458EiAF0, cellular telephone number 862-309-1216

6. iPhone 4, Model MC924LL/A, S/N C8PHHM9TDTD0, white, cellular telephone number 570-510-8794

7. AT T LG cellular telephone, black S/N 310KPPB279720

8. Manilla envelope containing six (6) flash drives and three (3) SD cards

9. LG cellular telephone, S/N 401KPYR210322, black, cellular telephone number 570-580-8861

10. Two (2) USB Flash Drives labeled "Prisoner Assistant"

11. iPad, S/N DLXFR57KDKPJ

12. USB 8GB Flash Drive

13. LG cellular telephone, IMEI 013695000342560, black, cellular telephone number 570-580-2626

14. LG cellular telephone, S/N 310KPKN171157, white, cellular telephone number (570) 580-8862

15. iPhone 6, IMEI 35690006128902 (Benanti's phone) PIN# 1650

## ATTACHMENT B

1.    One black Verizon LG cellular telephone, Serial Number 50BCQA51131136

2.    i-Phone, IMEI 356990060427129

## <u>ATTACHMENT C</u>

1.      White i-Pad, MDL: A1459, Serial Number: DMPJL5HSF18D

# ATTACHMENT D

## (Items to be seized)

1.  Any and all computer correspondence pertaining to the target offenses.

2.  Evidence of criminal activity, in whatever form, as defined in the target offenses.

3.  Any and all computer correspondence (1) offering to transmit through interstate commerce, including by United States mail or by computer, any visual depiction of violations of the target offenses.

4.  Any and all electronic communications pertaining to the target offenses.

5.  Photographs, pictures, and movies, depicting evidence of the target offenses.

6.  Information leading to the identity and location of victims or other co-conspirators, *pertaining to the target offenses.* *KCA*

7.  Electronic writings including but not limited to diaries, ledgers, letters, or other correspondence pertaining to the target offenses.

8.  Electronic correspondence identifying persons transmitting through the United States mail, or by computer, any visual depiction of the target offenses.

9.  Address books and phone books that might contain information on other subjects and/or victims, *pertaining to the target offenses.* *KCA*

10. Information evidencing the disposition of any money obtained via the commission of any of the target offenses.

11. Evidence of user attribution for all devices.

# AFFIDAVIT

I, Kristina L. Norris, being duly sworn, depose and state:

1.        I am a Special Agent of the Federal Bureau of Investigation (FBI), and, as such, I am an investigative or law enforcement officer of the United States within the meaning of Rule 41(a)(2)(C) of the Federal Rules of Criminal Procedure.  I have engaged in the enforcement of criminal laws and am within a category of officers authorized by the Attorney General to request and execute search warrants pursuant to 18 U.S.C. §§ 3052 and 3107.  I have been a Special Agent with the FBI since 2005.  I am currently assigned to the FBI Knoxville Division. Prior to this assignment, I was assigned to the FBI Boston Division, FBI Headquarters Counterterrorism Division, and FBI New York City Division.  I was previously employed as a sworn police officer with the Knoxville Police Department from 1994 to 2005.

2.        During my tenure as a law enforcement officer I have investigated a wide range of state and federal criminal violations, including those involving violent crime, gang activity, drug trafficking, money laundering, mail and wire fraud, and crimes against children.  Since 1994, I have received training and have experience in interviewing and interrogation techniques, arrest procedures, search and seizure, search warrant applications, and various other crimes and investigative techniques.  In my training and experience I have learned how participants in organized criminal activity use computers, cellular phones, both voice and text, to perpetuate and conceal criminal activity, and communicate with other participants in criminal activity.

1

3. The statements contained in this affidavit are based on an investigation conducted by FBI and other law enforcement officers. This affidavit is submitted in support of an application for a search warrant authorizing the search of electronic devices and storage media seized by the FBI, more fully described in Attachment D of this affidavit which is incorporated herein by this reference. These items are evidence, contraband, fruits, and instrumentalities of violations of armed bank robbery and extortion (18 U.S.C. § 2113(a)(d)(e)), kidnapping (18 U.S.C. § 1201(a)(1)), carjacking (18 U.S.C. § 2119), interstate transportation of stolen motor vehicles (18 U.S.C. § 2312), Hobbs Act robbery (18 U.S.C. § 1951), carrying a firearm during and in relation to the commission of a crime of violence (18 U.S.C. § 924 (c)(1)(A)(ii)), conspiracy to commit money laundering (18 U.S.C. § 1956(h)), engaging in monetary transactions in property derived from specified unlawful activity (18 U.S.C § 1957), mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. §1343), conspiracy to commit mail and wire fraud (18 U.S.C. § 1349), possession of a firearm by a convicted felon (18 U.S.C. § 922(g)(1)), and obstruction of justice (18 U.S.C. § 1512) (hereinafter the "target offenses") more fully described in Attachments A, B , and C of this affidavit, which are incorporated herein by this reference.

