IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

UNITED STATES OF AMERICA,      )
     )
         Plaintiff,      )
     )      No. 3:15-CR-177
v.      )
     )
MICHAEL BENANTI,      )      (VARLAN / SHIRLEY)
     )
         Defendant.      )

## REPORT AND RECOMMENDATION

All pretrial motions in this case have been referred to the undersigned pursuant to

28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the

District Court as may be appropriate. Defendant Benanti asks the Court to suppress all evidence

stemming from his November 25, 2015 arrest, including a series of oral statements he gave on

that day, because law enforcement lacked probable cause to arrest him and because his

statements were made while he was in custody, without the benefit of the <u>Miranda</u> warnings, and

during plea negotiations. In this regard, the Defendant filed two motions to suppress evidence,

Defendant's Motion to Suppress Based on the Illegal Arrest, November 25, 2016 [Doc. 32] and

Motion to Suppress Oral Statements Made by Defendant [Doc. 35], on May 2, 2016.

The parties appeared for an evidentiary hearing on these motions on June 2,

2016.[1] Assistant United States Attorneys David P. Lewen and Steven H. Cook appeared on

behalf of the Government. Attorneys Robert R. Kurtz and Richard L. Gaines represented the

---

[1] The Court also heard evidence and argument on the Defendant's eight other pending motions
[Docs. 33, 34, 37, 38, 40, 41, 42, & 43], which will be addressed by separate report and
recommendation or memorandum and order.

Defendant who was also present. The Court heard the testimony of witnesses, received exhibits, and considered the arguments of counsel before taking the motions under advisement on that day. For the reasons discussed in full below, the undersigned finds that Defendant Benanti was properly arrested based upon probable cause. The Court also finds that the majority of the Defendant's statements should be suppressed because they were unwarned or occurred during plea negotiations. However, the Court finds that some of the Defendant's statements were not the product of interrogation and may be admitted at trial. The Court also finds that all of the Defendant's unwarned statements may be used to impeach him, if he testifies.

## I.  POSITIONS OF THE PARTIES

Defendant Benanti is charged [Doc. 30] with conspiring to obstruct, delay, or affect commerce by committing robbery and extortion with regard to commercial entities in Pennsylvania, Connecticut, Tennessee, North Carolina, South Carolina, and Georgia (Count One), and with possession of a firearm in furtherance of a crime of violence in relation to this conspiracy (Count Two). He is also charged with three sets of the following offenses: Bank robbery by extortion with use of a dangerous weapon (Counts Three, Ten, and Seventeen); use of a firearm in relation to the bank robbery by extortion (Counts Four, Eleven, and Eighteen); carjacking (Counts Five, Twelve, and Nineteen); use of a firearm in furtherance of carjacking (Counts Six, Thirteen, and Twenty); kidnapping (Counts Seven, Fourteen, and Twenty-one); using a firearm in furtherance of kidnapping (Counts Eight, Fifteen, and Twenty-two); and being a felon in possession of a firearm (Counts Nine, Sixteen, and Twenty-three). These charges arise out of the April 28, 2015 attempted robbery of the Y-12 Federal Credit Union in Oak Ridge, Tennessee; the July 7, 2015 robbery of the SmartBank in Knoxville, Tennessee; and the October

2

21, 2015 attempted robbery of the Northeast Community Credit Union in Elizabethton, Tennessee.

Defendant Benanti argues that his November 25, 2015 arrest in North Carolina violated the Fourth Amendment, because law enforcement did not have probable cause to arrest him. He also contends that all statements he made to law enforcement on that day were made in violation of his Fifth Amendment rights. He maintains that he made the statements during custodial interrogation without the benefit of the <u>Miranda</u> warnings or in the course of plea negotiations.

The Government responds that the Defendant was properly arrested based upon probable cause. It also contends that some of the Defendant's statements are admissible as volunteered admissions. Moreover, it asks the Court to recognize that all of the Defendant's November 25 statements may be admissible to impeach his testimony, should he choose to testify at trial.

## II.    SUMMARY OF TESTIMONY

The Government presented the testimony of two law enforcement officers involved in the investigation of the Defendant: Trooper Greg Reynolds of the North Carolina State Highway Patrol (NCSHP) and Federal Bureau of Investigation (FBI) Special Agent Jeff Blanton.

Trooper Reynolds testified that he has served with the NCSHP for sixteen years. His primary duties are to respond to calls for service, to enforce all North Carolina motor vehicle laws, and to provide back up for other law enforcement officers. Officer Reynolds has been involved in approximately fifteen foot pursuits and at least fifteen vehicle pursuits. He is also a

3

training officer, instructing new and current troopers. Trooper Reynolds is trained and certified to be a training officer and has specialized certificates in maintaining control of subjects, defensive tactics, and officer survival. As a training officer, he reviews incidents in which officers are involved and uses the incidents as case studies for training.

Trooper Reynolds stated that he was involved in the November 25, 2015 traffic stop and arrest of Defendant Benanti. Nearly two months earlier, his supervisor had notified him of an unusual incident in Hayward County, involving a vehicle pursuit on September 3, 2015. Troopers Hooper and Shelton were involved in this incident, and Trooper Reynolds reviewed the recordings from the cameras mounted on their dashboards. Trooper Reynolds reviewed these recordings [Exh. 1] with the Court and testified about their contents.

Trooper Reynolds testified that Trooper Hooper's recording reveals that Hooper was traveling west on I-40 in Hayward County with his lights and siren activated in pursuit of a dark-colored Sport Utility Vehicle (SUV). At two minutes and forty-three seconds into the recording, the SUV pulls onto the shoulder but then moves back into the left lane because an unmarked highway patrol car is blocking the shoulder. At three minutes and fifty seconds into the recording, the SUV pulls onto the shoulder and the passenger door opens. Then, the SUV immediately speeds off again. The SUV crashes at around four minutes and seventeen seconds into the recording. At 5:37 on the recording, Trooper Shelton tells Trooper Hooper not to go into the woods after the fleeing suspects.

Trooper Reynolds stated that the pursuit begins at two minutes into Trooper Shelton's recording. At three minutes and seven seconds into the recording, the fleeing SUV purposely strikes a vehicle in the right lane and then continues to flee. At three minutes and twenty-eight seconds into the recording, the SUV strikes a red car in the right lane. At 3:42, the

4

SUV strikes another vehicle in the right lane. Both vehicles crash and come to a stop. The occupants of both vehicles exit. Then, two white males, who are the occupants of the SUV, flee into the woods. Trooper Shelton states that they are not going into the woods after the occupants of the SUV.

Trooper Reynolds said, prior to November 25, 2015, he reviewed these recordings between five and ten times. He also conducted post-incident briefings with Troopers Hooper and Shelton and discussed what they saw. Based upon these conversations and his own review of the recordings, Trooper Reynolds testified that the passenger of the SUV was a heavy-set white male with a bald spot on the back of his head. The driver was a slender white male. Both fled from the SUV carrying black duffle or gym bags, which were approximately twenty-four to thirty inches long and eight to twelve inches wide. Trooper Reynolds stated that based on his personal experience and his experience as a training officer, it is uncommon for suspects to carry items that large when they flee. He said it is also uncommon for the occupants of a fleeing vehicle to pull over, open the passenger's door, and then resume flight. He agreed that stopping pursuit of the suspects at the tree-line was the safest course for the troopers because of the high probability of ambush, given that the suspects had the high ground and had items in their hands.

Trooper Reynolds testified that the recordings reveal that the occupants of the SUV had committed numerous crimes, such as failure to heed blue lights and siren, reckless driving, failure to stop following a collision, and assault with a deadly weapon with intent to inflict serious injury or kill. Additionally, the SUV, a Ford Edge, was stolen from a northern state and had a stolen South Carolina license plate. A global positioning system (GPS) unit was discovered in a search of the abandoned SUV. Trooper Reynolds said that between September 3

and November 25, the FBI and the Haywood County Sheriff's Department continued to investigate the incident.

Trooper Reynolds stated that his supervisor contacted him at 11:30 a.m., on November 25, 2015, with information that a gray Nissan Pathfinder with a stolen Maryland license plate and two white male occupants, who were believed to be involved in the September 3 chase and in multiple bank robberies, would be traveling through his jurisdiction. His lieutenant instructed him to use extreme caution, to take long guns and ballistic armor, and to "do whatever it takes" to stop this vehicle. He was told to be ready for an assault. Trooper Reynolds stated this was the first time he had received an instruction like this. In response, Trooper Reynolds put on his rifle-rated vest, took his AR-15, and proceeded to the indicated location. He said that the plan was to "take out" or disable this vehicle, if it did not stop.

Trooper Reynolds, who testified with the aid of his in-car video [Exh. 2], stated that he set up on I-26 east-bound at the 37 mile marker and began looking for the vehicle. He said that he was the lead car and that Trooper Alan Smith was behind him and Trooper Ritchie Lancaster was to his right. Trooper Reynolds said he pulled behind a gray Nissan Pathfinder with a Maryland license plate and confirmed that the plate was stolen. He then attempted to stop the Pathfinder. He said that the vehicle slowed down and pulled over to the right shoulder. The passenger opened his door and got out of the vehicle; and then, the driver sped off again. Trooper Reynolds said the passenger was a heavy-set white male with a bald spot on the back of his head, and he was holding a black bag. Trooper Reynolds said that all of these features were consistent with the passenger in the September 3 chase. He said that Troopers Smith and Lancaster continued pursuing the Pathfinder and that he focused on the passenger. He said, based upon the information he had at the time, he considered this to be a high-risk stop and that

6

he used caution to take the passenger into custody without anyone getting injured. He said he arrested the passenger, whom he identified as Defendant Benanti.

Trooper Reynolds said that the November 25 stop was similar to the September 3 chase in the following ways: Both vehicles had stolen license plates; both vehicles were slow to respond to law enforcement's signal to stop; both vehicles momentarily pulled onto the shoulder; both times the passenger's side door opened; both vehicles then sped off and led police in a chase; both passengers were white, heavy-set males with a bald spot on the back of the head; and both passengers carried a black bag. He stated that on both occasions, the vehicle stopped next to the fog line, which put the officer at a disadvantage because the officer would have to walk into the road to engage the driver.

