UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

UNITED STATES OF AMERICA,    )
                             )
            Plaintiff,       )
                             )
v.                           )    No.: 3:15-CR-177-TAV-CCS-1
                             )
MICHAEL BENANTI,             )
                             )
            Defendant.       )

## <u>MEMORANDUM OPINION AND ORDER</u>

This criminal matter is before the Court for consideration of the Report and Recommendation entered by United States Magistrate Judge C. Clifford Shirley, Jr. (the "R&R") [Doc. 58]. The R&R addresses two of the defendant's motions to suppress evidence [Docs. 32, 35]. The government responded to the motions [Doc. 46], and Magistrate Judge Shirley held a hearing on the motions on June 2, 2016 [Doc. 87]. Magistrate Judge Shirley then issued the R&R, recommending that the Court deny the defendant's Motion to Suppress Based on the Illegal Arrest, November 25, 2015 [Doc. 32] and grant in part and deny in part the Motion to Suppress Oral Statements Made by Defendant [Doc. 35]. The defendant filed objections to the R&R [Doc. 73], and the government responded to those objections [Doc. 80]. For the reasons that follow, the Court will overrule the defendant's objection and accept the R&R.[1] Thus, the

---

[1] The Court will not, however, accept the section of the R&R allowing the defendant's statements made to Agents Blanton and Gryder from 3:00–4:34 p.m. to be used for impeachment purposes if the defendant elects to testify [Doc. 58 pp. 43–44], as the government stated in its response that it will not use any of these statements for impeachment of the defendant if he chooses to testify at trial [Doc. 80 p. 1 n.1].

defendant's Motion to Suppress Based on the Illegal Arrest, November 25, 2015 [Doc. 32] will be denied, and the defendant's Motion to Suppress Oral Statements Made by Defendant [Doc. 35] will be granted in part and denied in part.

## I.   Background[2]

On September 3, 2015, North Carolina State Highway Patrol ("NCSHP") Troopers Shelton and Hooper attempted to stop a dark-colored Ford Edge SUV traveling on I-40 westbound in North Carolina, close to the Tennessee state line.[3]   The troopers were in separate vehicles and had their lights and sirens activated.   The SUV pulled onto the shoulder twice, with one of the troopers stopping behind it each time, then sped back onto the road.   The second time the SUV pulled onto the shoulder, the driver's side wheels were not fully over the line delineating the roadway, and the passenger door opened briefly before the vehicle sped away.   As the pursuit continued, the Ford Edge intentionally struck three vehicles, crashed into a barrier, and spun around one-hundred-and-eighty degrees.   As soon as the Ford Edge came to a stop, two white males, each holding black duffle bags, exited the SUV and ran across three lanes of traffic and into the woods on the opposite side of the Interstate.   The driver had a slender build, and the passenger was heavy-set with dark hair and a bald spot on the back of his head.   Troopers

---

[2] The defendant does not dispute the R&R's Summary of Testimony found on pages 3–21, or the Findings of Fact on pages 21–28, aside from a few specific objections [Doc. 73 pp. 2–3].   The Court, therefore, adopts the R&R's summary of testimony and findings of fact that the defendant did not object to, and the Court and will address the defendant's limited objections in turn.

[3] The account of this incident is based on Trooper Reynolds's testimony at the June 2, 2016, hearing before Magistrate Judge Shirley.

Shelton and Hooper pursued the men across the road but did not follow them into the woods. The NCSHP subsequently determined that the Ford Edge was stolen and had a stolen out-of-state license plate.

On October 21, 2015, two masked white males attempted to rob the Northeast Community Credit Union in Elizabethton, Tennessee, by kidnapping a bank employee and her son. These crimes resembled two other bank robberies that occurred on April 28, 2015, in Oak Ridge, Tennessee, and July 7, 2015, in Knoxville, Tennessee.[4] Special Federal Bureau of Investigation ("FBI") Agent Jeff Blanton, who testified before Magistrate Judge Shirley on June 2, 2016, headed the investigation of the crimes involving Northeast Community Credit Union.

On the same day of the attempted robbery of the Northeast Community Credit Union, Agent Blanton learned of the September 3 car chase in North Carolina and that the occupants of that vehicle fled carrying large bags. Agent Blanton subsequently spoke with the NCSHP and learned that the Ford Edge, abandoned by the perpetrators in the September 3 chase, contained a Global Positioning System ("GPS") unit. Agent Blanton obtained that GPS unit, had the FBI's digital processing laboratory extract the data from the unit, and reviewed the data. The GPS data revealed that the GPS unit was used three times: First, to travel from northern Virginia to 124 Rebel Ridge Road, Maggie Valley,

---

[4] Agent Blanton listed the following commonalities of the three sets of crimes: (1) the bank employees were targeted in their homes; (2) the perpetrators forced the bank employees to go to the bank and withdraw money, while the employees' family members were held hostage; and (3) all of the victims, with the exception of an infant, were blindfolded.

3

North Carolina, on August 1, 2015; Second, the users had traveled from a location near 124 Rebel Ridge Road to west Knoxville and back to 124 Rebel Ridge Road on September 2, 2015; and Third, the unit was activated on September 3, 2015, at 124 Rebel Ridge Road and terminated at the crash site on that day. The "waypoint," labeled as "home" on the GPS track, was a strip mall in Waynesville, North Carolina, which contained a property rental business.[5]

The property at 124 Rebel Ridge Road, where the GPS unit was activated on September 3, 2015, is a rental cabin, managed by Premier Vacation Rentals ("PVR"). On November 12, 2015, Melissa Pless, an employee of PVR, related to law enforcement that she rented a series of PVR cabins to two white males, whom she knew as Ron Bradford and Craig. Ms. Pless described Ron as a tall, slender, bald, white male with glasses, and she said that Craig, who conducted most of the business for the two, was a stout, white male. She said that Ron and Craig, who told her that they were in Maggie Valley to ghostwrite a book, rented a cabin at Highview Drive from June 19 to July 26, 2015, and paid $3,106 in cash. Ms. Pless said that Ron and Craig rented the cabin at 124 Rebel

_____

[5] Agent Blanton testified that the GPS track revealed that the users had traveled to a community in west Knoxville one day before the Ford Edge crashed in North Carolina, a few miles from the Tennessee state line. He stated that a waypoint labeled "star" was located at the Enrichment Federal Credit Union on Kingston Pike and Cedar Springs Road. This credit union was one-half mile from the SmartBank, which was targeted in the East Tennessee crimes under investigation. Agent Blanton stated that one and one-half miles from "star" was a waypoint labeled "switch," which Agent Blanton took to be the place where the switch car would be located. Approximately three hundred yards north of "switch" was a waypoint labeled "crozs." Around two hundred yards southeast of "crozs" was a waypoint labeled "crozs1," and a waypoint labeled "crozs2" was located three hundred yards east of "switch." Agent Blanton stated that this evidence increased his suspicion that the individuals from the North Carolina car chase were involved in the three bank robberies in East Tennessee.