## Details of the Investigation

4. The information set forth below is provided as a broad overview of the investigation conducted to date, which includes information from detailed debriefings with Brian Witham (Witham), as well as review of surveillance videos, victim/witness interviews, recorded jail calls, and analysis of physical and documentary evidence gained from the execution of prior federal search warrants in this case. This affidavit, however, does not include a listing of all investigative techniques employed or the full and complete results of any of the listed investigative efforts.

2

## Armed Robbery of Peoples Security Bank & Trust - September 12, 2014

5.    On September 12, 2014, two males, later identified as Michael Benanti (Benanti) and Witham, entered the Peoples Security Bank and Trust (PSBT), the deposits of which were then insured by the Federal Deposit Insurance Corporation, located on North Gravel Pond Road, Clarks Summit, Pennsylvania.

6.    Benanti and Witham wore full facial coverings, gloves and hats while brandishing sawed-off shotguns. Benanti and Witham entered the bank just prior to opening. Benanti and Witham had previously selected the PSBT and Witham conducted physical surveillance on the bank in preparation of this robbery. Benanti and Witham hid in a wooded area adjacent to the bank, waiting for the bank employees to arrive for work.

7.    Analysis of the exterior and interior PSBT surveillance video showed that when the tellers exited their vehicles and walked towards the bank's entrance, they were immediately approached by Benanti and Witham. Benanti and Witham displayed firearms. A bank employee then opened the bank door.

8.    Once inside the bank, the surveillance video showed Benanti ordering the female bank employees to the ground and Witham ordering the bank manager to open the bank vault. Benanti and Witham stole approximately $156,000.00 from the bank. Benanti and Witham fled the bank in a stolen charcoal grey Jeep Grand Cherokee, which they had previously concealed in the adjacent wooded area.

9.    The Jeep Grand Cherokee was discovered a few miles from the bank near an abandoned house, fully engulfed in flames.

3

10.    The $156,000 in PSBT robbery money has not been recovered by law enforcement.

### Attempted Vehicle Theft in Fayetteville, North Carolina – December 10, 2014

11.    In the early morning hours on December 10, 2014, Benanti was apprehended by an officer with the Fayetteville, North Carolina police department as he and Witham attempted to steal vehicles from the lot of the Reed-Lallier Chevrolet dealership.

12.    Benanti and Witham fled police on foot.  Witham got away but Benanti was apprehended by police.  Benanti was charged with various felony state offenses, including felony breaking and entering, felony conspiracy, felony attempted larceny, and felony possession of a Schedule II controlled substance.  The charges, however, were subsequently dismissed by the Cumberland County District Attorney's Office.

### Attempted Armed Extortion of
### Achieve Financial Credit Union – February 22, 2015

13.    Benanti and Witham used cell phones, including disposable cell phones (also known as "burner phones," which in your affiant's training and experience, are inexpensive cellular phones used to facilitate criminal activity for a period of time and then disposed of), to research Connecticut bank executives to kidnap in the area; they focused on executives and/or executives' family members who maintained a social media presence on websites such as Facebook and LinkedIn.  Benanti and Witham ultimately decided to target the Chief Financial Officer (CFO) of the Achieve Financial Credit Union in New Britain, Connecticut, the deposits of which were insured by the National Credit Union Administration Board.  The CFO lived with his 70-year-old mother, in a house on Lufkin Lane in Bristol, Connecticut.  Benanti and Witham prepared for this crime by arming themselves with real firearms and

4

constructing devices made to look like home-made explosives but which were fakes. They also decided to wear all black clothing and represent themselves to be police officers during the crime.

14.     Shortly before midnight on February 22, 2015, the CFO arrived home and as he was in his garage he observed a man dressed in black, including black facial coverings, running down his driveway pointing a gun at him saying "police, get down!" The CFO got down on his knees and the masked man put the gun to the CFO's head, at which time the CFO observed another armed man dressed in black who also said, "police!" The two men, later identified as Benanti and Witham, then encountered the CFO's mother as she peered into the garage, at which point one of the defendants pointed a gun at her and said, "don't be alarmed, we're the police." Benanti and Witham then forced the CFO and his mother at gunpoint from the garage to the house. The mother was moved at gunpoint from the living room to her bedroom where she was bound on her bed.

15.     Benanti and Witham remained with the CFO and his mother through the morning hours of February 23, 2015. During that time, Benanti and Witham instructed the CFO to go to the Achieve Financial Credit Union and remove a large quantity of money. They taped one of the "explosives" to the CFO's torso and told him it would detonate at 11:00 a.m., they also told the CFO that another "explosive" was placed in his mother's room and it too would detonate if he failed to do as they instructed. In response to these threats the CFO, with the "explosive" taped to his body, drove to the Achieve Financial Credit Union and was eventually intercepted by law enforcement. Benanti and Witham determined to abort their plans while the CFO was gone and they left the CFO's home in a Honda CRV. Benanti and Witham

5

escaped to New York where they set the Honda CRV on fire. Benanti and Witham then made their way back to North Carolina and began renting cabins under false names.