Trooper Reynolds testified that once Benanti got out and the Pathfinder sped away, Trooper Smith pursued the fleeing vehicle, and he was left alone with Benanti. He stated that Benanti was fidgeting and moving excessively, which made Trooper Reynolds uncomfortable and caused him to suspect that Benanti had a weapon. Trooper Reynolds provided video footage [Exh. 2] and a transcript [Exh. 2a] of his dealings with Benanti following the stop. These exhibits reveal that Trooper Reynolds ordered Benanti onto the ground at gunpoint. Trooper Reynolds then handcuffed Benanti and had Benanti stand. Benanti asked Trooper Reynolds if he was being arrested "for something?", and Trooper Reynolds replied in the affirmative. Trooper Reynolds then communicated with the other Troopers by radio. Trooper Reynolds ordered Benanti to stop "digging around," and Benanti said he was trying to get his wrists straight in the handcuffs. Trooper Reynolds asked Benanti if he had any weapons and if he knew what was going on. Benanti declined to comment, other than to agree that it was not normal to be kicked out of a car on the Interstate. Trooper Reynolds told Benanti that he was

7

under arrest and attempted to advise Benanti of the <u>Miranda</u> warnings. Benanti interrupted him and asked to have his handcuffs loosened. Benanti said that he had no weapons on his person.

According to the transcript, another officer radioed Trooper Reynolds and asked him to bring Benanti and his bag to the location where officers had stopped the Pathfinder. Benanti again asked Trooper Reynolds to loosen his handcuffs, relating that they were "making [him] ill." [Exh. 2a, p.5] Trooper Reynolds told Benanti that the FBI would help with his handcuffs, but then said he would loosen them in five minutes. Trooper Reynolds seated Benanti in his patrol car and directed Benanti to sit on his hands and to avoid moving around. Trooper Reynolds asked Benanti his name and where he was from, to which Benanti responded "Mike Benanti" and stated that he was from Pennsylvania. Benanti continued to complain about the handcuffs while being transported to the other location.

The exhibits reveal that after Trooper Reynolds and Benanti arrived at the location at which officers had stopped the Pathfinder, Trooper Reynolds helped Benanti get out of the car and adjusted his handcuffs. Benanti told Trooper Reynolds that he had been in prison for sixteen years, so he was familiar with wearing handcuffs. Benanti asked Trooper Reynolds what happened, and Trooper Reynolds replied that it was not his case. Benanti told Trooper Reynolds that he had nothing to do with whatever was going on and that the police had "the wrong dude." Trooper Reynolds asked Benanti why he was in prison, to which Benanti replied that he had been nineteen and it was over "money." [Exh. 2a, p.10] Benanti stated that he got out of prison seven or eight years ago. In response to a question from Trooper Reynolds, Benanti said he was in federal prison in Lewisburg.

The transcript reflects that Trooper Reynolds asked and wrote down Benanti's name, date of birth, address, and telephone number. Benanti spontaneously added his social

security number.  Trooper Reynolds asked about and recorded Benanti's height, weight, hair and eye color, and that he had no tattoos or major scars.  Trooper Reynolds again asked where Benanti served time, and Benanti responded Lewisburg, Pennsylvania.  Benanti declined to identify the driver for Trooper Reynolds.  Trooper Reynolds asked Benanti what the plan was and where he and the driver were heading.  Benanti declined to answer.

In response to questions from Benanti, Trooper Reynolds stated that Benanti was under arrest, that there are charges against him but not from the NCSHP, and that the FBI will talk to him about them.  Benanti asked what happened to the driver of the Pathfinder, and Trooper Reynolds told him to "[j]ust stand by."  [Exh. 2a, p.15]  Benanti continued to ask about the charges, remarking that it is not typical for Trooper Reynolds to wear protective armor. Benanti spontaneously told Trooper Reynolds that he had been in the Bahamas the previous week, distributing his girlfriend's ashes, after she committed suicide.  Benanti stated that whatever is going on had nothing to do with him, and Trooper Reynolds continued to respond that they had to wait for the other law enforcement officers to join them.  Benanti told Trooper Reynolds that he wanted to make sure that Trooper Reynolds knew that he had cooperated and been truthful in giving his name.

The exhibits reveal that Benanti asked what happened with the driver, whom he saw being carried away.  Benanti questioned Trooper Reynolds about what the driver had done, and Trooper Reynolds said that he did not know, stating "I'm just a guy they sent in to come get you, I don't know nothing else."  [Exh. 2a, p.18]  Benanti asked how Trooper Reynolds knew to get him, and Trooper Reynolds replied that it was because he was in that car.  Benanti remarked that it was not his car and that he "got thrown out" of it.  Benanti told Trooper Reynolds that he had been professional during the stop and asked if Trooper Reynolds had thought he was armed.

9

Trooper Reynolds responded that he would not be wearing all of the protective gear, if he did not think Benanti was armed.

According to the exhibits, Benanti again complained of his handcuffs hurting. Benanti stated that he was technically not under arrest and asked if Trooper Reynolds had officially read him his rights. Trooper Reynolds replied, "No," because he had not asked Benanti about anything. Benanti asked the location in which he had been stopped. Trooper Reynolds replied that they were in Asheville, North Carolina. Benanti stated that he had been to North Carolina three times but, then, said he wanted to "recant" that statement. Benanti asked Trooper Reynolds if there was an indictment. Trooper Reynolds said that he did not know. Benanti again complained of his handcuffs, and Trooper Reynolds figured out that Benanti's watch was restricting them. Benanti thanked him for adjusting his handcuffs and watch. Benanti asked Trooper Reynolds if he had children or a girlfriend, to which Trooper Reynolds responded that he did not. Just before the transcript concludes, Benanti stated that he is the CEO of a company.

On cross-examination, Trooper Reynolds testified that he did not recall when he was informed of the September 3, 2015 car chase but that it could have been within a week of the event. He said that he received the video recordings of the chase by email and reviewed them the day he received the email. He said Troopers Hooper and Shelton were both in "Troop G," which is also his troop. Trooper Reynolds stated that the video of the September 3 chase shows that the two patrol cars were less than fifty yards from the SUV. He said that although the SUV pulled over and the passenger door opened briefly, no one got out at that time. He stated that, following the wreck, the occupants of the SUV were only on the video for a few seconds after exiting their vehicle, during which time they were moving quickly. He said that Trooper Shelton described the occupants as two white males and said that they got out of the SUV and ran into

10

the woods. Trooper Reynolds read into the record a report from the City of Asheville Police Department [Exh. 5], documenting Trooper Shelton's selection of a photograph from a six-person photograph lineup on November 25, 2015. The report reveals that Trooper Shelton did not select Defendant Benanti's photograph and that Trooper Shelton stated, although the photograph he selected had the characteristics of the suspect, he was "not 100% sure it is the suspect." [Exh. 5, p.1]

Trooper Reynolds said that between September 3, 2015, and November 25, 2015, he reviewed the video recordings from Troopers Hooper and Shelton's patrol cars between five and ten times. He said he first reviewed them with Troopers Hooper and Shelton and, after that, reviewed them in a classroom setting and in training.

Trooper Reynolds stated that following the chase and wreck on September 3, 2015, a GPS unit was recovered from the Ford Edge and provided to the FBI. He stated that he had no access to the GPS and had not reviewed the information from the GPS. He said that he learned that the GPS contained an address of 124 Rebel Ridge in Maggie Valley, North Carolina. He said that this information led to another address, at which a multi-agency law enforcement team conducted surveillance. Trooper Reynolds reviewed the U.N.I.T. Surveillance Notes [Exh. 6] as a part of his testimony. The notes reveal that, beginning on November 19, 2015, agents from several North Carolina law enforcement agencies conducted surveillance at 380 Allison Drive, Maggie Valley, North Carolina. Between November 19 and November 25, 2015, agents observed one white female and two white males[2] at the residence. The agents also observed

_____

[2] The notes state that on November 23, 2015, "[A]gent Whitley observed what appeared to be two males standing in front of two males standing in front of two vehicles." [Exh. 6, p.4] This is the only mention of more than two white males, and Agent Blanton later testifies that he believes this to be a typographical error.

11

several vehicles at the residence. Trooper Reynolds stated that at the time he arrested Defendant Benanti on November 25, 2016, he did not have a description of the individuals he was to stop, nor did he know that officers had observed a female and males other than the occupants of the Pathfinder at the Allison Drive cabin.

Trooper Reynolds said that during his meal break on November 25, Trooper Smith contacted him to make a vehicle stop. Trooper Smith said that the occupants of the vehicle were the same individuals from the September 3 car chase. Lieutenant Wingo, radioed him and said that the NCSHP had received information relating to the September 3 car chase. Lieutenant Wingo said that the individuals he was to stop were the ones from the September 3 incident and that they had also been involved in some bank robberies. Lieutenant Wingo did not say how he knew these individuals were involved in bank robberies. Lieutenant Wingo told him to stop these individuals whatever it took. Trooper Reynolds said that on November 25, 2015, he did not know the names or identifying information of the individuals he was to stop.

Trooper Reynolds stated that the area in which the September 3 car chase occurred and the location in which he was to stop the individuals on November 25 were about fifty miles apart. He said that the two incidents occurred on different roads—one on I-40 westbound and the other on I-26 eastbound. He said the incidents occurred nearly three months apart and involved different vehicles. Trooper Reynolds said that on September 3, the passenger was wearing a short-sleeved shirt and shorts and that on November 25, the passenger was wearing long pants and a jacket. He also stated that on November 25, the vehicle did not strike any other vehicles and that the passenger got out of the car and did not flee or resist arrest.

Trooper Reynolds testified that on November 25, 2015, he followed the vehicle that he was directed to stop and called in the tag number, confirming that the Maryland license

12

plate was stolen.  He said he did not learn until sometime after the arrest that the vehicle was also stolen.   He said that his stop of the Pathfinder was based upon the collective knowledge of law enforcement and on the stolen license plate on the Pathfinder, which was a crime occurring in his presence.   He stated that once the Pathfinder sped away and he saw Benanti outside of the vehicle, he recognized him as the passenger from the September 3 incident.  Trooper Reynolds testified that he believed he had probable cause to arrest Benanti for the stolen license tag on the Pathfinder and because he was a passenger in the September 3 car chase.  Trooper Reynolds said that he believed Benanti was in possession of the stolen license plate because he was a passenger in the vehicle.

Trooper Reynolds stated that Benanti went to the ground slowly and did not resist being handcuffed.  He said that he attempted to advise Benanti of the <u>Miranda</u> warnings but that he was interrupted.  He agreed that he did not provide the full <u>Miranda</u> warnings to Benanti.  He stated that he transported Benanti in his patrol car from the location of the stop to another location one mile away.  He said that Benanti was handcuffed during this drive.  He stated that Benanti was subsequently transported to the Asheville, North Carolina Police Department. Trooper Reynolds identified a North Carolina Uniform Citation [Exh. 7], dated November 25, 2015, and charging Benanti with felony possession of a stolen motor vehicle.  He also identified an arrest warrant [Exh. 7] for Benanti for the possession of a stolen motor vehicle on November 25, 2015.  Trooper Reynolds agreed that the Defendant was not charged with possession of a stolen license plate or with any crimes occurring on September 3, 2015.