4

Ridge Road from July 17, to October 25, 2015, for $5,200, and from October 25 to November 15, 2015, for $6,475.[6] Ms. Pless stated that the men then moved to the cabin at 380 Allison Drive and paid a $500 deposit. Agent Blanton shared all of this information with the NCSHP. Ms. Pless also stated that Ron and Craig initially drove a black Lexus SUV but that she had not seen that vehicle in the last few months and that Ron and Craig were currently driving a gold SUV. Agent Blanton knew that the perpetrators of the April 28, 2015, attempted robbery of the Y-12 Federal Credit Union drove a black Lexus SUV and that, following that robbery, law enforcement found a stolen black Lexus SUV, which had been burned to the extent that the frame was damaged.

Agent Blanton testified that Ms. Pless provided the officers with Craig's email address, telephone number, and his address of 713 Chestnut Street, Philadelphia, Pennsylvania. Agent Blanton said that this address resolved to a public parking lot. Agent Blanton stated that the information from Ms. Pless, including the fact that Ron and Craig paid in cash, further added to his suspicions that these two men were involved in the East Tennessee bank robberies and related crimes. He testified that he provided the information from Ms. Pless to the NCSHP before November 25, 2015.

---

[6] Ms. Pless stated they paid $425 in cash and used a gift card addressed to Ron Bradley, rather than Ron Bradford. She said that Craig explained this discrepancy by saying that Ron had been given a gift card but that someone had written his name incorrectly.

5

The FBI and North Carolina law enforcement officers conducted surveillance of the cabin at 380 Allison Drive on November 19, 23, 24, and 25, 2015. On November 19, officers observed three vehicles at the cabin, including an SUV. They also saw a white male, who was bald, of athletic build, and around six feet tall. Later that day, officers observed a white female and a white male leave the cabin in a vehicle with a Vermont license tag. The white female drove the pair to a CVS Pharmacy, and the bald, white male passenger went in the store. On November 23, 2015, the officers observed two men standing in front of two vehicles at the cabin. Later that morning, the officers saw two men leaving the residence in a silver minivan. On November 24, officers saw a white male leave the cabin in a maroon Toyota Highlander with a license plate that was registered to a GMC Yukon. The man got gas and then vacuumed the Highlander at a car wash, before going back in the direction of the cabin. Later on November 24, officers saw a third vehicle—a silver SUV—at the cabin and also saw two white males outside the residence at different times. At 11:05 a.m., on November 25, 2015, surveilling officers saw a silver Nissan Pathfinder with a Maryland license tag leave the cabin. A records check on the license tag revealed that it was stolen.

At 11:23 a.m. that same day, the surveilling officers followed the Pathfinder eastbound on I-40 and remained in contact with local law enforcement, which in turn was in contact with the FBI. The officers followed the Pathfinder onto I-26 eastbound and continued to follow it until the NCSHP attempted to stop the Pathfinder near mile marker 36.

NCSHP Trooper Gregg Reynolds—who also testified before Magistrate Judge Shirley at the June 2 hearing—was on a meal break on November 25, 2015, when he received a call from his supervisor directing him to stop a gray Nissan Pathfinder, with a stolen license plate, which would be traveling through his jurisdiction that morning. The supervisor related that the two white men in the Pathfinder were believed to be the perpetrators of the September 3 car chase and of several bank robberies. Trooper Reynolds, a training officer for the NCSHP, was familiar with the September 3 car chase because he had reviewed the video recordings from the in-car cameras of Troopers Shelton and Hooper between five and ten times, had interviewed Troopers Shelton and Hooper about the chase, and had used the videos in his training sessions.[7] The NCSHP supervisor told Trooper Reynolds that he was to stop the Pathfinder "whatever it took." Trooper Reynolds testified that this was the first time he had ever received such an instruction in his sixteen years with the NCSHP. Thus, Trooper Reynolds donned protective gear, got his AR-15, and set up on I-26 with two other troopers in separate patrol cars.

The Pathfinder passed Trooper Reynolds heading eastbound on I-26. Trooper Reynolds followed it and confirmed that the Maryland license plate was stolen. He then

---

[7] Trooper Reynolds is a training officer, instructing new and current troopers. He is trained and certified to be a training officer and has specialized certificates in maintaining control of subjects, defensive tactics, and officer survival. In this capacity, he reviews incidents in which officers are involved and uses the incidents as case studies for training. Trooper Reynolds testified that this video footage was used in training because this incident was particularly unusual and raised concerns with regard to officer safety.

7

attempted to stop the Pathfinder. The Pathfinder pulled onto the shoulder, with its wheels touching the fog line, the passenger's side door opened, and a white male got out. The Pathfinder then sped away. Troopers Smith and Shelton pursued the Pathfinder, while Trooper Reynolds remained with the passenger. After the Pathfinder fled, Trooper Reynolds saw that the passenger was a heavy-set, white male with a bald spot on the back of his head and that he held a black duffle bag. Trooper Reynolds testified that the passenger's physical characteristics were very similar to the September 3 passenger, which led him to believe that they were the same person [Doc. 87 p. 63 ll.3–12].[8]

---

[8] The R&R provided that "Trooper Reynolds recognized the man, whom he later identified as Michael Benanti, as the passenger from the September 3 car chase" [Doc. 58 p. 25]. The defendant objects to this particular finding of fact [Doc. 73 p. 2]. He states that this "does not accurately reflect Trooper Reynolds [sic] testimony" [Id.]. The defendant asserts that Trooper Reynolds merely perceived similarities between the passenger in the September 3 chase and the passenger in November 25 case—both were heavy-set bald males, carrying black bags [Id. at 2–3]. In sum, the defendant argues that Trooper Reynolds "was unable to identify Mr. Benanti as being the same individual as the person from the September 3 chase" [Id. at 3]. To resolve this factual dispute, the Court has reviewed the transcript of the June 2 hearing before Magistrate Judge Shirley and has utilized Trooper Reynolds's exact language.