### Attempted Armed Extortion of Y-12 Federal Credit Union - April 28, 2015

16.     On the morning of April 28, 2015, the CEO of the Y-12 Federal Credit Union, his wife, and their teenage son, were accosted by two masked men, later identified as Benanti and Witham – Benanti was wearing a rubber mask depicting a black male with a medium skin tone and Witham was wearing a black facial covering, both were brandishing loaded semi-automatic pistols.

17.     The CEO was instructed by Benanti and Witham to drive to the Y-12 Federal Credit Union located at 501 Lafayette Drive, Oak Ridge, Tennessee, the deposits of which were then insured by the National Credit Union Administration Board, and obtain a large amount of United States currency from the credit union. The CEO complied with Benanti and Witham's demands and proceeded to drive to the credit union. The CEO's wife and son were bound and blindfolded by Benanti and Witham and driven around in a vehicle owned by the victims.

18.     Prior to the CEO departing his residence for the credit union, Benanti and Witham used the CEO's cellular telephone to connect to his wife's cellular telephone that they had taken. Benanti and Witham instructed the CEO to keep his cellular telephone in his pocket, with the call connected to his wife's phone, so that Benanti and Witham could monitor the CEO's activities while he travelled to and was at the credit union. Benanti and Witham maintained control of the wife's cell phone while driving around in the victims' vehicle.

19.     While at the credit union, the CEO wrote a note to employees referencing a home invasion and robbery because he knew that Benanti and Witham were listening and monitoring his activities. One of the bank employees subsequently contacted the Oak Ridge Police Department regarding the CEO and the note he had given them.

6

20.     The CEO obtained more than $200,000 in United States currency from the credit union vault and returned to his car.  Shortly thereafter, the CEO was approached by officers of the Oak Ridge Police Department.  The CEO announced to Benanti and Witham, through the open line on the cellular telephone, that he was being approached by the police and asked them for instructions. Shortly thereafter, Benanti and Witham aborted their plans, disconnected the call with the CEO, threw the wife's cell phone out of the car window, and a short time later, abandoned the wife and son, still bound and blindfolded, in the parking lot of the Gettysvue clubhouse in Knoxville, Tennessee.  Benanti and Witham exited the victims' vehicle and fled the scene in a stolen black Lexus SUV which they later set on fire causing it to explode.

### Armed Robbery of Ingles – May 6, 2015

21.     On May 6, 2015, Witham entered the Ingles, located at 301 Long Shoals Road, Arden, North Carolina. Witham moved behind the customer service counter, brandished a pistol and demanded money from the safe.

22.     Witham left the store with a reported $15,000.00 in United States currency. Benanti, armed with a loaded AR-15 assault rifle and a two-way radio that allowed him to communicate with Witham, served as a look out while Witham executed the robbery.  Witham got into a stolen white Toyota 4-Runner that he and Benanti were using and they fled the scene.

23.     This robbery money has not been recovered by law enforcement.

### Armed Extortion of SmartBank - July 7, 2015

24.     In the morning hours of July 7, 2015, Benanti and Witham, armed with loaded semi-automatic pistols and a yellow-tipped crowbar, forcibly entered the Knoxville, Tennessee home of a loan officer employed by SmartBank.  The loan officer lived in his home with his wife and 5-month-old infant.  Upon entry, Benanti and Witham chased the loan officer's wife up the

stairs. The family hastily barricaded themselves in the master bathroom as Benanti and Witham used the crowbar to pry open the master bedroom door. Having pried their way into the master bedroom, they next pried their way into the master bathroom. The loan officer and his wife both observed the crowbar used and reported that it had a yellow tip.

25. Once in the master bathroom, Benanti and Witham told the loan officer that he was going to help them rob his bank. Benanti and Witham told the loan officer to put on a shirt with a breast pocket. They then ordered the family downstairs and took the car keys to the wife's car and ordered the family into the garage. Once in the garage, the loan officer observed an assault rifle with a curved magazine in his son's stroller. This assault rifle did not belong to the victims.

26. After directing the wife to place the infant in the car seat, Benanti and Witham bound and blindfolded the loan officer and his wife. The family sat in the back seat of the car while Benanti and Witham occupied the two front seats.

27. Prior to leaving the house in the car, Benanti told the family that failure to do what they demanded could result in the family being killed by Witham.