On re-direct examination, Trooper Reynolds testified that the FBI extracted information from the GPS found in the Ford Edge involved in the September 3 incident.  From the GPS data, officers recovered an address of Rebel Ridge Road in Maggie Valley, North

13

Carolina. Law enforcement conducted surveillance of that residence and determined that the occupants had moved to 380 Allison Drive. On November 25, 2015, surveilling officers observed two white males leaving 380 Allison Drive in a vehicle with a stolen license plate.

On recross-examination, Trooper Reynolds stated that prior to November 25, he was not aware that officers had recovered the Rebel Ridge address or that they had connected individuals at Rebel Ridge to Allison Drive. He said he was not aware of any connection between the Rebel Ridge address and the individuals in the vehicle he stopped on November 25. He said that he did know that the individuals whom he was to stop on November 25 came from Allison Drive.

Special FBI Agent Jeff Blanton testified that he has worked for the FBI for twenty years and is a senior supervising agent in the Knoxville Division. He said that before joining the FBI, he worked as a police officer in North Carolina. He stated that during his time with the FBI, he had worked on every type of crime for which the FBI is responsible. He said he was familiar with the street term "switch car," which denotes a second vehicle that a perpetrator uses to elude law enforcement after abandoning the vehicle in which the perpetrator escaped.

Agent Blanton testified that a series of crimes targeting bank employees occurred in East Tennessee on April 28, July 7, and October 21, 2015. These offenses had a number of similarities and were committed by armed, masked perpetrators, who were described as two white males. Agent Blanton listed the following commonalities of the three sets of crimes: In all three, bank employees were targeted in their homes. The perpetrators forced the bank employee to go to the bank and withdraw money, while the employee's family members were held hostage. All of the victims, with the exception of an infant, were blindfolded. He said that his office investigated the crimes that occurred in Elizabethton, Tennessee, on October 21, 2015.

14

Agent Blanton stated that on the day of the attempted robbery of the Northeast Community Credit Union in Elizabethton, he learned of a high-speed chase in North Carolina that occurred in September 2015.  He learned that the occupants of the fleeing car had jumped from the vehicle and fled carrying large bags.  He thought this fact was unusual, because individuals fleeing law enforcement in such situations usually ran without taking items with them.  Agent Blanton said, following the crimes on October 21, 2015, he spoke with the NCSHP officers investigating the September car chase and learned that they had retrieved a GPS unit from the abandoned vehicle.  The NCSHP turned the GPS unit over to him, and he delivered it to the FBI's digital evidence processing laboratory, which extracted the data from the unit.  Agent Blanton stated that, upon reviewing the GPS track, which is the unit's calculation of the most efficient route to a location after the user enters a "waypoint," his suspicions that the individuals, who fled the North Carolina car chase, were involved in the crimes in East Tennessee were raised.  The data extraction showed that the users of the GPS unit had turned it on three times.  The users had activated it in a Walmart parking lot in northern Virginia on August 1, 2015, and had entered the address of 124 Rebel Ridge Road, Maggie Valley, North Carolina.  The users had activated the GPS a second time on September 2, 2015, at a location near 124 Rebel Ridge Road and had traveled to west Knoxville and back to 124 Rebel Ridge Road.  Finally, the GPS users had activated it a third time on the following day from 124 Rebel Ridge Road and the track terminated at the site of the crash in North Carolina.  The waypoint labeled as "home" on the track was a strip mall in Waynesville, North Carolina, which contained a property rental business.

Agent Blanton testified that the GPS track revealed that the users had traveled to a community in west Knoxville one day before the Ford Edge crashed in North Carolina, a few

15

miles from the Tennessee state line.  He stated that a waypoint labeled "star" was located at the Enrichment Federal Credit Union on Kingston Pike and Cedar Springs Road.  This credit union was one-half mile from the SmartBank, which was targeted in the East Tennessee crimes under investigation.  Agent Blanton stated that one and one-half miles from "star" was a waypoint labeled "switch," which Agent Blanton took to be the place where the switch car would be located.  Approximately three hundred yards north of "switch" was a waypoint labeled "crozs." Around two hundred yards southeast of "crozs" was a waypoint labeled "crozs1," and a waypoint labeled "crozs2" was located three hundred yards east of "switch."  Agent Blanton said that he did not know what "crozs" meant.  He stated that this evidence increased his suspicion that the individuals from the North Carolina car chase were involved in the three bank robberies in East Tennessee.

Agent Blanton stated that on November 11, he learned that law enforcement had interviewed a representative of Premier Vacation Rentals (PVR), the rental property management company that managed the cabin at 124 Rebel Ridge Road.  Melissa Pless,[3] a PVR employee, stated that she had personally interacted with Ron Bradford and Craig, two men who had recently rented the Rebel Ridge cabin.  Ms. Pless stated that Ron Bradford was a tall, skinny, bald, white male with glasses and that Craig was a stout, white male.  The men told her that they were ghost writing a book and were in Maggie Valley for inspiration.  Ms. Pless related that Craig conducted almost all of the business for the two.   She stated that in June 2015, these men rented the "Lovin' the View" cabin at 415 Highview Drive in Maggie Valley, North Carolina. She said they executed a rental agreement on June 19, 2015, to rent Lovin' the View from June

---

[3] Agent Blanton referred only to a PVR employee on direct examination but, later, identified the PVR employee as Melissa Pless on cross-examination.

22 to July 26, 2015. Ms. Pless stated that the men had paid $3,106 in cash. Ms. Pless said that the men rented the "Bare Necessities" cabin at 124 Rebel Ridge Road from July 27 to October 25, 2015, for $5,200. She said the men extended their stay at Bare Necessities to November 15, 2015, for $6,475. She said they paid $425 in cash and used a gift card addressed to Ron Bradley, rather than Ron Bradford. She said that Craig explained this discrepancy by saying that Ron had been given a gift card but someone had written his name incorrectly. Ms. Pless said the men had moved from 124 Rebel Ridge to a new cabin, "Southern Comfort," at 380 Allison Drive. She said that Craig had arranged for this cabin and paid a $500 deposit. She said that the three cabins rented by Ron and Craig were all located in the Country Club area of Maggie Valley.

Agent Blanton testified that Ms. Pless provided the officers with Craig's email address, telephone number, and his address of 713 Chestnut Street, Pennsylvania. Agent Blanton said that this address resolved to a public parking lot. Agent Blanton said that the information from the PVR employee, including the fact that Ron and Craig paid in cash, added to his suspicions that these two men were involved in the East Tennessee bank robberies and related crimes. He stated that he provided the information from the PVR employee to the NCSHP before November 25, 2015.

Agent Blanton stated that the FBI and North Carolina law enforcement began surveillance on 380 Allison Drive, Maggie Valley, North Carolina. This surveillance revealed two white males and a white female at the cabin. Several different vehicles were spotted at the cabin and, at one point, officers saw a dog at the cabin. On November 25, 2015, surveilling officers saw a vehicle with a stolen license plate leave 380 Allison Drive. The officers observed a white male driving the vehicle and that another white male was a passenger. Agent Blanton stated that this information was conveyed to law enforcement agencies in North Carolina,

17

including the NCSHP. He said that the FBI shared information regularly with the NCSHP during the investigation.

On cross-examination, Agent Blanton testified that he was the case agent on the robbery in Elizabethton, Tennessee, and that Mick Nocera and Paul Hughes were the case agents on the two Knoxville robberies. He said that he was an active participant in the investigation of the Elizabethton robbery and knew of the investigation into the Knoxville robberies. Agent Blanton stated that, on the day of the Elizabethton robbery, he was told of the car chase in North Carolina. When the victim of the Elizabethton robbery told him that two white males with bags perpetrated that crime, he was struck by the similarity of two white males, each with black bags, who fled the September 2015 car chase in North Carolina. Agent Blanton stated that he contacted the NCSHP and, ultimately, met with Troopers Hooper and Shelton. He said that he traveled to North Carolina and met with officers from several law enforcement agencies there. He stated that he did not personally conduct surveillance on the cabin at 380 Allison Drive. He said that the surveilling officers watched the cabin for six days, that several vehicles and people were in and out of that cabin, and that the surveilling officers did not identify its occupants or successfully photograph them. He did not know if any NCSHP troopers were part of the surveillance team.

Agent Blanton identified Melissa Pless as the PVR employee who provided information on the two men who rented 124 Rebel Ridge and then moved to 380 Allison Drive. Ms. Pless said that Ron and Craig drove a black Lexus SUV. Agent Blanton said that officers searched the cabin at Rebel Ridge but located no evidence. Agent Blanton said that the perpetrators of the East Tennessee bank robberies wore masks. He said that Ms. Pless's description of Craig and Ron was consistent with the appearance of the two men who fled

18

following the September 2015 car chase in North Carolina. Agent Blanton testified that the statement in the U.N.I.T Surveillance Notes [Exh. 6] from the surveillance of 380 Allison Drive on November 23, 2015, that the agent observed "what appeared to be two males standing in front of two males standing in front of two vehicles" contained a typographical error. However, Agent Blanton stated that he had not consulted with the surveillance team on that.

Agent Blanton testified that he told the NCSHP to stop the white males who left 380 Allison Drive on November 25, 2015, if the individuals did something illegal in the officers' presence. He said that he lacked the authority to direct the NCSHP to make an arrest.

Agent Blanton stated that he spoke with the Defendant twice on November 25, 2015. He said, on the first occasion, he attempted to interview the Defendant, but the Defendant refused to waive his Miranda rights. He said the second time, he, Assistant United States Attorney David Lewen, and Special Agent Mick Nocera met with the Defendant. He stated that they had a conversation with the Defendant, which concluded with AUSA Lewen saying, "We're done." After that, AUSA Lewen and the agents left the room. Agent Blanton said as they were walking out, the Defendant made the comment that "there are two types of people, those that go in harm's way and do things and those that plan."

Agent Blanton stated that the data extracted from the GPS in the Ford Edge had very few tracks and waypoints. He stated that the Rebel Ridge Road waypoint and the track through Knoxville were beneficial to the investigation. He agreed that the SmartBank and the Y-12 Federal Credit Union were not waypoints in the GPS data.