Trooper Reynolds said that the November 25 stop was similar to the September 3 chase in the following ways: (1) both vehicles had stolen license plates; (2) both vehicles were slow to respond to law enforcement's signal to stop; (3) both vehicles momentarily pulled onto the shoulder; (4) both times the passenger's side door opened; (5) both vehicles then sped off and led police in a chase; (6) both passengers were white, heavy-set males with a bald spot on the back of the head; (7) both passengers carried a black bag; and (8) on both occasions, the vehicle stopped next to the fog line, which put the officer at a disadvantage because the officer would have to walk into the road to engage the driver. Trooper Reynolds further testified that, based on his personal experience and his experience as a training officer, it is uncommon for suspects to carry items as large as the duffel bags when they flee. He said it is also uncommon for the occupants of a fleeing vehicle to pull over, open the passenger's door, and then resume flight.

With regard to dissimilarities between the two events, Trooper Reynolds said that the area in which the September 3 car chase occurred and the location in which he was to stop the individuals on November 25 were about fifty miles apart. He also stated that the two incidents

Trooper Reynolds and a second officer approached the defendant, pointing guns at him and yelling at him to get on the ground.  The officers handcuffed him and frisked him, while he was still on the ground.  Then, the second officer left to pursue the Pathfinder.  After asking the defendant to rise to his knees, Trooper Reynolds told the defendant, "F**k around, I'll kill you," to which the defendant responded, "I know, you should" [Doc. 46-1 p. 1].  Trooper Reynolds testified that he believed he had probable cause to arrest the defendant for the stolen license tag on the Pathfinder and because he was a passenger in the September 3 car chase. Trooper Reynolds said that he believed the defendant was in possession of the stolen license plate because he was a passenger in the vehicle.

Trooper Reynolds helped the defendant stand and walked him to the patrol car, where Reynolds turned off the siren.  The defendant asked whether he was being arrested.  Trooper Reynolds affirmed that the defendant was being arrested, radioed the other troopers, and ordered the defendant to stop moving around.  The defendant explained that he was trying to straighten his wrists in the handcuffs.  Trooper Reynolds asked the defendant if he had any weapons and if he knew what was going on.  The defendant declined to comment.  Trooper Reynolds told the defendant that he was under arrest and

---

occurred on different roads—one on I-40 westbound and the other on I-26 eastbound. He further testified that the incidents occurred nearly three months apart and involved different vehicles. Trooper Reynolds provided that on September 3, the passenger was wearing a short-sleeved shirt and shorts and that on November 25, the passenger was wearing long pants and a jacket.  He also stated that on November 25, the vehicle did not strike any other vehicles and that the passenger got out of the car and did not flee or resist arrest.

attempted to advise the defendant of the *Miranda* warnings, but the defendant interrupted him, asking Trooper Reynolds to loosen his handcuffs. Reynolds admits that he did not provide the full *Miranda* warnings to the defendant. At this point, the defendant stated that he had no weapons on his person.

Another officer radioed Trooper Reynolds and asked him to bring the defendant and his bag to the location where the Pathfinder had been stopped. The defendant again asked that his handcuffs be loosened, but Trooper Reynolds deferred to the FBI, then said that he would loosen them in five minutes. Trooper Reynolds seated the defendant in his patrol car, directed him to sit on his hands and not move, and asked the defendant his name and where he was from. The defendant identified himself and said that he was from Pennsylvania. Trooper Reynolds transported the defendant to a location approximately one mile away, at which other officers had stopped the Pathfinder.

Upon reaching the second location, Trooper Reynolds assisted the defendant out of the patrol car and loosened the handcuffs. The defendant told Trooper Reynolds that he had been in prison for sixteen years, so he was familiar with wearing handcuffs. Trooper Reynolds asked the defendant why and where he had been in prison, to which the defendant responded that he went to prison in Lewisberg over money when he was nineteen and that he had been out for seven or eight years. Trooper Reynolds then asked the defendant a series of identifying questions: name, birthdate, address, telephone number, height, weight, hair color, eye color, and whether he had any tattoos or scars. Trooper Reynolds wrote down the defendant's answers, and the defendant spontaneously

added his social security number.  Trooper Reynolds again asked where the defendant had been imprisoned, and the defendant responded Lewisburg, Pennsylvania.  Trooper Reynolds asked the defendant to identify the driver of the Pathfinder, what their plan was, and where they were headed, but the defendant declined to provide any of this information.

For the remainder of the time, until the defendant was transported to the Asheville Police Department, the defendant questioned Trooper Reynolds about his charges and about the driver of the Pathfinder.  Trooper Reynolds told the defendant that he was under arrest but that his charges were not from the NCSHP and that the FBI would talk to him about his charges.  The defendant spontaneously told Trooper Reynolds that he had been in the Bahamas the previous week, distributing his girlfriend's ashes, after she committed suicide.  The defendant stated that whatever is going on had nothing to do with him, and Trooper Reynolds continued to respond that they had to wait for the other law enforcement officers to join them.  The defendant told Trooper Reynolds that he wanted to make sure that Trooper Reynolds knew that he had cooperated and been truthful in giving his name.  Twice during the time that the defendant was in Trooper Reynolds's custody, Trooper Reynolds mentioned that his body microphone was still recording.

At 3:07 p.m., on November 25, 2015, Agent Blanton and FBI Task Force Officer Matt Gryder interviewed the defendant at the Asheville Police Department.  The agents produced a *Miranda* rights waiver form, and Agent Blanton asked the defendant if

anyone had read him his rights yet. The defendant replied that they had started but had not really read them to him and that he was familiar with the *Miranda* rights. The defendant asked if there was an indictment on him. The agents responded that there was no indictment at that time. The defendant asked if they could speak informally first. The agents left after a fifteen to eighteen-minute conversation, during which the defendant repeatedly asked for an immunity agreement and declined to answer any questions without one.