28. Benanti and Witham parked the car in an area behind the SmartBank, which is located at 202 Advantage Place, Knoxville, Tennessee 37922. The loan officer's blindfold was removed, at which time the loan officer observed that Benanti and Witham were now wearing rubber masks depicting old men faces. Benanti and Witham directed the loan officer to initiate a cell phone call from his cell phone to his wife's cell phone, which they had taken, so that the loan officer could be monitored while inside the SmartBank.

8

29.    Benanti and Witham told the loan officer that they would be monitoring the open line on his wife's cell phone and that his wife and infant son would be hurt if the loan officer terminated the call or instructed anyone to call the police.

30.    The loan officer was given an empty bag and was instructed to enter the bank and remove money from the vault. The loan officer did as instructed and obtained approximately $195,000.00 in cash, which he turned over to Benanti in the parking lot. Benanti and Witham drove to another location, left the wife and infant in the car, and escaped in a different vehicle they had previously stolen.

31.    The $195,000 has not been recovered by law enforcement.

### Vehicle Pursuit- September 3, 2015

32.    On September 3, 2015, the North Carolina State Highway Patrol (NCSHP) was involved in a vehicle pursuit with a Ford Edge determined to be stolen from New Hampshire. The pursuit occurred on I-40 west in western North Carolina near the Tennessee state line. During the pursuit, the Ford Edge attempted to hit other vehicles in an effort to cause the other vehicles to crash, thereby obstructing NCSHP's pursuit. After striking one car, however, the Ford Edge crashed. Two white males, each carrying black duffel bags, fled from the Ford Edge and were pursued on foot, but the pursuit was terminated by the NCSHP Trooper, who believed he was going to be ambushed. The two white males escaped. These subjects were later, in November 2015, determined to be Benanti and Witham.

9

## Attempted Armed Extortion of Northeast Community Credit Union- October 21, 2015

33.     On the morning of October 21, 2015, a teller with the Northeast Community Credit Union (NCCU), located in Elizabethton, Tennessee, the deposits of which were then insured by the National Credit Union Administration Board, exited her residence with her three-year-old son on her way to work.

34.     As the teller was securing her son in his car seat she heard footsteps behind her. When she looked up, she saw an adult male dressed in black, wearing a black ski mask walking toward her. The masked male, later identified as Witham, brandished a black, semi-automatic pistol and a crowbar with yellow on it. Witham was wearing black gloves and pointed the gun at the teller as he moved toward her.

35.     Witham advised the teller that he and his associate were planning to rob NCCU. Witham directed the teller to get into her vehicle. The teller sat directly behind the driver. The armed male, Witham, sat in the driver's seat and the other male, Benanti, sat in the right front passenger seat. Benanti shoved a duffel bag into the back seat with the teller.

36.     Witham took the teller's cell phone and texted the teller's supervisor to let the supervisor know that the teller was going to be running late. Shortly thereafter, the teller was ordered to put on a blindfold.

37.     Witham and Benanti eventually drove to the NCCU. When the teller removed her blindfold, she noticed Benanti and Witham had changed their masks and were now wearing old men masks with black hair on the back with baseball caps. The teller also observed an assault rifle on the center console between the two front seats. There was also a GPS unit on the center console.

10

38.     Once at NCCU, Witham instructed the teller to go inside NCCU, get $350,000.00 and be back within five minutes.  Witham instructed the teller not to get bait money, wires, or dye packs and not to contact law enforcement.  The teller took the duffel bag and went inside NCCU but was unable to get any money, so the teller returned to her car and begged the two men not to kill her or her son.

39.     The teller and her son were dropped off, and Benanti and Witham escaped in a stolen vehicle.

## Review of GPS from Stolen Ford Edge

40.     After the attempted armed extortion of the NCCU, it was learned that the stolen Ford Edge from the September 3, 2015 high-speed chase in North Carolina contained a GPS device.  This device was searched and found to contain historical routes in Knoxville, Tennessee and a route to an address in Canton, North Carolina.  The address led to a rental cabin located at 124 Rebel Ridge Road.

41.     Law enforcement made contact with the rental cabin property manager who told agents that two white males recently vacated the rental cabin located at 124 Rebel Ridge Road and moved to another rental cabin located at 380 Allison Drive.  Law enforcement began to conduct surveillance on the rental cabin located at 380 Allison Drive.

## Vehicle Pursuit- November 25, 2015

42.     While conducting surveillance on the morning of November 25, 2015, law enforcement observed two white males in a Nissan Pathfinder with stolen Maryland plates depart from the rental cabin located at 380 Allison Drive.  The NCSHP attempted to stop the Pathfinder with the stolen plates, which was at that point traveling on I-26 east toward Greenville, South Carolina, but the Pathfinder did not stop and a pursuit ensued.