Agent Blanton testified that the FBI directed the surveillance at 380 Allison Road in order to identify the two white males staying at that cabin. He said that during the investigation of the two white males, who were staying at 380 Allison Drive, he was in close

19

contact with North Carolina FBI agents and the NCSHP supervisor Trooper White. Agent Blanton related that he felt confident the men at the cabin at 380 Allison Road were linked to the GPS data. He said that PVR employee Melissa Pless said that Ron and Craig, the men renting first the Rebel Ridge cabin and later the Allison Drive cabin, drove a black Lexus SUV. He stated that this information further enhanced his suspicions because the perpetrators in the Knoxville bank robbery in April 2015 drove a black Lexus SUV. Shortly after the attempted robbery of a credit union on April 28, 2015, a black Lexus SUV was found burned to the extent that its frame was damaged, and law enforcement determined it had been stolen.

Agent Blanton stated that law enforcement interviewed Ms. Pless on November 12, 2015. At that time, she said she had not seen the black Lexus SUV in several months. Ms. Pless told him that Ron and Craig were currently driving a gold SUV. She said that Ron and Craig signed a rental agreement for 415 Highland Drive on June 19, 2015.

Agent Blanton testified that he interviewed the Defendant at the Buncombe County Jail, in Asheville, North Carolina, on November 25, 2015. He said the room was a little larger than a standard interview room. He identified an Advice of Rights form [Exh. 4] that he reviewed with the Defendant at 9:14 p.m. Agent Blanton said that when he pulled out the form, the Defendant stated that he understood his rights and asked if they could just talk. He said the Defendant said he had spent sixteen years in federal prison. Agent Blanton said that after the Defendant agreed to waive his rights, he reviewed each of the rights with the Defendant. The Defendant then signed the form. The form reflects that Agent Blanton and another agent signed as witnesses at 9:16 p.m. Agent Blanton said that the Defendant undoubtedly understood his Miranda rights.

Agent Blanton testified that following the Defendant's execution of the rights waiver, they interviewed the Defendant for five to ten minutes. He said that at the time that he walked out of the interview room, AUSA Lewen was not present in the room. This is when the Defendant made the statement about the two types of people.

## III.    FINDING OF FACTS

The Court makes the following factual findings based upon the testimony and exhibits presented at the June 2, 2016 evidentiary hearing:

On September 3, 2015, North Carolina State Highway Patrol Troopers Shelton and Hooper attempted to stop a dark-colored Ford Edge SUV, which was traveling on I-40 westbound in North Carolina, close to the Tennessee state line. The troopers were in separate vehicles and had their lights and sirens activated. The SUV pulled onto the shoulder twice, with one of the troopers stopping behind it each time, then sped back onto the road. The second time the SUV pulled onto the shoulder, the driver's side wheels were not fully over the line delineating the roadway and the passenger door opened briefly, before the vehicle sped away. As the pursuit continued, the Ford Edge intentionally struck three vehicles, then crashed into a barrier, and spun around one hundred and eighty degrees. As soon as the Ford Edge came to a stop, two white males, each holding black duffle bags, exited the SUV and ran across three lanes of traffic and into the woods on the opposite side of the Interstate. The driver had a slender build, and the passenger was heavy-set with dark hair and a bald spot on the back of his head. Troopers Shelton and Hooper pursued the men across the road but did not follow them into the woods. The NCSHP subsequently determined that the Ford Edge was stolen and had a stolen out-of-state license plate.

21

On October 21, 2015, two masked white males attempted to rob the Northeast Community Credit Union in Elizabethton, Tennessee, by kidnapping a bank employee and her son. These crimes resembled two other bank robberies occurring on April 28, 2015, in Oak Ridge, Tennessee, and July 7, 2015, in Knoxville, Tennessee. Special FBI Agent Jeff Blanton headed up the investigation of the crimes involving Northeast Community Credit Union. On the same day of the attempted robbery of the Northeast Community Credit Union, Agent Blanton learned of the September 3 car chase in North Carolina and that the occupants of that vehicle had fled carrying large bags. Agent Blanton subsequently spoke with the NCSHP and learned that the Ford Edge, abandoned by the perpetrators in the September 3 chase, contained a GPS unit. Agent Blanton obtained that GPS unit, had the FBI's digital processing laboratory extract the data from the unit, and reviewed the data. The GPS data revealed that the GPS unit was used three times: Once to travel from northern Virginia to 124 Rebel Ridge Road, Maggie Valley, North Carolina, on August 1, 2015. Second, the users had traveled from a location near 124 Rebel Ridge Road to west Knoxville and back to 124 Rebel Ridge Road on September 2, 2015. Third, the unit was activated on September 3, 2015, at 124 Rebel Ridge Road and terminated at the crash site on that day. The "waypoint" labeled as "home" on the GPS track was a strip mall in Waynesville, North Carolina, that contained a property rental business.

The property at 124 Rebel Ridge Road is a rental cabin, managed by Premier Vacation Rentals. On November 12, 2015, Melissa Pless, an employee of PRV, related to law enforcement that she rented a series of PVR cabins to two white males, whom she knew as Ron Bradford and Craig. Ms. Pless described Ron as a tall, slender, bald, white male with glasses, and she said that Craig, who conducted most of the business for the two, was a stout, white male. She said that Ron and Craig, who told her that they were in Maggie Valley to ghostwrite a book,

22

rented a cabin at Highview Drive from June 19 to July 26, 2015, and paid $3,106 in cash. Ms. Pless said that Ron and Craig rented the cabin at 124 Rebel Ridge Road from July 17 to October 25, 2015, for $5,200, and from October 25 to November 15, 2015, for $6,475. Ms. Pless stated that the men then moved to the cabin at 380 Allison Drive and paid a $500 deposit. Agent Blanton shared all of this information with the NCSHP. Ms. Pless also stated that Ron and Craig initially drove a black Lexus SUV but that she had not seen the Black SUV in the last few months and that Ron and Craig were currently driving a gold SUV. Agent Blanton knew that the perpetrators of the April 28, 2015 attempted robbery of the Y-12 Federal Credit Union drove a black Lexus SUV and that, following that robbery, law enforcement found a stolen black Lexus SUV, which had been burned to the extent that the frame was damaged.

The FBI and North Carolina law enforcement officers conducted surveillance of the cabin at 380 Allison Drive on November 19 and 23 through 25, 2015. On November 19, officers observed three vehicles at the cabin, including an SUV, and a white male, who was bald, of athletic build, and around six feet tall. Later that day, officers observed a white female and a white male leave the cabin in a vehicle with a Vermont license tag. The white female drove the pair to a CVS Pharmacy, and the bald, white male passenger went in the store. On November 23, 2015, the officers observed two men standing in front of two vehicles at the cabin. Later that morning, the officers saw two men leaving the residence in a silver minivan. On November 24, officers saw a white male leave the cabin in a maroon Toyota Highlander with a license plate that was registered to a GMC Yukon. The man got gas and then vacuumed the Highlander at a car wash, before going back in the direction of the cabin. Later on November 24, officers saw a third vehicle, a silver SUV, at the cabin and also saw two white males outside the residence at different times. At 11:05 a.m., on November 25, 2015, surveilling officers saw a silver Nissan

Pathfinder with a Maryland license tag leave the cabin. A records check on the license tag revealed that it was stolen. At 11:23 a.m., the surveilling officers followed the Pathfinder eastbound on I-40 and remained in contact with local law enforcement, which in turn was in contact with the FBI. The officers followed the Pathfinder onto I-26 eastbound and continued to follow it until the NCSHP attempted to stop the Pathfinder near mile marker 36.

NCSHP Trooper Gregg Reynolds was on a meal break on November 25, 2016, when he received a call from his supervisor directing him to stop a gray Nissan Pathfinder, with a stolen license plate, which would be traveling through his jurisdiction that morning. The supervisor related that the two white men in the Pathfinder were believed to be the perpetrators of the September 3 car chase and of several bank robberies. Trooper Reynolds, a training officer for the NCSHP, was familiar with the September 3 car chase, because he had reviewed the video recordings from the in-car cameras of Troopers Shelton and Hooper between five and ten times, had interviewed Troopers Shelton and Hooper about the chase, and had used the videos in his training sessions. The NCSHP supervisor told Trooper Reynolds that he was to stop the Pathfinder "whatever it took." Trooper Reynolds donned protective gear, got his AR-15, and set up on I-26 with two other troopers in separate patrol cars.

The Pathfinder passed Trooper Reynolds heading eastbound on I-26. Trooper Reynolds followed it and confirmed that the Maryland license plate was stolen. He then attempted to stop the Pathfinder. The Pathfinder pulled onto the shoulder, with its wheels touching the fog line, the passenger's side door opened, and a white male got out. The Pathfinder then sped away. Troopers Smith and Shelton pursued the Pathfinder, while Trooper Reynolds remained with the passenger. After the Pathfinder fled, Trooper Reynolds saw that the passenger was a white male with a bald spot on the back of his head and that he held a black

24

duffle bag. Trooper Reynolds recognized the man, whom he later identified as Michael Benanti, as the passenger from the September 3 car chase. Trooper Reynolds and a second officer approached the Defendant, pointing guns at him and yelling at him to get on the ground. The officers handcuffed him and frisked him, while he was still on the ground. Then, the second officer left to pursue the Pathfinder. After asking the Defendant to rise to his knees, Trooper Reynolds told the Defendant, "F**k around, I'll kill you," to which the Defendant responded, "I know, you should."

Trooper Reynolds helped the Defendant stand and walked him to the patrol car, where Reynolds turned off the siren. Benanti asked whether he was being arrested. Trooper Reynolds affirmed that Benanti was being arrested, radioed the other troopers, and ordered Benanti to stop moving around. Benanti explained that he was trying to straighten his wrists in the handcuffs. Trooper Reynolds asked Benanti if he had any weapons and if he knew what was going on. Benanti declined to comment. Trooper Reynolds told Benanti that he was under arrest and attempted to advise Benanti of the <u>Miranda</u> warnings, but Benanti interrupted him, asking Trooper Reynolds to loosen his handcuffs. Benanti stated that he had no weapons on his person. Another officer radioed Trooper Reynolds and asked him to bring Benanti and his bag to the location where the Pathfinder had been stopped. Benanti again asked that his handcuffs be loosened, but Trooper Reynolds deferred to the FBI, then said that he would loosen them in five minutes. Trooper Reynolds seated Benanti in his patrol car, directed him to sit on his hands and not move, and asked Benanti his name and where he was from. Benanti identified himself and said that he was from Pennsylvania. Trooper Reynolds transported Benanti to a location approximately one mile away, at which other officers had stopped the Pathfinder.