At 4:00 p.m., Agents Blanton and Gryder again spoke with the defendant at the Asheville Police Department. Agent Blanton told the defendant that he had spoken with the Assistant United States Attorney ("AUSA") but that he did not have an immunity agreement for the defendant. Agent Blanton told the defendant that the NCSHP was going to charge him with possession of a stolen vehicle and that the federal authorities were going to seek a criminal complaint charging him with the interstate transportation of a stolen vehicle. The conversation continued for thirty-four minutes, ending with Agent Blanton reiterating that the United States Attorney's Office would not give the defendant immunity "up front." At one point in the conversation, Agent Blanton told the defendant that the room had a recording device and that their conversation was being recorded. After the agents left, the defendant asked Asheville Police Department Officer Shelton to allow him to make a telephone call to his family. Officer Shelton gave the defendant a cellular telephone, which the defendant used to call his sister. The defendant's side of this telephone conversation was recorded.

At 9:14 p.m. on November 25, 2015, Agent Blanton, FBI Agent Mick Nocera, and AUSA David Lewen spoke with the defendant at the Buncombe County Jail in Asheville, North Carolina. The room in which they met was a little larger than a standard interview room. Although the defendant said he understood his rights and asked if they could just talk, Agent Blanton reviewed each of the lines on the Advice of Rights form with the defendant. The defendant then signed the Advice of Rights form. After the defendant executed the rights waiver,[9] the agents and AUSA Lewen spoke with him for five to ten minutes. The meeting ended with AUSA Lewen saying, "We're done." Then, AUSA Lewen and the agents left the room. After AUSA Lewen had walked out and as Agent Blanton was walking out, the defendant said, "There are two types of people, those who go in harm's way and do things and those that plan."

The defendant is charged with conspiring to obstruct, delay, or affect commerce by committing robbery and extortion with regard to commercial entities in Pennsylvania, Connecticut, Tennessee, North Carolina, South Carolina, and Georgia (Count One), and with possession of a firearm in furtherance of a crime of violence in relation to this conspiracy (Count Two) [Doc. 30]. He is also charged with three sets of the following offenses: bank robbery by extortion with use of a dangerous weapon (Counts Three, Ten, and Seventeen); use of a firearm in relation to the bank robbery by extortion (Counts Four, Eleven, and Eighteen); carjacking (Counts Five, Twelve, and Nineteen); use of a

---

[9] The form reflects that Agent Blanton and another agent signed as witnesses at 9:16 p.m. Agent Blanton said that the defendant undoubtedly understood his *Miranda* rights.

firearm in furtherance of carjacking (Counts Six, Thirteen, and Twenty); kidnapping (Counts Seven, Fourteen, and Twenty-One); using a firearm in furtherance of kidnapping (Counts Eight, Fifteen, and Twenty-Two); and being a felon in possession of a firearm (Counts Nine, Sixteen, and Twenty-Three) [*Id.*].

The defendant asks the Court to suppress all evidence stemming from his November 25, 2015 arrest, including a series of oral statements he gave on that day, because law enforcement lacked probable cause to arrest him and because his statements were made while he was in custody, without the benefit of the *Miranda* warnings, and during plea negotiations. In this regard, the defendant filed two motions to suppress evidence—a Motion to Suppress Based on the Illegal Arrest, November 25, 2015 [Doc. 32] and a Motion to Suppress Oral Statements Made by Defendant [Doc. 35].

In the R&R, Magistrate Judge Shirley recommends that the Court find that: (1) the defendant was properly arrested based upon probable cause; (2) the majority of the defendant's statements should be suppressed because they were unwarned or occurred during plea negotiations; (3) some of the defendant's statements were not, however, the product of interrogation and may be admitted at trial; and (4) all of the defendant's unwarned statements may be used to impeach him, if he chooses to testify [Doc. 58]. Thus, Magistrate Judge Shirley recommends that the defendant's Motion to Suppress Based on the Illegal Arrest, November 25, 2015 [Doc. 32] be denied and his Motion to Suppress Oral Statements Made by Defendant [Doc. 35] be granted in part and denied in part. Specifically, Magistrate Judge Shirley recommends that:

14

(1)    The defendant's comments made in the presence of Trooper Reynolds be allowed in the government's case-in-chief, with the exception of:

        (a)    The defendant's comment that he has no idea what is going on and that it is not normal to be kicked out of and abandoned by a car traveling on the interstate [Doc. 46-1, ll.58–65];

        (b)    The defendant's explanation of why he was in prison and where [*Id.* ll.234–45, 290–94]; and

        (c)    The defendant's response to Trooper Reynolds's questions about the identity of the driver and what the defendant and the driver were doing [*Id.* ll.296–300, 314–20].

(2)    The defendant's statements to Agents Blanton and Gryder at the Asheville Police Department be deemed inadmissible in the government's case-in-chief because they are unwarned and, furthermore, the government has stated that it does not plan to use them in its case-in-chief;

(3)    The defendant's conversation with Officer Shelton and his telephone conversation with his sister should not be excluded because they are not the product of interrogation;

(4)    The defendant's discussion with AUSA Lewen and Agents Blanton and Nocera at the Buncombe County Jail should be deemed inadmissible as plea discussions. The defendant's comment about the two kinds of people made after the conclusion of plea negotiations, however, is admissible in the government's case-in-chief, if relevant; and

(5)    The government should be permitted to use any of the defendant's statements of November 25, 2015, including the statements in numbers (1)(a)–(c) and (2) above and except for those deemed to be plea discussions, to impeach the Defendant, if he testifies [Doc. 58 pp. 49–50].

The defendant filed objections to the R&R, asserting that the magistrate judge erred in determining that law enforcement had probable cause to arrest the defendant for the September 3 incident [Doc. 73 p. 1]. Additionally, the defendant objects to the partial denial of his Motion to Suppress Oral Statements [*Id.*]. Specifically, the defendant

15

objects to the use of his statements to Trooper Reynolds, Agent Blanton, and Agent Gryder in the government's case in chief or for impeachment purposes [*Id.*]. Finally, the defendant objects to the use of his statement regarding "two types of people" because it was made as part of plea negotiations with an attorney for the government and because it was a product of the earlier *Miranda* violations [*Id.* at 1–2]. The government responded in opposition to the defendant's objections [Doc. 80].[10]

## II.     Standard of Review

The Court reviews *de novo* those portions of the R&R to which the defendant has objected.   28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b).   Accordingly, the Court considers the R&R, the motions to suppress, the parties' underlying and supporting briefs, the defendant's objections, and the government's response to those objections, all in light of the applicable law.