11

43. Eventually, the Pathfinder pulled over on the shoulder and Benanti got out of the passenger side and was apprehended by law enforcement. The Pathfinder sped off but Witham was apprehended shortly thereafter. It was later determined that the Pathfinder was stolen. At the time of Benanti's arrest, he was carrying a leather bag that contained surveillance equipment, including a digital camera, a cell phone, a monocular device, gloves, trash bags, chocolate and bottled water, and a notebook and pens. Benanti also attempted to destroy a handwritten note that contained the names, addresses, vehicles and other notes pertaining to three bank executives located in South Carolina.

### Search of 380 Allison Drive – November 26, 2015

44. After the vehicle chase involving the stolen Nissan Pathfinder, a search warrant issued in the United States District Court for the Western District of North Carolina was executed at 380 Maggie Valley Drive, Maggie Valley, North Carolina on November 26, 2015. Witham later informed law enforcement that 380 Maggie Valley Drive, Maggie Valley, North Carolina was the residence which he and Benanti shared and used as a base for criminal activity.

45. Pursuant to the search of this residence, numerous electronic devices including cellular telephones, external storage media, a "Go-Pro" camera, and computers were seized. Pursuant to a subsequent search warrant issued in the United States District Court for the Eastern District of Tennessee, these items were forensically analyzed and found to contain fake identifications for Witham and Benanti, thousands of deleted photographs of banks, bank employees and their families, routes to banks, social media accounts for bank employees and their families, and social media accounts in the alias identification of Witham and Benanti. Witham later indicated to law enforcement that these electronic devices were used as part of their criminal activities.

12

46. Law enforcement also found in the residence two loaded semi-automatic pistols and two loaded assault rifles, rubber masks, including old men masks, a black male mask with medium skin tone, and a female mask, wigs, false facial hair, fake tattoos and a crow bar with a yellow tip.

47. Law enforcement also found several documents pertaining to "Prisoner Assistant, Inc." which, based on information provided by Witham and open source information, including Prisoner Assistant's website and a January 30, 2014 Wall Street Journal profile of Benanti and Prisoner Assistant, is a fee-based company purportedly involved in taking money from prison inmates and their supporters, and claiming to use that money to open bank accounts and move money for the inmate. Based on information provided by Witham and open source information, Benanti was identified as the CEO of Prisoner Assistant, Natasha Bogoev was identified as the CFO and Witham was identified as the company's Director of Special Projects.

### Information Provided By Brian Witham

48. After his arrest on November 25, 2015, Witham provided information to law enforcement on several occasions. Witham confessed to participating with Benanti in a series of armed robberies and armed extortions including, importantly, the robberies in the Eastern District of Tennessee involving a yellow-tipped crowbar, assault rifles, old-men masks, and other disguises. Additionally, Witham told law enforcement that he (Witham) and Benanti used electronic devices to manufacture fraudulent identification documents and that Benanti had engaged in a bank fraud scheme using stolen identities.

13

49.     Witham further informed law enforcement that a portion of the proceeds from the armed robberies and armed extortions were funneled into Benanti's business, Prisoner Assistant, which was located and operated out of the basement of Benanti's residence, located at 410 Mountain Woods Drive, Lake Harmony, Pennsylvania. Witham further explained that Benanti had been stealing inmate money from Prisoner Assistant accounts, and was using bank robbery, and other illegally obtained funds, to keep the business solvent.

50.     Witham confirmed that he and Benanti utilized disposable cellular phones, commonly referred to as "burner" phones, to communicate with one another, conduct criminal activity, and to conduct social media surveillance of potential victims. Witham also explained that he and Benanti commonly used surreptitious video recording devices, such as "GoPro" cameras, to monitor the patterns of potential victims and that the digital downloads of these surveillance files were maintained on external storage devices.

51.     Witham further explained that he and Benanti used portable electronic devices to connect public internet access points in order to research potential victims and to access alias social media accounts. "Burner" phones, tablets, and other such mobile electronic devices served as the conduit for this activity. Witham was aware that Benanti's Pennsylvania residence concealed additional evidentiary items of criminal activity.

52.     On December 15, 2015, a federal grand jury in the Eastern District of Tennessee found probable cause to believe that Benanti and Witham committed a host of violent federal crimes, including the Y-12 Federal Credit Union, SmartBank, and NCCU armed extortions, and the grand jury returned a 15-count federal indictment against both men. See ECF Entry 3, Case Number 3:15-CR-177.

53. On March 1, 2016, Witham appeared before the District Court in the Eastern District of Tennessee and pled guilty to many of the crimes contained in the above referenced indictment, including the Y-12 Federal Credit Union, SmartBank, and NCCU armed extortions, and he also pled guilty to, among other things, the PSBT armed robbery that arose out of the Middle District of Pennsylvania, the Achieve Financial Credit Union attempted armed extortion that arose out of the District of Connecticut, and the Ingles armed robbery that arose out of the Western District of North Carolina. See ECF Entries 24 (Plea Agreement) and 26 (Minute Entry), Case Number 3:15-CR-177.