Upon reaching the second location, Trooper Reynolds assisted Benanti out of the patrol car and loosened the handcuffs. Benanti told Trooper Reynolds that he had been in prison for sixteen years, so he was familiar with wearing handcuffs. Trooper Reynolds asked Benanti why and where he had been in prison, to which Benanti responded that he went to prison in Lewisberg over money when he was nineteen and that he had been out for seven or eight years. Trooper Reynolds then asked Benanti a series of identifying questions: name, birthdate, address, telephone number, height, weight, hair color, eye color, and whether he had any tattoos or scars. Trooper Reynolds wrote down the Defendant's answers. Trooper Reynolds again asked where Benanti had been imprisoned, and Benanti responded Lewisburg, Pennsylvania. Trooper Reynolds asked Benanti to identify the driver of the Pathfinder, what their plan was, and where they were headed, but Benanti declined to provide any of this information. For the remainder of the time, until Benanti was transported to the Asheville Police Department, Benanti questioned Trooper Reynolds about his charges and about the driver of the Pathfinder. Trooper Reynolds told Benanti that he was under arrest but that his charges were not from the NCSHP and that the FBI would talk to him about his charges. Twice during the time that the Defendant was in Trooper Reynolds' custody Trooper Reynolds mentioned that his body microphone was still recording.

At 3:07 p.m., on November 25, 2015, Agent Blanton and FBI Task Force Officer Matt Gryder interviewed Benanti at the Asheville Police Department. The agents produced a Miranda rights waiver form, and Agent Blanton asked Benanti if anyone had read him his rights yet. Benanti replied that they had started but had not really read them to him and that he was familiar with the Miranda rights. Benanti asked if there was an indictment on him. The agents responded that there was no indictment at that time. Benanti asked if they could speak

26

informally first. The agents left after a fifteen to eighteen minute conversation, in which Benanti repeatedly asked for an immunity agreement and declined to answer any questions without one.

At 4:00 p.m., Agents Blanton and Gryder again spoke with Benanti at the Asheville Police Department. Agent Blanton told Benanti that he had spoken with the U.S. Attorney but that he did not have an immunity agreement for Benanti. Agent Blanton told Benanti that the NCSHP was going to charge him with possession of a stolen vehicle and that the federal authorities were going to seek a criminal complaint charging him with the interstate transportation of a stolen vehicle. The conversation continued for thirty-four minutes, ending with Agent Blanton reiterating that the US Attorney's Office would not give Benanti immunity "up front." At one point in the conversation, Agent Blanton told Benanti that the room had a recording device and that their conversation was being recorded. After the agents left, Benanti asked Asheville Police Department Officer Shelton to allow him to make a telephone call to his family. Officer Shelton gave Benanti a cellular telephone, which Benanti used to call his sister. Benanti's side of this telephone conversation was recorded.

At 9:14 p.m. on November 25, 2015, Agent Blanton, FBI Agent Mick Nocera, and Assistant United States Attorney David Lewen spoke with Benanti at the Buncombe County Jail in Asheville, North Carolina. The room in which they met was a little larger than a standard interview room. Although Benanti said he understood his rights and asked if they could just talk, Agent Blanton reviewed each of the lines on the Advice of Rights form with Benanti. Benanti then signed the Advice of Rights form. After Benanti executed the rights waiver, the agents and AUSA Lewen spoke with him for five to ten minutes. The meeting ended with AUSA Lewen saying, "We're done." Then, AUSA Lewen and the agents left the room. After AUSA Lewen

had walked out and as Agent Blanton was walking out, the Defendant said, "There are two types of people, those who go in harm's way and do things and those that plan."

## IV.     ANALYSIS

The Defendant asks the Court to suppress all evidence, including all statements, stemming from his November 25, 2015 arrest. He argues that officers violated his rights under the Fourth Amendment because they lacked probable cause to arrest him. Additionally, he argues that his statements were made in violation of the Fifth Amendment because he gave the statements without the benefit of the <u>Miranda</u> warnings and while he was in custody and subject to interrogation. He also contends that some of his statements on November 25, 2015, must be suppressed because they were made during the course of plea negotiations. The Court addresses each of these arguments in turn.

### A.   Warrantless Arrest on November 25, 2015

Trooper Greg Reynolds of the North Carolina State Highway Patrol arrested Defendant Benanti on November 25, 2015. The Defendant contends that he was arrested when Trooper Reynolds ordered him to the ground at gunpoint and handcuffed him as soon as he stepped out of the vehicle. He argues that at that point, the officer did not have probable cause to believe he had committed a crime. He maintains that the only grounds for arrest at that time were that he was a passenger in a car bearing a stolen license plate, which he contends was an insufficient basis for arrest. The Government responds that Trooper Reynolds had both personal and collective knowledge of facts giving him probable cause to arrest the Defendant for a host of violent felonies and property crimes.

28

The Court begins with the well-settled standard that an officer may arrest an individual if the officer has probable cause to believe the person has committed or is committing a felony based upon the totality of the circumstances. Illinois v. Gates, 462 U.S. 213, 230-31 (1983); United States v. Caicedo, 85 F.3d 1184, 1192 (6th Cir. 1996). Probable cause is "reasonable grounds for belief supported by less than prima facie proof but more than mere suspicion." United States v. Bennett, 905 F.2d 931, 934 (6th Cir. 1990). "[P]robable cause is a flexible, common-sense standard." Texas v. Brown, 460 U.S. 730, 742 (1983). "The establishment of probable cause 'requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.'" United States v. Barrett, 890 F.2d 855, 861 (6th Cir. 1989) (quoting Gates, 462 U.S. at 244 n.13), superseded on other grounds by 18 U.S.C. § 3742(e). To determine whether an officer had probable cause, the Court examines the totality of the circumstances by making "a realistic assessment of the situation from a law enforcement officer's perspective." Id.; see also United States v. Ferguson, 8 F.3d 385, 392 (6th Cir. 1993).

On November 25, 2015, Trooper Reynolds was directed by his supervisor to stop a gray Nissan Pathfinder, with a stolen license plate, that would be traveling on I-26 eastbound, in Reynolds' jurisdiction, in the late morning. Trooper Reynolds spotted the Pathfinder and confirmed through a records check that the license plate was stolen. Accordingly, Trooper Reynolds properly activated his lights and siren in order to stop the Pathfinder. The Pathfinder pulled to the shoulder of the Interstate, stopping next to the fog line. The passenger door opened, a white male holding a black bag got out, and the Pathfinder sped away. Trooper Reynolds remained with the passenger, while other troopers pursued the Pathfinder.

The Court finds that Trooper Reynolds arrested Defendant Benanti, the passenger, when he ordered him to the ground at gunpoint and handcuffed him. See Michigan v. Chesternut, 486

29

U.S. 567, 573 (1988) (holding that the test for whether or not a seizure has occurred is whether a reasonable person would believe that he or she is not free to leave). Although in some circumstances an individual can be handcuffed during an investigatory stop, the totality of the circumstances surrounding Trooper Reynolds' seizure of the Defendant reveal it to be an arrest, rather than a <u>Terry</u> detention: Trooper Reynolds immediately ordered the Defendant to the ground at gunpoint and handcuffed him. The Defendant remained continuously handcuffed, even once the scene was secured. Trooper Reynolds attempted to provide the Defendant the <u>Miranda</u> warnings. Additionally, Trooper Reynolds told the Defendant that he was under arrest. These circumstances reveal that the Defendant was arrested, rather than detained. Thus, Trooper Reynolds must have had probable cause to arrest the Defendant at the point in time when he ordered him to the ground and handcuffed him. As discussed below, the Court finds that he did.

First, based upon his own personal knowledge, Trooper Reynolds had probable cause to arrest the Defendant for crimes occurring during the September 3, 2015 car chase. Upon pulling behind the Nissan Pathfinder, Trooper Reynolds confirmed that the vehicle had a stolen out-of-state license plate and properly attempted to stop the vehicle for this offense. However, rather than stopping as directed, the Pathfinder pulled to the shoulder long enough for the passenger to get out and then the vehicle sped away. The passenger, a stocky white male with a bald spot on the back of his head, was holding a black duffle bag. As a training officer, Trooper Reynolds had reviewed the video recordings of the September 3 chase between five and ten times and had discussed the events of September 3 in detail with the two troopers involved in that chase. At the time the passenger exited the Pathfinder on November 25, Trooper Reynolds had already observed several similarities between his pursuit of the Pathfinder and the NCSHP pursuit of a Ford Edge on September 3: Both vehicles were SUV's with stolen out-of-state license plates.

30

Both vehicles gave the appearance of complying with the signal to stop by pulling onto the shoulder right next to the fog line, so that an officer approaching the driver would have to walk in the road. On both occasions, the passenger door opened, likely in an attempt to lull the officer into getting out of his vehicle, and then the vehicle sped away. Moreover, once the Pathfinder left, Trooper Reynolds was able to see the passenger, Defendant Benanti, and observed that he was a white male with a bald spot on the back of his head and that he was holding a black bag, just like the passenger from the Ford Edge on September 3, 2015. Trooper Reynolds affirmatively testified that once the Pathfinder sped away and he saw Benanti outside of the vehicle, he recognized him as the passenger from the September 3 incident. Accordingly, the Court finds that Trooper Reynolds had probable cause to arrest the Defendant for fleeing the scene of an accident on September 3, 2015.

The Court also finds that the collective knowledge of law enforcement contributed to Trooper Reynolds' probable cause. A police officer may rely upon information supplied by another officer or law enforcement agency to provide probable cause to arrest. United States v. Duval, 742 F.3d 246, 253 (6th Cir. 2014); United States v. Perkins, 994 F.2d 1184, 1189 (6th Cir.) (holding that collective knowledge of all officers involved can provide probable cause to arrest), cert. denied 510 U.S. 903 (1993); see also United States v. Hensley, 469 U.S. 221, 232 (1985) (holding that officers conducting Terry stop could rely upon flyer issued by another police department, when the issuing officers had reasonable suspicion and an objective reading of the flyer would have allowed an experienced officer to believe the defendant was wanted for further investigation). "'[E]ffective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another and . . . officers, who must often act swiftly, cannot be expected to cross-examine their fellow officers about the

31

foundation for the transmitted information.'" United States v. Barnes, 910 F.2d 1342, 1344 (6th Cir. 1990) (quoting United States v. Robinson, 536 F.2d 1298, 1299 (9th Cir. 1976)). Thus, law enforcement officers "working as a team" or working "'in close communication with one another'" can contribute to the collective knowledge of the arresting officer. Duval, 742 F.3d at 253 (quoting United States v. Woods, 544 F.2d 242, 260 (6th Cir. 1976)). "If agents are so working, the group's knowledge of a fact may be considered by a reviewing court, 'not just the knowledge of the individual officer who physically effected the arrest.'" Id. (quoting Woods, 544 F.2d at 260). The issue is whether the law enforcement officer relaying the information–in this case Agent Blanton–had probable cause. See Barnes, 910 F.2d at 1344; see also Hensley, 469 U.S. at 231.