## III.    Analysis

The defendant has objected to the majority of Magistrate Judge Shirley's recommendations.   Specifically, the defendant contends that the officers did not have probable cause to arrest him on November 25, 2015, and that none of his oral statements on September 3 should be admissible in the government's case in chief or for impeachment purposes.   Accordingly, the Court will begin with a *de novo* review of whether law enforcement had probable cause to arrest the defendant and will then

---

[10] The government conceded, however, that statements made to Agents Blanton and Gryder from 3:00–4:34 p.m. will not be used for impeachment purposes if the defendant elects to testify [Doc. 80 p. 1 n.1].

evaluate which, if any, of the defendant's statements from November 25 should be suppressed.

### A. Probable Cause to Arrest

In the R&R, Magistrate Judge Shirley found that, on November 25, Trooper Reynolds had probable cause to arrest the defendant, based solely on the September 3 incident [Doc. 58 p. 35]. The R&R declined to address whether there was probable cause to arrest the defendant for other crimes [*Id.*].

Objecting to the R&R, the defendant argues that Trooper Reynolds did not have probable cause to arrest him on November 25 [Doc. 73], setting forth arguments similar to those stated in his original motion to suppress [Doc. 32]. In particular, the defendant notes that "[a] passenger's mere presence in a vehicle subject to a lawful traffic stop does not create reasonable suspicion that the passenger is guilty of any criminal activity" [Doc. 73 p. 3].

Additionally, the defendant contends that "[a]lthough there were some similarities between the two incidents [on September 3 and November 25], there were equally significant differences that pointed to a lack of probable cause" [*Id.* at 4]. Thus, according to the defendant, "Trooper Reynolds did not positively identify the defendant as being the same individual as the passenger from the September 3 incident," and he was "acting on a mere suspicion rather than a 'probability or substantial chance of criminal activity'" [*Id.*]. In support, the defendant notes dissimilarities between the two events, such as distance, location, and time [*Id.*].

17

Finally, the defendant argues that the Magistrate Judge erred in finding that the collective knowledge of law enforcement supports a finding of probable cause because law enforcement had confirmed neither that the individuals from the November 25 incident were the same as the September 3 incident, nor that the men from the September 3 incident were involved in bank robberies [*Id.* at 5]. The defendant contends that Ms. Pless gave vague descriptions of the two men who rented properties from her, and law enforcement did not corroborate that the individuals at the Allison Drive cabin were the same individuals from the September 3 incident [*Id.*].

A seizure occurs when the government intentionally terminates a person's freedom of movement, *United States v. Richardson*, 40 F. App'x 7, 12 (6th Cir. 2002), and a fleeing suspect is considered seized when there is an application of force or submission to an officer's "show of authority." *California v. Hodari D.*, 499 U.S. 621, 625–26 (1991). Warrantless seizures—or arrests—are valid only if supported by probable cause. *United States v. Avery*, 137 F.3d 343, 352 (6th Cir. 1997); *see also United States v. Caicedo*, 85 F.3d 1184, 1192 (6th Cir. 1996) ("Police may arrest a person without a warrant if they have probable cause at the time of the arrest to believe that the person has committed or is committing a crime.").

Probable cause is "reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990). In other words, probable cause means a substantial chance or likelihood of criminal conduct, not an actual showing of criminal activity. *Illinois v. Gates*, 462

18

U.S. 213, 245 n.13 (1983); *see also Caicedo*, 85 F.3d at 1192 (stating that probable cause "does not require any showing that the officer's suspicions prove to be correct or that they are more likely true than false").

"[T]he collective knowledge of agents working as a team" should be considered when determining whether officers had probable cause to make an arrest. *See United States v. Woods*, 544 F.2d 242, 260 (6th Cir. 1976) ("When a superior officer orders another officer to make an arrest, it is proper to consider the superior's knowledge in determining whether there was probable cause."). Similarly, "when a group of agents in close communication with one another determines that it is proper to arrest an individual, the knowledge of the group that made the decision may be considered in determining probable cause, not just the knowledge of the individual officer who physically effected the arrest." *Id.*

An arrest made without probable cause is unlawful, and any evidence seized pursuant to it must be suppressed. *Hodari D.*, 499 U.S. at 624. The government bears the burden of demonstrating that, "at the moment the arrest was made, the officers had probable cause to make it." *Beck v. Ohio*, 379 U.S. 89, 91 (1964).

The government does not dispute that Trooper Reynolds arrested the defendant on November 25, 2015 [Doc. 46 p. 10]. It also does not contend that this arrest was made pursuant to a warrant [*Id.* at 11]. Thus, the government must demonstrate that, at the time of the arrest, Trooper Reynolds had probable cause to believe that the defendant was

either committing or had committed a crime in order for this Court to admit evidence resulting from the defendant's arrest. *Caicedo*, 85 F.3d at 1192.

Like Magistrate Judge Shirley, this Court finds that the government has met its requisite burden. Trooper Reynolds reviewed video footage of the September 3 incident on five to ten occasions—pursuant to his role as a training officer—due to the unusual nature of this occurrence. Trooper Reynolds was able to perceive the passenger's physical characteristics from the video footage of the September 3 chase [Doc. 87 p. 37 ll.6–8, p. 49 ll.10–24]. He testified that the passenger who fled was a white, heavy-set male, with a bald spot on the back of his head [*Id.*]. Importantly, Trooper Reynolds noted that the passenger in the September 3 incident fled the scene while carrying a black duffel bag, and he testified before Magistrate Judge Shirley that it was particularly uncommon for suspects to flee while carrying items this large. In fact, Trooper Reynolds, in his over fifteen years of law enforcement service, had never witnessed this aspect prior to November 25.