### Search of Prisoner Assistant and Benanti's residence – December 15, 2015

54. On December 15, 2015, a federal search warrant was issued in the District Court for the Middle District of Pennsylvania authorizing the search of Prisoner Assistant and Benanti's residence located 410 Mountain Woods Drive, Lake Harmony, Pennsylvania. Numerous electronic devices were seized during the search, which are listed in Attachment A of this Affidavit. The FBI also found a container in Benanti's office that contained disguises similar to the disguises found at 380 Allison Drive, including a rubber mask depicting a human face, wigs, false facial hair, fake tattoos, and shirts and hats bearing law enforcement insignia, including "FBI" and "NYPD".

55. On December 16, 2015, Prisoner Assistant employees Leah White (White) and Becky Bixler (Bixler) provided the electronic items described in Attachments B and C to the FBI. These items were previously provided to White and Bixler by Benanti, but were not discovered during the search which occurred on December 15, 2015.

15

56. As stated above, Natasha Bogoev was Prisoner Assistant's CFO, and she was also Benanti's girlfriend. On or about October 30, 2015, law enforcement found Bogoev's body in a hotel room in Pennsylvania. Bogoev died as a result of being shot in the head. Bogoev's death is alleged to have been a suicide. It is believed that Bogoev's iPhone is listed on Attachment B as number 1.

## Benanti Jail Calls

57. Your affiant has listened to many of Benanti's jail calls. Based on your affiant's training and experience, as well as your affiant's knowledge of the details of this investigation, several of Benanti's jail calls corroborate information provided by Witham and they also provide additional evidence of the commission of several of the target offenses, including conspiracy to commit money laundering, engaging in monetary transactions with proceeds of specified unlawful activity, conspiracy to commit mail and wire fraud, and obstruction of justice.

58. Shortly after his arrest in Fayetteville, North Carolina on December 10, 2014, Benanti made a recorded jail call to Bogoev. This call occurred approximately ten months before Bogoev's death. At the time of the call, Bogoev was employed as the CFO for Prisoner Assistant. During the call, Benanti instructed Bogoev to provide bond money to Benanti. Specifically Benanti directed Bogoev to "call any bail bondsman in North Carolina in Fayetteville. I'm in Cumberland County, you have to get this money here, $2,000 now, I don't care what account you pull it from, you have to wire it, use a debit card, it has to get here now, I need to be bailed out as soon as humanly possible."

59. On December 1, 2015, Benanti called Prisoner Assistant. A woman answered the phone and said, "Prisoner Assistant, how may I help you?" Benanti replied, "Hi, this is Michael Benanti, your boss" and he asked to speak with Leah [White] or Becky [Bixler], both of whom were then employed by Prisoner Assistant. Bixler then came on the phone and Benanti told her

16

he was in "bad trouble" and instructed Bixler to "go into another room and get a paper and pen." Benanti then told Bixler, "Listen, this call is recorded and it's monitored so pay attention and, and just try and understand me. I went up to North Carolina, I went and saw Brian and, um, we wound up getting pulled over and getting arrested, and the house he was staying at had a bunch of stuff in it. And, uh, the feds are involved, right now they only have me arrested for a car theft but the feds are coming with a massive indictment that's going to be very, very, very bad and, uh, they said I'm going to do life in prison. Um, I need to get money for an attorney and sort this out if, if it's even possible . . . They're gonna put a whole conspiracy on it and it's gonna involve robbery and it's gonna be really bad and, and, and I'm gonna go away forever . . . I want you to take all the money from all the accounts and put it into my personal account, that's my directive . . . Tell my sister to get over there and get everything the hell out of the house, anything you want, take it . . . But I need cash, I mean just go to the bank, if you have the signature authority, go and take out five grand right now, ten grand, and just start, just start taking it out . . ." Bixler then said, "Um, can you uh," but Benanti cut her off and said, "Remember, remember, remember this is recorded, I don't want to get into too many details . . . Just try to get as much cash as you can . . . Just start pulling it 5 grand at a time, 6, 8 grand at a time, start pulling it so the cash is there for when I need it, um, and, and, uh, put it only where you know. Um, and, really, client services stops until this is over . . . All the direct deposits, just move them out, everything, just move them right out . . . I need the best Tennessee lawyer there is, I need a Knoxville, Tennessee lawyer. As a matter of fact, just, just, talk to my sister and talk to my, uh, Aunt, agree on the attorney, call him and hire him tomorrow, just wire the money as quick as the bank can put it, put whatever you put in my personal account, 20, 30, 40 grand and wire it to him, 25 grand, wire it to him."