In 2012, our appellate court approved the following three-part test for determining whether the collective knowledge doctrine may be applied: "(1) the officer taking the action must act in objective reliance on the information received; (2) the officer providing the information must have facts supporting the level of suspicion required; and (3) the stop must be no more intrusive than would have been permissible for the officer requesting it." United States v. Lyons, 687 F.3d 754, 767 (6th Cir. 2012) (citing United States v. Williams, 627 F.3d 247, 252–53 (7th Cir. 2010)). In the instant case, Trooper Reynolds properly relied on the direction from his supervisor to stop a gray Nissan Pathfinder, with a stolen license plate, occupied by two white males who had recently left 380 Allison Drive, Maggie Valley, North Carolina, and would be traveling near him. Trooper Reynolds was instructed that the occupants of this Pathfinder were the men involved in the September 3 chase and that they were also involved in several bank robberies.

32

Second, Agent Blanton, the officer providing information to the NCSHP, had probable cause to believe that the occupants of the Pathfinder were involved in the September 3 car chase. The Ford Edge abandoned by the two individuals in the September 3 car chase contained a GPS unit. Agent Blanton reviewed the data extracted from that unit and found that the individuals had been traveling to and from a rental cabin at 124 Rebel Ridge Road, Maggie Valley, North Carolina. Law enforcement interviewed an employee of the rental agency, who described the two men to whom the Rebel Ridge cabin was rented during that time period. The descriptions of the men renting the Rebel Ridge cabin matched that of the two men who fled the September 3 chase. Additionally, the rental agency employee said that the two men paid for their extended stay at various rental properties with cash and had used a gift card that bore a last name different from that used by one of the men. The rental agency employee said these same two men were now renting a cabin at 380 Allison Drive. Surveillance of the Allison Drive cabin over the week before the November 25 stop revealed two men, one woman, and several vehicles at the cabin. The two male occupants of the Allison Drive cabin were seen leaving in a gray Pathfinder on the morning of November 25. This Pathfinder had a stolen out-of-state license plate, as did the Ford Edge driven by the men in the September 3 chase. The Court finds that Agent Blanton and the NCSHP, with whom Agent Blanton was in continuous communication, had probable cause to believe that the two men staying at the Allison Drive cabin and driving the Pathfinder were the two men who fled the stolen Ford Edge on September 3.

The Defendant argues the fact that the surveilling officers never identified the men staying at 380 Allison Drive as the men who fled the Ford Edge on September 3 vitiates probable cause. The Court disagrees. Agent Blanton and the NCSHP did not have to know the names of the two men in order to have probable cause that they were the same ones involved in the vehicle

33

chase on September 3. The waypoints and tracks from the GPS from the Ford Edge revealed that the occupants of the Ford Edge had traveled back and forth from a cabin at 124 Rebel Ridge Road, in Maggie Valley, North Carolina. The rental agency employee identified the two men who rented the Rebel Ridge cabin during that time as Ron Bradford and Craig. She said these same two men were now renting a cabin at 380 Allison Drive. Surveillance of the Allison Drive cabin in the week preceding the November 25 stop revealed two men[4] were staying there. The Court finds this evidence provides reasonable grounds to believe that the two men in the Pathfinder were the two men from the Ford Edge. Moreover, Trooper Reynolds confirmed the identification of the occupants of the Pathfinder as the men who fled the Ford Edge because he recognized Defendant Benanti from the video recordings of the events on September 3.

Finally, the Court must find that the seizure effectuated by Trooper Reynolds was no more intrusive than a seizure that the directing officer could have performed at that point in time. The Court observes that Agent Blanton communicated the information from the GPS data extraction, the interview of the PVR employee, and the surveillance of 380 Allison Drive to the NCSHP. Thus, Trooper Reynolds' supervisor, who directed him to stop the Pathfinder, had probable cause to arrest Defendant Benanti.

The Defendant argues that Trooper Reynolds could not arrest Defendant Benanti, who was a passenger in the Pathfinder, for the stolen license tag. He also argues that the evidence linking the occupants of the Pathfinder to the bank robberies in East Tennessee was too tenuous

---

[4] The Defendant points to one sentence in the surveillance notes that he maintains shows four men were present. However, the Court agrees with Agent Blanton that the second mention of two men in this statement—that the agent "observed what appeared to be two males standing in front of two males standing in front of two vehicles" [Exh. 6, p.4]—is a typographical error. The remainder of the surveillance notes from that day and the other three days only reference one or two white males.

to provide probable cause to arrest him for those crimes. Having found that Trooper Reynolds properly arrested the Defendant for the crimes arising out of the September 3 car chase, the Court need not determine whether Trooper Reynolds also had probable cause to arrest the Defendant for other crimes.

Thus, the Court finds that based upon the totality of the circumstances, which includes both those circumstances known to Trooper Reynolds and the collective knowledge of the NCSHP and Agent Blanton, Trooper Reynolds had probable cause to arrest the Defendant immediately upon encountering him on the side of the road. The Defendant's motion to suppress [Doc. 32] all evidence, including a paper seized from his person [Exhs. 13a & 13b), flowing from his November 25, 2015 arrest should be denied.


## B. Statements of November 25, 2015

The Defendant asks the Court to suppress all statements that he made on November 25, 2015, arguing that these statements were taken in violation of his Fifth Amendment rights. He maintains that he was taken into custody around 11:45 a.m., on November 25, but that he was not advised of his rights under <u>Miranda</u> until 9:14 p.m. The Defendant contends that all statements he made before 9:14 p.m. must be suppressed because they were made while he was in custody and subject to interrogation but had not been advised of the <u>Miranda</u> warnings. He also argues that the statements made after he executed a rights waiver must be excluded pursuant to Federal Rule of Evidence 410, because they were made during plea negotiations with the Assistant United States Attorney. Alternatively, he asserts that these statements are the direct result of the prior <u>Miranda</u> violation, despite the intervening advice of rights.

The Government agrees that the Defendant was in custody at all relevant times and that he was not given the complete Miranda warning until 9:14 p.m. However, it argues that many of the statements the Defendant made in the presence of Trooper Reynolds were volunteered and, thus, not barred by the Fifth Amendment. The Government argues that the statements the Defendant made to FBI Agents Blanton and Gryder between 3:00 p.m. and 5:00 p.m. were not made during plea negotiations because a prosecuting attorney was not present and the agents repeatedly told the Defendant that they had no authority to negotiate. Additionally, although the Government concedes that the statements made after 9:14 p.m. can be considered to be made during plea negotiations, it argues that the Defendant's statement about the two types of people is admissible, because the Defendant made this comment after plea negotiations had ended and the AUSA and agents had left the room. Finally, the Government maintains that all of the Defendant's statements were voluntarily given and, thus, all of his statements on November 25, except for those made during plea negotiations, may be used in rebuttal and to impeach him if he testifies.

The Fifth Amendment protects against a defendant being "compelled in any criminal case to be a witness against himself." In light of this protection, the Supreme Court has held that law enforcement officers cannot interrogate a suspect who is in custody until they advise the suspect of his or her rights under the Fifth Amendment. Miranda v. Arizona, 384 U.S. 436, 478-79 (1966); see also United States v. Salvo, 133 F.3d 943, 948 (6th Cir. 1998). "Statements elicited in noncompliance with this rule may not be admitted for certain purposes in a criminal trial." Stansbury v. California, 511 U.S. 318, 322 (1994); Salvo, 133 F.3d at 948. The obligation to administer Miranda warnings to suspects only arises if there has been "such a restriction on a person's freedom as to render him 'in custody.'" Oregon v. Mathiason, 429 U.S. 492, 495

36

(1977) (per curiam). In the instant case, the Government agrees that Defendant Benanti was in custody at all times relevant to this analysis.

The Court divides the Defendant's statements on November 25, 2015, into four groups: (1) The statements made in the presence of Trooper Reynolds following the Defendant's arrest and up until he was transported to the Asheville Police Department, (2) the statements the Defendant made to Agents Blanton and Gryder at the Asheville Police Department between 3:00 and 4:34 p.m., (3) the Defendant's conversation with Officer Shelton[5] and his telephone conversation with his sister, and (4) the statements the Defendant made at the Buncombe County Jail following his execution of a rights waiver at 9:14 p.m. The Court examines whether each of these groups of statements may be admitted at trial and for what purpose.

*(1) Statements to Trooper Reynolds*

The Defendant argues that the statements he made to Trooper Reynolds, following his arrest at gunpoint, must be suppressed because he did not have the benefit of the Miranda warnings. He asserts that the totality of the circumstances, including the fact that he was arrested by two troopers with assault rifles and that Trooper Reynolds threatened to kill him if he did not follow instructions, show that any statements he made cannot be deemed voluntary. The Government contends that the bulk of the statements made by the Defendant during this time were volunteered and, thus, admissible.

Interrogation is defined as "questioning initiated by law enforcement officers." Miranda, 384 U.S. at 444. The duty to warn under Miranda arises in custodial situations "whenever there

---

[5] The Government's response [Doc. 46, p.33 n.12] relates that Officer Shelton is a local Asheville Police Department officer. Thus, the Court infers that Officer Shelton is not NCSHP Trooper Shelton, who was involved in the September 3 car chase.

is 'express questioning or its functional equivalent.'" United States v. Murphy, 107 F.3d 1199, 1204 (6th Cir. 1997) (quoting Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980)). "Interrogation" under Miranda thus "refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response." Innis, 446 U.S. at 301. "Custodial interrogation includes 'words or actions that, given the officer's knowledge of any special susceptibilities of the suspect, the officer knows or reasonably should know are likely to "have . . . the force of a question on the accused" . . . and therefore be reasonably likely to elicit an incriminating response.'" United States v. Clark, 982 F.2d 965, 968 (6th Cir. 1993) (quoting Pennsylvania v. Muinz, 496 U.S. 582, 601 (1990) (internal citations omitted)). "The failure of police to administer Miranda warnings does not mean that the statements received have actually been coerced, but only that courts will presume the privilege against compulsory self-incrimination has not been intelligently exercised." Oregon v. Elstad, 470 U.S. 298, 310 (1985). "[W]here a defendant [in custody] makes a voluntary statement without being questioned or pressured by an interrogator," however, "the statements are admissible despite the absence of Miranda warnings." Murphy, 107 F.3d at 1204 (citing United States v. Montano, 613 F.2d 147, 149 (6th Cir.1980)).