Trooper Reynolds noted several additional similarities between the September 3 incident and the November 25 stop: both vehicles had stolen license plates; both vehicles were slow to respond to law enforcement's signal to stop; both vehicles momentarily pulled onto the shoulder; both times the passenger's side door opened; both vehicles then sped off and led police in a chase; and on both occasions, the vehicle stopped next to the fog line, which put the officer at a disadvantage because the officer would have to walk into the road to engage the driver. Trooper Reynolds also noted that it is uncommon for

20

the occupants of a fleeing vehicle to pull over, open the passenger's door, and then resume flight.

As argued by the defendant, there were also dissimilarities between the two events: the areas in which the incidents occurred were about fifty miles apart; the two incidents occurred on different roads; the incidents occurred nearly three months apart and involved different vehicles; on September 3, the passenger was wearing a short-sleeved shirt and shorts and on November 25, the passenger was wearing long pants and a jacket; on November 25, the vehicle did not strike any other vehicles and that the passenger got out of the car and did not flee or resist arrest. These differences are not, however, "equally significant" to the similarities between the two events, as the defendant argues [Doc. 73 p. 4]. In contrast, these differences are highly circumstantial and do not invalidate a finding that the two individuals were the same on each occasion. In sum, these differences do not abrogate a finding of probable cause. The law does not require such certainty. *See Caicedo*, 85 F.3d at 1192 (asserting that probable cause "does not require any showing that the officer's suspicions prove to be correct or that they are more likely true than false").

Trooper Reynolds's supervisor directed him on November 25 to stop a vehicle with a stolen license plate that would be traveling through his jurisdiction that morning. The supervisor stated that the two white men in the vehicle were believed to be the perpetrators of the September 3 car chase and of several bank robberies. This knowledge stemmed from extensive investigation by law enforcement and consistent communication

between the FBI and NCSHP with regard to this case.  Thus, this collective knowledge, and his supervisor's orders based on this knowledge, must be taken into account when evaluating whether Trooper Reynolds had probable cause to arrest the defendant. *Woods*, 544 F.2d at 260.

Furthermore, Trooper Reynolds verified that the license plate on the November 25 vehicle was in fact stolen, and his own observations corroborated his supervisor's assertion that these men were the same as those who fled on September 3—an occurrence with corresponding criminal violations.  Although he was not present during the September 3 chase, Trooper Reynolds was fully aware of the event's circumstances, and he had personal familiarity with the passenger's physical characteristics [Doc. 87 p. 53 ll.17–21].

In sum, viewing the totality of the circumstances, Trooper Reynolds had probable cause at the time he arrested the defendant to believe that the defendant had committed criminal conduct on September 3.  His belief that the passengers on September 3 and November 25 were the same man was more than a "mere suspicion," and his supervisor's orders stemmed from extensive verification, not a mere whim, as argued by the defendant [Doc. 73 p. 4].  The government has demonstrated that there was a "substantial chance or likelihood" that the defendant had engaged in prior crimes, and it need not prove that there were no differences between the events on September 3 and November 25 to make this showing. *Barrett*, 890 F.2d at 861.

Thus, for all of these reasons, the Court agrees with Magistrate Judge Shirley that Trooper Reynolds had probable cause to arrest the defendant on November 25, 2015, and it will not suppress evidence stemming from the defendant's arrest on this ground. Consequently, the defendant's objection on this ground will be overruled.

## B. Oral Statements

In the R&R, Magistrate Judge Shirley found that the majority of the defendant's statements should be suppressed because they were unwarned or occurred during plea negotiations [Doc. 58 p. 2]. Judge Shirley also found, however, that some of the statements were not the product of interrogation and may be admitted at trial [*Id.*]. Finally, Judge Shirley determined that all of the defendant's unwarned statements could be used to impeach the defendant at trial if he decides to testify [*Id.*]. In its response to the defendant's objections, however, the government stated that it will not use any of the defendant's statements made to Agents Blanton and Gryder from 3:00 to 4:34 p.m. [Doc. 58 pp. 43–44] for impeachment of the defendant [Doc. 80 p. 1 n.1].

The defendant objects to Magistrate Judge Shirley's recommendation that any of his oral statements be admissible as part of the government's case in chief, or for impeachment purposes [Doc. 73 p. 1]. He argues that all of his statements "were involuntary and the product of police coercion" and that his statement regarding "two types of people" was made as part of plea negotiations and was also the product of earlier *Miranda* violations [*Id.*].

23

The defendant does not appear to object to the use of his statements made to Officer Shelton or the use of his telephone conversation with his sister. Consequently, the Court will not review this portion of the R&R and will adopt Magistrate Judge Shirley's finding that these statements were not gained in violation of the Fifth Amendment [Doc. 58 p. 45].

Additionally, as previously noted, the government has agreed not to use the defendant's statements to Agents Blanton or Gryder from 3:00 to 4:34 p.m. for any reason, including impeachment purposes [Doc. 80 p. 7]. Thus, the Court will not examine these statements and will deem these statements made by the defendant inadmissible at trial for any purpose.

With regard to the portions of the defendant's statements that he has objected to, however, the Court reviews the R&R *de novo*. The Court divides the defendant's objections into two groups: (1) statements made to Trooper Reynolds; and (2) the defendant's "two types of people" statement. The Court will evaluate in turn whether these two groups of statements are admissible under the Fifth Amendment.

### 1. Statements Made to Trooper Reynolds

It is well-established that suspects must be informed of certain rights they possess under the Fifth Amendment before being subjected to "custodial interrogation." *Miranda v. Arizona*, 384 U.S. 436, 467–68 (1996). The prosecution "may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the

24

privilege against self-incrimination." *Id.* at 444; *see United States v. Cole*, 315 F.3d 633, 636 (6th Cir. 2003) ("Statements made by a defendant in response to interrogation while in police custody are not admissible unless the defendant has first been apprized [sic] of the constitutional right against self-incrimination and has validly waived this right.").

"Custodial interrogation" is defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way," *Miranda*, 384 U.S. at 444, and a suspect is "in custody" when "there has been a 'formal arrest or restraint on freedom of movement.'" *Mason v. Mitchell*, 320 F.3d 604, 631 (6th Cir. 2003) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)). Finally, any "words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response" amount to interrogation. *Rhode Island v. Innis*, 446 U.S. 291, 301–02 (1980).