17

60.    Approximately 13 days before the FBI executed the search warrant on Prisoner Assistant in Pennsylvania, Benanti called Bixler again on December 2, 2015. During this jail call Benanti asked if Bixler and White would keep Prisoner Assistant operational, to which Bixler replied, "Yeah, no, we're, we're just gonna, we're just gonna keep doing it, that's, that's all, we're just gonna keep doing it." Bixler then said that she and White recently discussed Prisoner Assistant's continued operation and said, "What our consensus is right now is that the best thing is just to, we're gonna keep business as usual here." Benanti then instructed Bixler to take possession of his iPhone and to give White Bogoev's iPhone. In addition to his directives regarding the iPhones, Benanti further instructed Bixler to "take, take my iPad, just start taking things, and please start taking her memories, like the memory box that has all of the cards and all of the, um, the email that we printed out, and all of that stuff, pictures, I want, I want, I want, I want you to have them, I want them, I want them to be available if I'm coming back at 65 years old at least I can call you and say there they are." Bixler replied, "Ok, I'll make sure they're safe." Benanti then cautioned Bixler, "Please just get them out of the house, man, because I think at some point they're gonna decide they're gonna go there and look too. I mean, there's nothing there but, you know, what the fuck." Bixler then reassured Benanti and said that she and White are "both on your side, please, believe me."

61.    These calls demonstrate that, at least as of December 1, 2015, Prisoner Assistant was being held out and operated as a going concern and that it would be, as Bixler said, "business as usual," that is, to continue soliciting funds from prison inmates with the representation that such funds would be put in a bank account for the inmate. Additionally, as stated above, a portion of the proceeds from Benanti's and Witham's violent crimes against

18

financial institutions – specified unlawful activities –had been reinvested into Prisoner Assistant to keep it solvent.

62.     These calls also demonstrate that Benanti actively uses Prisoner Assistant accounts for his own personal purposes, such as to pay a bond to get out of jail and to finance his personal criminal defense.  Your affiant has not seen any Prisoner Assistant documentation, nor is your affiant aware of any such documentation, containing representations to potential "clients" (*i.e.*, inmates and their supporters), that the money they entrust to Prisoner Assistant would be used for Benanti's personal expenses.  Indeed, your affiant is aware of at least one Prisoner Assistant client, an inmate in California, who has filed a January 27, 2016 complaint with the Pennsylvania Attorney General's Office regarding a significant amount of money he entrusted to Prisoner Assistant which he has been unable to access.

63.     These calls also demonstrate that Benanti actively attempted to remove, among other items, digital devices, which contain digital evidence, from Prisoner Assistant.

64.     Based upon training and experience, your affiant knows that individuals engaged in criminal activity often maintain electronic ledgers, media, bank documents, and similar wire and electronic communications on digital devices.  Additionally, the unique facts of this case, in conjunction with the data already revealed from digital devices seized to date, demonstrate probable cause to believe that evidence related to the target offenses will be found on the digital devices for which your affiant seeks authorization to search.  These devices may contain information which further identifies the criminal activities under investigation, the location of proceeds from such criminal activity, including the disposition of the approximate $350,000 that was unlawfully obtained from the PSBT, the Ingles, and the SmartBank, a portion of which Benanti and Witham knowingly concealed by plowing it back into Prisoner Assistant.

19

65. The purpose of this application is to obtain the Court's authorization to forensically search specific electronic items seized during the search of Prisoner Assistant and Benanti's residence, 410 Mountain Woods Drive, Lake Harmony, Pennsylvania, on December 15, 2015 and the particular items provided to the FBI by White and Bixler on December 16, 2015 for evidence of the target offenses listed above.

## Conducting the Forensic Examination

66. Based upon my training, experience and information related to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices including hard disk drives, floppy disks, compact disks, magnetic tapes, flash drives, thumb drives, zip drives, and memory chips. I also know that during the search of the premises it is not always possible to search computer equipment and storage devices for data for a number of reasons, including the following:

a. Searching computer systems is a highly technical process which requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software application or operating system that is being searched.

b. Searching computer systems requires the use of precise scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden", erased, compressed, encrypted, or password protected data. Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures

20

are not scrupulously followed. Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted.

c. The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing hundreds of gigabytes of data are now commonplace in desktop computers. Consequently, each non-networked, desktop computer found during a search can easily contain the equivalent of 7.5 million pages of data, which, if printed out, would completely fill a 10' x 12' x 10' room to the ceiling.

d. Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a computer user can conceal text in an image file which cannot be viewed when the image file is opened.

21

Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband or instrumentalities of a crime.

67.     In searching the data, the computer personnel may examine all of the data contained in the computer equipment and storage devices to view their precise contents and determine whether the data falls within the items to be seized as set forth herein.  In addition, the computer personnel may search for and attempt to recover "deleted," "hidden" or encrypted data to determine whether the data falls within the list of items to be seized as set forth herein.