The Court finds that most of the statements the Defendant made to Trooper Reynolds are admissible in the Government's case-in-chief. First, the Court observes that Trooper Reynolds begins to give the Miranda warnings to the Defendant but the Defendant cuts him off, stating that it looks like he is being arrested by the FBI, then asking to have his handcuffs loosened. Most of the statements Defendant Benanti makes are not in response to questions by Trooper Reynolds. In fact, the bulk of the interaction between Defendant Benanti and Trooper Reynolds involves

38

Benanti questioning Trooper Reynolds about the charges against him and against the driver of the Pathfinder. Generally, "[v]olunteered statements of any kind are not barred by the Fifth Amendment[.]" <u>Miranda</u>, 384 U.S. at 478.

The Court examines the totality of the circumstances to assess whether the Defendant's statements were voluntary, despite the fact that they were unwarned. The Court acknowledges that the Defendant's arrest was intense: Trooper Reynolds and a second officer approached the Defendant, pointing guns at him and yelling at him to get on the ground. The officers handcuffed him and frisked him, while he was still on the ground and while the siren continued to blare. The second officer left to pursue the Pathfinder. After asking the Defendant to rise to his knees, Trooper Reynolds told the Defendant, "F**k around, I'll kill you," to which the Defendant responded, "I know, you should." Trooper Reynolds helped the Defendant stand and walked him to the patrol car, where Reynolds turned off the siren. After that, the tension rapidly diffused, and the Defendant's demeanor throughout the remainder of this time in Trooper Reynolds' custody shows that he was not intimidated by the circumstances of his arrest. Instead, the Defendant volunteered that he was previously imprisoned for sixteen years and was familiar with being handcuffed. He repeatedly asked Trooper Reynolds to adjust his handcuffs, which Trooper Reynolds did. Additionally, toward the end of the time he was detained by Trooper Reynolds, the Defendant congratulated Trooper Reynolds on acting professionally. Thus, the Court finds that the totality of the circumstances show that the Defendant's statements to Trooper Reynolds were voluntary, even though he did not receive the <u>Miranda</u> warnings.

Moreover, most of the questions asked by Trooper Reynolds fall within a couple of exceptions to the <u>Miranda</u> requirement. First, the Court finds that Trooper Reynolds could properly ask Benanti whether he had a weapon prior to providing the <u>Miranda</u> warnings for his

39

own safety and that of the other responding officer. "It is well settled that warrantless [and Miranda-less] interrogation is permitted when officers have a reasonable belief based on articulable facts that they are in danger." United States v. Talley, 275 F.3d 560, 563 (6th Cir. 2001). Whether the belief that the officer is in danger is reasonable is an objective, rather than a subjective, determination. Id. In the instant case, Trooper Reynold's supervisor had instructed him to be prepared for an assault by the occupants of the Pathfinder. He also told Trooper Reynolds that the occupants of the Pathfinder were involved in the September 3 car chase and were suspected in several bank robberies. From watching the video recordings of the September 3 car chase, Trooper Reynolds was also aware that the occupants of the Pathfinder had previously responded violently (by purposely hitting three other cars) when officers had attempted to apprehend them. The Court finds that an officer in Trooper Reynolds' position had a reasonable belief, based upon articulable facts, that the Defendant could have a weapon on his person. Thus, Benanti's statements that he did not have any weapons on his person [Exh. 2a, lines 12 & 79] should not be suppressed.[6]

Additionally, Trooper Reynolds' questions seeking the Defendant's biographical information, such as the questions about his name, address, phone number, etc., are permissible

_____

[6] The exception for officer safety arises from the public safety exception to Miranda. Talley, 275 F.3d at 563. In New York v. Quarles, the Supreme Court recognized a public safety exception to the requirements of Miranda, permitting an officer to question an unwarned suspect in custody when such questions are "prompted by a concern for the public safety." 467 U.S. 649, 655 (1984). "For an officer to have a reasonable belief that he is in danger, at minimum, he must have reason to believe (1) that the defendant might have (or recently have had) a weapon, and (2) that someone other than police might gain access to that weapon and inflict harm with it." United States v. Williams, 483 F.3d 425, 428 (6th Cir. 2007). In the instant case, Trooper Reynolds did not have a reasonable belief that Benanti, who was handcuffed on the side of the Interstate, might gain access to a weapon. Moreover, no other people were around. Thus, the Court finds that the broader public safety exception does not apply in this case, only the more narrow exception for officer safety.

40

Case 3:15-cr-00177-TAV-CCS   Document 58   Filed 10/03/16   Page 40 of 51   PageID #: 1074

under another exception to the <u>Miranda</u> requirement, as questions normally attendant to processing an individual who has been arrested. "Questions posed 'to secure the personal history data necessary to complete the booking process, are exempt from <u>Miranda</u>'s coverage.'" <u>United States v. Broadus</u>, 7 F.3d 460, 464 (6th Cir. 1993) (quoting <u>United States v. Clark</u>, 982 F.2d 965, 968 (6th Cir.1993)). Thus, unless it appears that the officer used biographical questions to provoke an incriminating response, this type of routine questioning is not interrogation. <u>Id.</u> The location of the questioning, the nature of the questioning, and whether or not the officer records the information given are all relevant to whether the booking exception applies. <u>United States v. Pacheco-Lopez</u>, 531 F.3d 420, 424 (6th Cir. 2008). Here, the Court finds no evidence that Trooper Reynolds asked the Defendant biographical questions in order to get him to provide incriminating information. Instead, Trooper Reynolds was attempting to gather the information necessary to process the arrest of the Defendant. The nature of the questions asked and the fact that Trooper Reynolds was writing down the Defendant's answers cause the Court to conclude that the questions soliciting biographical information were not interrogation.

The only statements of Defendant Benanti that the Court finds should be excluded because they are made in response to interrogation by Trooper Reynolds are the following:

> (1) Benanti's comment that he has no idea what is going on and that it is not normal to be kicked out of and abandoned by a car traveling on the interstate [Exh. 2a, lines 58-65];
>
> (2) Benanti's explanation of why he was in prison and where [Exh. 2a, lines 234-245 & 290-94]; and
>
> (3) Benanti's response to Trooper Reynolds' questions about the identity of the driver and what Benanti and the driver were doing [Exh. 2a, lines 296-300 & 314-320].

The undersigned finds that the remaining statements by the Defendant to Trooper Reynolds were volunteered and, as such, should be deemed admissible in the Government's case-in-chief, despite the fact that they were unwarned.

Additionally, the Court finds that all of the Defendant's statements to Trooper Reynolds were voluntarily made and, thus, even the four sets of remarks the undersigned recommends excluding from the Government's case-in-chief are admissible to impeach him, if he chooses to testify at trial. Our Supreme Court has held that a defendant's unwarned statement, which is inadmissible in the government's case-in-chief, may be used to impeach the defendant's testimony, if the defendant chooses to testify, as long as the statement is trustworthy in that it was voluntarily given. Harris v. New York, 401 U.S. 222, 224-26 (1971); see also United States v. Phillips, 575 F2d 97, 100 (6th Cir. 1978) (following Harris v. New York and affirming the government's cross-examination of the defendant on statements he made to FBI agents after he asked for a lawyer). "The shield provided by Miranda cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances." Harris, 410 U.S. at 226. As discussed above, the undersigned finds, based upon a review of the totality of the circumstances, that the Defendant voluntarily engaged in the conversation with Trooper Reynolds. Thus, all of the Defendant's statements to Trooper Reynolds on November 25, 2015, from the time of his arrest to the time that he was transported to the Asheville Police Department may be used to impeach the Defendant should he choose to testify.

*(2) Statements to Agents Blanton and Gryder from 3:00 p.m. to 4:34 p.m.*

The Defendant argues that the statements he made to Agents Blanton and Gryder in an interview room at the Asheville Police Department should also be suppressed because they were unwarned and, at that point, he had been in custody for several hours.  The Government states [Doc. 46, p.43] that it does not intend to use any of the Defendant's statements to Agents Blanton and Gryder at the Asheville Police Department in its case-in-chief.[7]  However, the Government argues that these statements are admissible to impeach the Defendant, should he elect to testify.

The Court begins from the principle that statements made without the benefit of the Miranda warnings are presumed inadmissible.  Oregon v. Elstad, 470 U.S. 298, 307 (1985).  Between 3:00 p.m. and 4:34 p.m., on November 25, 2015, Agents Blanton and Gryder did not advise the Defendant of his Miranda rights.  Although the agents took out the rights waiver form and the Defendant said that he was "absolutely" familiar with the Miranda rights, the agents accepted the Defendant's request to "start a little informally" [Doc. 46-2, p.2], and Agent Blanton said that he was not going to give the advice of rights at that time [Doc. 46-2, p.2].  Later, in the interview, Agent Blanton confirmed that the Defendant had not been advised of his Miranda rights and, thus, their conversation could not be used against him.  [Doc. 46-2, p.10] "[U]nwarned statements that are otherwise voluntary within the meaning of the Fifth

---

[7] The Government also responds [Doc. 46] that the Defendant's statements to agents at the Asheville Police Department are not covered by Federal Rule of Evidence 410, which excludes statements made in the course of plea discussions, because a prosecuting attorney was neither present, nor participated in the discussion.  The Court does not take the Defendant to be arguing that the statements between 3:00 p.m. and 5:00 p.m. were plea discussions.  However, the Court agrees with the Government that Rule 410 would not apply to these interviews because no prosecuting attorney was involved.  See Fed. R. Evid. 410(a)(4); United States v. Marks, 209 F.3d 577, 582 (6th Cir.) (observing that "FBI agents cannot negotiate plea agreements with defendants, so statements that defendants make to them are not 'made in the course of plea discussions'"), cert. denied, 531 U.S. 882 (2000).

43

Amendment must nevertheless be excluded from evidence under <u>Miranda</u>. Thus, in the individual case, <u>Miranda</u>'s preventive medicine provides a remedy even to the defendant who has suffered no identifiable constitutional harm." <u>Elstad</u>, 740 U.S. at 307. Here, although Defendant Benanti likely understood his right not to incriminate himself, he still receives the benefit of the presumption because he did not receive the <u>Miranda</u> warnings.