The parties, and Magistrate Judge Shirley, are in agreement that the defendant was in custody at all relevant times and that he was not given complete *Miranda* warnings until 9:14 p.m. on November 25 [Doc. 58 p. 36]. Consequently, the crux of the dispute is with regard to whether the defendant's statements were the product of interrogation.

The Court finds that, although some of the defendant's statements to Trooper Reynolds resulted from questioning, the majority of the defendant's statements were wholly unsolicited. Though the defendant was in custody while speaking with Trooper Reynolds, spontaneous statements he made are admissible against him at trial. *See Miranda*, 384 U.S. at 478 ("Any statement given freely and voluntarily without any

compelling influences is, of course, admissible in evidence."); *see Cole*, 315 F.3d at 637 (stating that "[b]ecause the record reflects that [the defendant's] statements while being booked and later transported to jail were spontaneous and unprovoked by Officer Jones's initial question at the scene of the crime, the initial *Miranda* violation furnishes no basis to suppress the subsequent statements").

Additionally, several of the solicited statements were made pursuant to *Miranda* exceptions. First, the "public safety exception" applies, and *Miranda*-less interrogation is permitted, "when officers have a reasonable belief based on articulable facts that they are in danger," which is an objective determination. *United States v. Talley*, 275 F.3d 560, 563 (6th Cir. 2001). The Sixth Circuit utilizes a two-pronged inquiry to evaluate the reasonableness of an officer's belief that he or the public is in danger: The officer must have reason to believe (1) "that the defendant might have (or recently have had) a weapon," and (2) "that someone other than police might gain access to the weapon and inflict harm with it." *United States v. Reese*, 509 F. App'x 494, 501–02 (6th Cir. 2012) (quoting *Talley*, 275 F.3d at 563). Thus, "[t]he public safety exception is applied if and only if both of those two conditions are satisfied and no other context-specific evidence rebuts the inference that the officer reasonably could have perceived a threat to public safety." *Id.*

Second, "[q]uestions posed 'to secure the personal history data necessary to complete the booking process, are exempt from *Miranda*'s coverage.'" *United States v. Broadus*, 7 F.3d 460, 464 (6th Cir. 1993) (quoting *United States v. Clark*, 982 F.2d 965,

968 (6th Cir. 1993)). Unless it appears that the officer used biographical questions to provoke an incriminating response, this type of routine questioning is not interrogation. *Id.*; *see also United States v. Pacheco-Lopez*, 531 F.3d 420, 424 (6th Cir. 2008) (noting that the location and nature of the questioning, as well as whether or not the officer records the information given, are all relevant to whether the booking exception applies).

Here, Trooper Reynolds had been warned by his supervisor that the defendant and the driver of the vehicle were believed to be dangerous men [Doc. 87 p. 41 ll.15–20]. Additionally, as previously addressed, Trooper Reynolds had probable cause to believe that the defendant was the passenger who fled the September 3 incident—an unusually dangerous occurrence. The defendant fled the vehicle carrying a large black bag, which could have contained a weapon, and—based on information transmitted by his supervisor—it was reasonable for Trooper Reynolds to believe that the defendant was capable of inflicting harm with any weapons potentially in his possession [Doc. 46-1 ll.452–59]; *Reese*, 509 F. App'x at 501–02. Thus, Trooper Reynolds had an objectively "reasonable belief based on articulable facts" that he was in danger and, therefore, that it was necessary to ask the defendant certain unwarned questions, such as whether the defendant was armed [Doc. 46-1 ll.78–79]; *Talley*, 275 F.3d at 563.

Furthermore, Trooper Reynolds's questions regarding the defendant's name and basic information do not appear to have been asked in order to elicit an incriminating response from the defendant [Doc. 46-1 ll.249–88]. Thus, these inquiries also fall under an exception to *Miranda*. *Broadus*, 7 F.3d at 464.

The Court agrees with Magistrate Judge Shirley's determination, however, that some of the defendant's statements to Trooper Reynolds were the product of custodial interrogation, do not fall under any exception to *Miranda*, and are therefore inadmissible as part of the government's case-in-chief [Doc. 58 pp. 41–42]. While there was no objection to the inadmissibility of these statements in the government's case-in-chief, the defendant objects to Judge Shirley's determination that these statements are available to the government for impeachment purposes.

A defendant's unwarned statement, which is inadmissible in the government's case-in-chief, may be used to impeach the defendant, so long as the statement is trustworthy and was voluntarily made. *Harris v. New York*, 401 U.S. 222, 224–26 (1971). In determining whether a statement was voluntarily made, and is free from the inherent untrustworthiness of coercion, the Court must evaluate "the totality of the circumstances," including "the characteristics of the accused and the details of the interrogation." *United States v. Rigsby*, 943 F.2d 631, 635 (6th Cir. 1991); *see Dickerson v. United States*, 530 U.S. 428, 433 (2000) (asserting that "coerced confessions are inherently untrustworthy"). For a statement to be considered coerced, the evidence must demonstrate that (1) the police activity was objectively coercive; (2) the coercion in question was sufficient to overbear the defendant's will; and (3) the defendant's will was, in fact, overborne as a result of the coercive police activity. *McCall v. Dutton*, 863 F.2d 454, 459 (6th Cir. 1988).

Although the defendant's initial arrest was heated, the remainder of the defendant's interactions with Trooper Reynolds appear to have been more relaxed—cordial even [*See, e.g.*, Doc. 46-1 p. 2, l.33 ("I know that you have to do your job. I get it, I get it."); *id.* l.213 ("[Y]ou're being decent."); *id.* l.367 ("Pleased to meet you, man."); *id.* l.452 ("Good job, it was very professional."); *id.* l.489 ("He did excellent. You should have seen him.")]. Based on the totality of the circumstances, the Court finds that there was no police coercion by Trooper Reynolds and that the defendant's statements were voluntarily made, even if unwarned. Trooper Reynolds does not appear to have acted objectively coercively, and the defendant did not behave in a manner that suggests his "will was, in fact, overborne" by Trooper Reynolds's conduct. *McCall*, 863 F.2d at 459. Consequently, the defendant's statements to Trooper Reynolds, even those made pursuant to police interrogation, may be used by the government for impeachment purposes if the defendant elects to testify, and the Court will overrule this objection.