68.     In order to search for data that is capable of being read or interpreted by a computer, law enforcement personnel will need to seize, "image," copy and/or search the following items, subject to the procedures set forth above:

a.  Any computer equipment and storage device which is capable of being used to commit or further the crimes outlined above, or create, access or store the types of evidence, fruits, or instrumentalities of such crimes as outlined in Attachment D;

b. Any computer equipment used to facilitate the transmission, creation, display, encoding or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners which are capable of being used to commit or further the crimes outlined above, or create, access or store the types of evidence, fruits, or instrumentalities of such crimes as outlined in Attachment D;

c.  Any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-R, CD-RWs, DVDs, optical disks, flash drives, thumb drives, zip drives, printer or memory buffers, smart cards, PC cards,

22

memory calculators, electronic dialers, electronic notebooks, and personal digital assistants capable of being used to commit or further the crimes outlined above, or create, access or store the types of evidence, fruits, or instrumentalities of such crimes as outlined in Attachment D;

d. Any documentation, operating logs and reference manuals regarding the operation of the computer equipment, storage devices or software;

e. Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices or data to be searched;

f. Any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the computer equipment, storage devices or data; and

g. Any passwords, password files, test keys, encryption codes or other information necessary to access the computer equipment, storage devices or data.

## Conclusion

69.     Based on the aforementioned information, I have probable cause to believe, and I do believe, that evidence, contraband, fruits, and instrumentalities of violations of the target offenses as set forth above and in Attachment D are currently located on the devices listed in Attachment A which were seized from Prisoner Assistant and Benanti's residence, 410 Mountain Woods Drive, Lake Harmony, Pennsylvania, pursuant to a federal search warrant issued by the District Court for the Middle District of Pennsylvania on December 15, 2015, and Attachments B and C which were provided by Leah White and Becky Bixler, respectively, on December 16, 2015.

23

70.    All devices for which this application seeks search authorization are physically located in the Eastern District of Tennessee.

Kristina L. Norris
Special Agent,
Federal Bureau of Investigation

Subscribed and sworn to before me this 30th day of March, 2016.

Honorable C. Clifford Shirley, Jr.
United States Magistrate Judge

24

# ATTACHMENT A

1.   iPhone 4, Model MC924LL/A, S/N C8PHHMAL, white with purple case, cellular telephone number 516-356-0276 (Bugaev's iPhone)

2.   Flash Drive (found on dresser in Michael Benanti bedroom)

3.   Brookstone HD Video Pen, 4GB USB

4.   Mini Digital Video Camera in black case

5.   Verizon Samsung flip cellular telephone, MEID A00000458EiAF0, cellular telephone number 862-309-1216

6.   iPhone 4, Model MC924LL/A, S/N C8PHHM9TDTD0, white, cellular telephone number 570-510-8794

7.   AT T LG cellular telephone, black S/N 310KPPB279720

8.   Manilla envelope containing six (6) flash drives and three (3) SD cards

9.   LG cellular telephone, S/N 401KPYR210322, black, cellular telephone number 570-580-8861

10.  Two (2) USB Flash Drives labeled "Prisoner Assistant"

11.  iPad, S/N DLXFR57KDKPJ

12.  USB 8GB Flash Drive

13.  LG cellular telephone, IMEI 013695000342560, black, cellular telephone number 570-580-2626

14.  LG cellular telephone, S/N 310KPKN171157, white, cellular telephone number (570) 580-8862

15.  iPhone 6, IMEI 35690006128902 (Benanti's phone) PIN# 1650

## ATTACHMENT B

1.     One black Verizon LG cellular telephone, Serial Number 50BCQA51131136

2.     i-Phone, IMEI 356990060427129

# <u>ATTACHMENT C</u>

1.      White i-Pad, MDL: A1459, Serial Number: DMPJL5HSF18D

# ATTACHMENT D

## (Items to be seized)

1.  Any and all computer correspondence pertaining to the target offenses.

2.  Evidence of criminal activity, in whatever form, as defined in the target offenses.

3.  Any and all computer correspondence (1) offering to transmit through interstate commerce, including by United States mail or by computer, any visual depiction of violations of the target offenses.

4.  Any and all electronic communications pertaining to the target offenses.

5.  Photographs, pictures, and movies, depicting evidence of the target offenses.

6.  Information leading to the identity and location of victims or other co-conspirators, pertaining to the target offenses. *ken ws*

7.  Electronic writings including but not limited to diaries, ledgers, letters, or other correspondence pertaining to the target offenses.

8.  Electronic correspondence identifying persons transmitting through the United States mail, or by computer, any visual depiction of the target offenses.

9.  Address books and phone books that might contain information on other subjects and/or victims, *pertaining to the target offenses.* *ken ws*

10. Information evidencing the disposition of any money obtained via the commission of any of the target offenses.

11. Evidence of user attribution for all devices.