Like with his conversation with Trooper Reynolds, the Defendant appears to volunteer information, not in response to interrogation, in his discussions with Agents Blanton and Gryder. However, because the Government does not intend to use any of these discussions in its case in chief, the Court will not expend judicial resources to parse these interviews line by line. However, the Court will examine whether these statements, like the statements to Trooper Reynolds, were voluntary, despite being unwarned, such that they could be used to impeach the Defendant, if he chooses to testify. The Defendant argues that the length of time that he had been in custody at that point, between three and four and one-half hours rendered his statements involuntary. Although lengthy questioning can amount to police coercion, the Court finds that the interviews with the agents, which were a total of fifty-three minutes long, were not coercive. <u>See</u> <u>Ledbetter v. Edwards</u>, 35 F.3d 1062, 1069 (6th Cir. 1994) (questioning from midnight to 3:00 a.m. not coercive); <u>but, c.f.</u>, <u>Spano v. New York</u>, 360 U.S. 315, 322 (1959) (deeming an interview lasting eight consecutive hours through the night to be coercive). Accordingly, the Court determines that the length and circumstances of the Defendant's interview do not amount to police coercion. The Court finds the Defendant's statements to Agents Blanton and Gryder were voluntary and, thus, that they may be used to impeach the Defendant, should he choose to testify.

44

*(3) Statements to Officer Shelton and Telephone Conversation*

At the June 2 hearing, defense counsel argued that the Court should also suppress the Defendant's conversation with Officer Shelton and his telephone conversation with his sister because the taint from the earlier unwarned statements carries over to these statements. Defense counsel also noted that the Defendant had been in custody over five hours at this point. The Court finds that none of the statements made by the Defendant to Officer Shelton or to his sister are the product of interrogation. As discussed above, interrogation is "questioning initiated by law enforcement officers." Miranda, 384 U.S. at 444. The Court finds that any questions asked by Officer Shelton were related to whether the Defendant needed to go to the bathroom and to the Defendant calling his family. The Defendant spontaneously rants about the federal authorities attempting to pressure him for information and his belief that his arrest was unwarranted, but Officer Shelton did nothing to precipitate these soliloquies. Moreover, it is beyond dispute that the Defendant's conversation with his sister was not the product of interrogation by the police. The Court finds that these statements were not gained in violation of the Fifth Amendment.[8]

*(4) Comment about Two Kinds of People*

Both parties agree that the Defendant's statements during his meeting with AUSA Lewen, Agent Blanton, and Agent Nocera are inadmissible for any reason because they are statements the Defendant made during plea negotiations that ultimately failed to result in a guilty

---

[8] Although not raised by the Defendant, the Court also finds that the recording of the Defendant's side of a telephone conversation with his sister is not a Fourth Amendment violation. Agent Blanton informed the Defendant that interview room in which he was detained contained a recording device and that everything they said in the room was being recorded. Moreover, the Defendant conducted his telephone conversation in the presence of Officer Shelton.

45

plea. Federal Rule of Criminal Procedure 11(f) states that the admissibility of plea discussions is governed by Federal Rule of Evidence 410. Rule 410(a)(4) provides in pertinent part that evidence of "a statement made during plea discussions with an attorney for the prosecuting authority" is not admissible against a criminal defendant, "if the discussions did not result in a guilty plea[.]" However, the Government argues that after the plea discussion had ended, the Defendant made a comment that "there are two types of people, those who go in harm's way and do things and those that plan." The Government argues that this statement should be admissible in its case-in-chief, because the Defendant had been advised of the <u>Miranda</u> rights at the start of the discussion with AUSA Lewen and Agents Blanton and Nocera, and the plea discussions had ended at the time Benanti made this comment. The Defendant responds that this comment should be suppressed because it was the direct result of the prior <u>Miranda</u> violation.

First, the Court examines whether the Defendant's comment about the two types of people can be considered to be part of the prior plea discussion. Agent Blanton testified that he, Agent Nocera, and AUSA Lewen met with the Defendant in an interview room at the Buncombe County Jail. Following the Defendant's execution of a rights waiver, the discussion lasted five to ten minutes. Agent Blanton related that AUSA Lewen said, "We're done." Thereafter, AUSA Lewen, Agent Nocera, and Agent Blanton left the room. Agent Blanton testified that the Defendant made the remark about the two types of people after AUSA Lewen was already out of the room. Based upon the testimony of Agent Blanton, the Court finds that the plea discussion ended when AUSA Lewen said the parties were done and left the room. Accordingly, a remark the Defendant made following the conclusion of the plea discussion is not covered by Federal Rule of Evidence 410(a)(4).

The Defendant argues that even if the comment at issue was not a part of the plea discussion, it should be suppressed, despite the Miranda warning at 9:14 p.m., because the comment directly flowed from the earlier unwarned interrogation. Two Supreme Court cases speak to the admissibility of a warned statement, following an unwarned statement. See Missouri v. Seibert, 542 U.S. 600 (2004); Oregon v. Elstad, 470 U.S. 298 (1985). In Oregon v. Elstad, the Court recognized that a break in the stream of events between a properly warned confession and a prior unwarned but voluntary admission can remove the taint of the unwarned statement. 470 U.S. at 310. "When a prior statement is actually coerced, the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators all bear on whether that coercion has carried over into the second confession." Id. When such a break in the stream of events occurs, the subsequent Miranda "warning conveys the relevant information and thereafter the suspect's choice whether to exercise his privilege to remain silent should ordinarily be viewed as an 'act of free will.'" Id. (quoting Wong Sun v. United States, 371 U.S. 471, 486 (1963)).

In the instant case, the undersigned finds that a sufficient break in the stream of events occurred so as to remove any taint from the prior unwarned statements. Although at least one of the same law enforcement officers (Agent Blanton) was involved in the pre-Miranda interview, the post-Miranda interview occurred four and one-half hours later, at a different location, and with at least two new participants (AUSA Lewen and Agent Nocera). The Court also finds that the instant Defendant was not afflicted by a "subtle form of lingering compulsion [from] the psychological impact of the suspect's conviction that he has let the cat out of the bag" in the previous, unwarned statement, because the Defendant never confessed or admitted his involvement in any crimes in the earlier statements. See Elstad, 470 U.S. at 310. Thus, the

47

Defendant's comment following the warned plea discussion was not caused by his earlier unwarned statements.

The Supreme Court has also examined the effect of a "Miranda in the middle" tactic by law enforcement, in which the police obtained the defendant's unwarned confession, then later provided the Miranda warnings and had the defendant repeat the confession. Missouri v. Seibert, 542 U.S. 600 (2004). The lead opinion observed that "when Miranda warnings are inserted in the midst of coordinated and continuing interrogation, they are likely to mislead and 'depriv[e] a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them.'" Id. at 601 (quoting Moran v. Burbine, 475 U.S. 412, 424 (1986)). In the instant case, the Court finds no evidence that Trooper Reynolds or the agents engaged in tactics designed to circumvent the effectiveness of the Miranda warnings. Instead, both Trooper Reynolds and Agent Blanton attempted to provide the Miranda warnings to the Defendant. It was the Defendant who cut Trooper Reynolds off and who asked to begin informally, rather than allow Agent Blanton to review the Miranda warnings.

A review of the five-factor test set forth by the Seibert plurality confirms that no Miranda-in-the-middle tactic was in play here. The following factors are relevant to determining whether Miranda warnings given after the defendant has made some statements can effectively preserve the defendant's Fifth Amendment rights in giving additional statements:

> [T]he completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first.

Id. at 601-02. In the instant case, neither Trooper Reynolds, nor Agents Blanton and Gryder asked Defendant Benanti detailed questions in the initial interviews. Instead, the conversations were let by Benanti and, at least with regard to his conversations with Agents Blanton and Gryder, were more discussions of whether Benanti would, at some point in the future, provide any type of statement, rather than him doing so then. As discussed above, there was a break in both time and location between Benanti's unwarned interviews and his subsequent plea discussion. The Court finds that at least Agent Blanton was present at both the afternoon interviews and the plea discussion later that night. However, any continuity in the warned and unwarned statements was with regard to a continuation of the discussion of the availability of immunity, not a substantive discussion of the crimes. Thus, the Court finds that the Defendant's statement about the two types of people was not the result of the any prior Miranda violation and is admissible in the Government's case in chief, provided that it can somehow be shown to be relevant.

In summary, the Court recommends that

> (1) the Defendant's comments made in the presence of Trooper Reynolds be allowed in the Government's case-in-chief, with the exception of
>
> > (a) Benanti's comment that he has no idea what is going on and that it is not normal to be kicked out of and abandoned by a car traveling on the interstate [Exh. 2a, lines 58-65];
> >
> > (b) Benanti's explanation of why he was in prison and where [Exh. 2a, lines 234-245 & 290-94]; and
> >
> > (c) Benanti's response to Trooper Reynolds' questions about the identity of the driver and what Benanti and the driver were doing [Exh. 46-1, lines 296-300 & 314-320].

49

(2) Benanti's statements to Agents Blanton and Gryder at the Asheville Police Department be deemed inadmissible in the Government's case-in-chief because they are unwarned and, furthermore, the Government has stated that it does not plan to use them in its case-in-chief;

(3) Benanti's conversation with Officer Shelton and his telephone conversation with his sister should not be excluded because they are not the product of interrogation;

(4) Benanti's discussion with AUSA Lewen and Agents Blanton and Nocera at the Buncombe County Jail should be deemed inadmissible as plea discussions. However, Benanti's comment about the two kinds of people made after the conclusion of plea negotiations is admissible in the Government's case-in-chief, if relevant; and

(5) The Government should be permitted to use any of Defendant Benanti's statements of November 25, 2015, including the statements in numbers (1)(a)-(c) and (2) above and except for those deemed to be plea discussions, to impeach the Defendant, if he testifies.

## V. CONCLUSION

After carefully considering the parties' filings and arguments, the evidence, and the relevant legal authorities, the Court finds that the Defendant was properly arrested on November 25, 2015, based upon probable cause. The Court also finds that part of the Defendant's statements on November 25, 2015, must be suppressed or excluded because they were unwarned or occurred during plea negotiations. However, all of the Defendant's statements to Trooper Reynolds, with the exception of four parts of the statement set out above, are admissible because they were voluntary and volunteered. Additionally, the Defendant's conversation with Officer Shelton, telephone conversation with his sister, and comment about two kinds of people made following the conclusion of the plea discussion are also admissible, if relevant. Accordingly, the

50

undersigned respectfully **RECOMMENDS** that the Defendant's Motion to Suppress Based on the Illegal Arrest, November 25, 2016 [Doc. 32] be denied and his Motion to Suppress Oral Statements Made by Defendant [Doc. 35] be granted in part and denied in part.[9]

Respectfully submitted,

_____ s/ C. Clifford Shirley, Jr. _____
United States Magistrate Judge

---

[9] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2) (as amended). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); see United States v. Branch, 537 F.3d 582, 587 (6th. Cir. 2008); see also Thomas v. Arn, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).

51