### 2. "Two Types of People" Statement

Evidence of "a statement made during plea discussions with an attorney for the prosecuting authority if the discussions did not result in a guilty plea or they resulted in a later-withdrawn guilty plea" is not admissible against the defendant who made the statement. Fed. R. Evid. 410. In *United States v. Little*, Nos. 92-6719, 92-6720, 92-6721, 1993 WL 501570 (6th Cir. Dec. 6, 1993), the Sixth Circuit adopted the following test for determining whether the statement at issue occurred in the course of plea discussions: (1) whether the accused exhibited an actual subjective expectation to negotiate a plea at the

29

time of the discussion; and (2) whether the accused's expectation was reasonable given the totality of objective circumstances. *Id.* at *3. Rule 410 "can be fairly read to apply to statements made to a government attorney during the course of plea discussions or to an agent whom the government attorney has authorized to engage in plea discussions." *United States v. O'Neal*, 992 F.2d 1218, at *8 (6th Cir. Apr. 28, 1993).

Here, the defendant argues that his statement regarding "two types of people" is inadmissible at trial because it was made as part of plea negotiations [Doc. 73 p. 9]. Although the defendant's preceding discussion with the AUSA was a plea negotiation and, consequently, the defendant's statements made at that time are inadmissible [Doc. 58 pp. 45–46], the defendant's statement about "two types of people" was made after the AUSA asserted that the discussion was over and had exited the room. Therefore, the defendant appeared to have made this statement with no expectation that it would be taken into account as part of his plea negotiations. Even if he did render this assertion with an expectation that it was part of the plea discussion, this intention would have been objectively unreasonable under the circumstances. Moreover, the government was no longer present when the defendant made the statement, and the AUSA had not authorized the agents involved to engage in plea discussions on his behalf. Thus, the defendant's "two types of people" statement was not made as part of a plea negotiation and is consequently not covered by Federal Rule of Evidence 410. *O'Neal*, 992 F.2d 1218, at *8; *Little*, 1993 WL 501570, at *3.

Furthermore, the defendant's statement did not flow from the earlier unwarned interrogation. The Supreme Court has set forth the following five-factor test for analyzation of "*Miranda* in the middle" interrogations: (1) the completeness and detail involved in the first round of questioning; (2) the overlapping content of the statements made before and after the warning; (3) the timing and setting of the interrogation; (4) the continuity of police personnel during the interrogations; and (5) the degree to which the interrogator's questions treated the second round as continuous with the first. *Missouri v. Seibert*, 542 U.S. 600, 615 (2004). In *Seibert*, the Court focused on the question of "whether it would be reasonable to find that the warnings could function 'effectively' as *Miranda* requires." *Id.* at 611–12. Unless the subsequent warning informed the suspect to a degree that he could then make an informed choice, then the second statement should not be treated as distinct from the first. *Id.* at 612.

Here, there is no evidence that law enforcement intended to circumvent *Miranda*. Trooper Reynolds attempted to give the defendant *Miranda* warnings directly after his arrest, but the defendant interrupted him. Additionally, Trooper Reynolds did not ask detailed questions during the initial interview. In fact, as previously established, most of the defendant's statements were entirely unsolicited. Furthermore, the defendant's statements do not significantly overlap. There was also a substantial break in time between the defendant's unwarned interviews and the plea negotiation later that evening, and the defendant changed locations. Although Agent Blanton appears to have been

present at both the afternoon interrogation and the plea discussion, there was not a complete carryover of police personnel.

Thus, in sum, the Court finds that the defendant's statement with regard to "two types of people" was not the result of earlier un-*Mirandized* interrogation, was not part of a plea negotiation, and is therefore admissible as part of the government's case-in-chief, as well as for impeachment purposes, should the defendant elect to testify.

## IV. Conclusion

Accordingly, upon a careful and *de novo* review of the record and the law, and for the reasons discussed herein, the Court finds that the recommendations contained in the R&R are correct. The defendant's objections [Doc. 73] are **OVERRULED.** The Court **ACCEPTS in part** the R&R and incorporates it into this Memorandum Opinion and Order [Doc. 58], and the Court **DENIES in part** the R&R, only to the extent that certain statements made by the defendant may not be used by the government for impeachment purposes.

Thus, the Court **DENIES** the defendant's Motion to Suppress Based on the Illegal Arrest, November 25, 2015 [Doc. 32] and **GRANTS in part and DENIES in part** the defendant's Motion to Suppress Oral Statements Made by Defendant [Doc. 35].

The Court hereby **ORDERS** as follows:

(1)     The defendant's comments made in the presence of Trooper Reynolds shall be allowed in the government's case-in-chief, with the exception of:

(a)     The defendant's comment that he has no idea what is going on and that it is not normal to be kicked out of and abandoned by a car traveling on the interstate [Doc. 46-1, ll.58–65];

32

(b)    The defendant's explanation of why he was in prison and where [*Id.* ll.234–45, 290–94]; and

(c)    The defendant's response to Trooper Reynolds's questions about the identity of the driver and what the defendant and the driver were doing [*Id.* ll.296–300, 314–20].

(2)    The defendant's statements to Agents Blanton and Gryder at the Asheville Police Department are inadmissible in the government's case-in-chief because they are unwarned and, furthermore, the government has stated that it does not plan to use them in its case-in-chief;

(3)    The defendant's conversation with Officer Shelton and the defendant's telephone conversation with his sister shall not be excluded because they are not the product of interrogation;

(4)    The defendant's discussion with AUSA Lewen and Agents Blanton and Nocera at the Buncombe County Jail shall be inadmissible under Rule 410 as plea discussions;

(5)    The defendant's comment about "two types of people" made after the conclusion of plea negotiations is admissible in the government's case-in-chief, if relevant; and

(6)    The government shall be permitted to use the defendant's statements from November 25, 2015, including the statements in numbers (1)(a)–(c) above, to impeach the defendant if he elects to testify. The government shall not, however, be permitted to use the defendant's statements in numbers (2) and (4) for impeachment of the defendant.

IT IS SO ORDERED.

s/ Thomas A. Varlan
CHIEF UNITED STATES DISTRICT JUDGE