UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

UNITED STATES OF AMERICA,      )
                               )
            Plaintiff,         )
                               )
v.                             )        No.:   3:15-CR-177-TAV-CCS-1
                               )
MICHAEL BENANTI,               )
                               )
            Defendant.         )

## MEMORANDUM OPINION AND ORDER

This criminal matter is before the Court for consideration of the Report and Recommendation entered by United States Magistrate Judge C. Clifford Shirley, Jr. ("R&R") on October 7, 2016 [Doc. 65].  The R&R addresses the defendant's Motion to Suppress Evidence Obtained at 380 Allison Drive ("Southern Comfort") [Doc. 33] and the defendant's Omnibus Motion to Suppress All Subsequent Search Warrants [Doc. 34]. The government responded to the motions [Doc. 46], and Magistrate Judge Shirley held a hearing on the motions, along with other motions pending before the Court, on June 2, 2016 [Doc. 48].  Magistrate Judge Shirley then issued the R&R, recommending that the Court deny the defendant's Motion to Suppress Evidence Obtained at 380 Allison Drive [Doc. 33] and that the Court deny the defendant's Omnibus Motion to Suppress All Subsequent Search Warrants [Doc. 34] as moot.[1]  The defendant has filed objections to

---

[1] The defense acknowledged "that if the Court upholds the search of 380 Allison Drive, Maggie Valley, North Carolina, that the instant Motion would be rendered moot" [Doc. 34 p. 1 n.1].

the R&R [Doc. 76], the government responded to those objections [Doc. 81], and the defendant replied [Doc. 86]. For the reasons that follow, the Court will overrule the defendant's objections and accept the R&R. Thus, the defendant's Motion to Suppress Evidence Obtained at 380 Allison Drive ("Southern Comfort") [Doc. 33] will be denied and the defendant's Omnibus Motion to Suppress All Subsequent Search Warrants [Doc. 34] will be denied as moot.

## I. Background[2]

On the morning of April 28, 2015, two armed, white males and a masked white female invaded the home of an executive with the Y-12 Federal Credit Union ("the Credit Union"), his wife, and their adult son, in Knoxville, Tennessee [Doc. 76-1 ¶ 5].[3] The perpetrators took the wife's phone and told the executive to keep his phone in his shirt pocket, while continuously connected to his wife's phone, so that they could monitor his

---

[2] The Court's probable cause determination is typically limited to the four corners of the affidavit supporting the search warrant in question. *United States v. Frazier*, 423 F.3d 526, 535 (6th Cir. 2005); *United States v. Hatcher*, 473 F.2d 321, 323 (1973). Consequently, the Court will summarize the facts recited in the warrant affidavit [Doc. 76-1]. The Court will also, however, note information known to the affiant–officer but not presented to the issuing magistrate judge, strictly in order to address the applicability of the good-faith exception. *See Frazier*, 423 F.3d at 535–36 (holding that a court reviewing an officer's good faith may look beyond the four corners of the affidavit to information known to the applying officer).

Additionally, the Court presumes the reader's familiarity with this case, and it will only include facts necessary to the determination of the instant motions.

[3] While the affidavit describes the male perpetrators as white, the wife of the Credit Union executive stated in an interview that one of the males was white and the other was black [Doc. 33-2], the executive stated that one male was white and one was Hispanic, and the son stated that both men were white [Doc. 46 p. 30]. The Court will take this information into consideration when determining whether the good-faith exception applies.

movements [*Id.* ¶ 8]. The perpetrators then instructed the executive to drive to the Credit Union and obtain a large amount of money [*Id.* ¶ 6]. The executive complied [*Id.*].

Once at the Credit Union, however, the executive wrote a note to employees, telling them what had occurred [*Id.* ¶ 9]. One of the employees subsequently called the police [*Id.*]. The executive took a large amount of money from the vault, returned to his car, and was soon after approached by responding police officers [*Id.* ¶ 10]. He told the perpetrators over his wife's phone that the police were approaching him and asked for further instruction [*Id.* ¶ 11].

While the executive traveled to the Credit Union, the perpetrators had bound and blindfolded his wife and son and driven them around in the family's car, a 2015 Lexus [*Id.* ¶ 7]. After receiving the executive's warning that police had arrived at the Credit Union, the perpetrators aborted the plan, disconnected the phone call, threw the wife's phone out of the car, and abandoned the executive's family in a parking lot [*Id.* ¶ 12]. They then fled in the victims' car and were not identified or apprehended [*Id.*]. The victims' Lexus was later found abandoned and burned [*Id.*].

Several months later, on the morning of July 7, 2015, a similar crime was perpetrated on a second local bank executive and his family [*Id.* ¶ 13]. Two white males, similar in description to the prior robbery, forced their way into another Knoxville home, carrying firearms and a crowbar [*Id.* ¶ 14]. This home was occupied by a SmartBank executive, his wife, and their infant son [*Id.*]. The family barricaded themselves in a bathroom, but the intruders pried their way into the bathroom [*Id.*]. The invaders told the

3

executive that he was going to help them rob SmartBank [*Id.* ¶ 15].  They instructed the executive to put on a shirt with a pocket and ordered the wife, along with the infant, to go into the garage, where the wife observed an unknown assault rifle in her son's stroller [*Id.*].

The invaders then blindfolded the executive, put a belly-belt around his waist, and secured his wrists with handcuffs through the belt [*Id.* ¶ 16].  They ordered the wife to place the infant in the family's car, a Mazda 6, and then they blindfolded her [*Id.*].  The perpetrators ordered all three family members to sit in the backseat and told them that failure to follow instructions could lead to the family's death [*Id.*].  While in the car, the wife heard one of the perpetrators utilize a GPS device [*Id.* ¶ 17].

The perpetrators, now donning old man masks, proceeded to park the car behind the SmartBank and removed the executive's blindfold [*Id.* ¶ 18].  They told the executive to initiate a call between his phone—which was placed in his shirt pocket—and his wife's phone—which was in the perpetrators' possession [*Id.*].  They informed the executive that they would be monitoring his actions via the phone call, and they threatened to hurt his wife and son if he terminated the call or told anyone to call the police [*Id.*].  The perpetrators then gave the executive an empty bag in which to place the money from the vault [*Id.* ¶ 19].

The executive did as he was instructed—placing $195,000 into the bag and then exiting the bank [*Id.*].  The executive handed the bag over to the perpetrators, who told him that his family would not be harmed, but would still not be released, if he cooperated

4

[*Id.*].  The perpetrators sped away after receiving the money, with the wife and son still in the car, while leaving the executive behind in the parking lot [*Id.*].  During the drive, the wife heard the two men talking to another person who was not in the car [*Id.* ¶ 20].

The perpetrators then drove to a densely wooded area and told the wife to remain in the car for approximately ten minutes, at which point she could exit and find her keys on the ground [*Id.* ¶ 21].  After the perpetrators got out of the car, the wife heard them enter another vehicle [*Id.*].  Several minutes later, the wife found her keys and drove to find help [*Id.*].

When the Federal Bureau of Investigation ("FBI") later investigated this event, they spoke to the SmartBank executive's neighbor, who stated that he saw a strange car outside the family's home on the evening of July 1, 2015 [*Id.* ¶ 22].  He said that there were two men and a woman sitting inside the car [*Id.*].

On September 3, 2015, the North Carolina State Highway Patrol ("NCSHP") engaged in a vehicle chase with a car later determined to have been stolen from New Hampshire [*Id.* ¶ 23].[4]  The two white males driving the vehicle—who FBI agents suspected were involved in the previous bank robberies—fled and were pursued on foot until the officers believed that proceeding would be dangerous [*Id.* ¶¶ 23–24].  The men consequently escaped [*Id.* ¶ 23].

---

[4] This chase, as well as the November 25, 2015 incident, are addressed in greater detail by the Court is its prior Memorandum Opinion and Order accepting Magistrate Judge Shirley's previous R&R [Doc. 58].  For the purposes of the current analysis, however, the Court will only include facts with regard to this event as set forth in the warrant affidavit.

5

Agents then found a GPS device in the abandoned vehicle, and a track on the GPS was to the address of 124 Rebel Ridge Road, Canton, North Carolina, which is managed by Premier Vacation Rentals ("PVR") [*Id.* ¶ 24]. A PVR employee informed agents that two white men in their 30s—who had been renting cabins with PVR since June 19, 2015—had rented the cabin at that address from July 27, 2015, through October 25, 2015 [*Id.*]. They then extended their stay at 124 Rebel Ridge to November 15, 2015 [*Id.*]. The two men began renting another PVR property at 380 Allison Drive, Maggie Valley, North Carolina, called "Southern Comfort," on November 16 [*Id.*].

The FBI subsequently obtained consent to search the property at 124 Rebel Ridge and processed the scene for trace evidence on November 19, 2015 [*Id.* ¶ 25]. FBI agents informed the local sheriff's office of their ongoing investigation, and the sheriff's office agreed to conduct physical surveillance of Southern Comfort in order to determine if there were new vehicles arriving or whether there was probable cause to make an arrest of the suspects [*Id.*].

On November 24, 2015, officers conducting surveillance at Southern Comfort observed a Toyota Highlander with a South Carolina license tag leave the property, driven by a white male [*Id.* ¶ 26]. They continued monitoring that vehicle as it drove to a gas station and until it returned to Southern Comfort [*Id.*]. A registration check of the Highlander tag returned to a GMC Yukon [*Id.*].

The next day, officers observed a Nissan Pathfinder, occupied by two white males, leaving Southern Comfort [*Id.* ¶ 27]. They determined that the vehicle had stolen license

6

tags from Maryland, and they later discovered that the vehicle was also stolen from Maryland [*Id.* ¶¶ 27, 28]. NCSHP officers were notified, a traffic stop of the vehicle was attempted, and a chase ensued [*Id.* ¶ 27]. The driver eventually stopped, the passenger door opened, and a white male, later identified as the defendant, exited the Pathfinder [*Id.*]. He was immediately taken into custody [*Id.*]. The driver then proceeded to drive from the scene, and he ultimately fled on foot [*Id.*]. Officers apprehended the driver and took him into custody [*Id.*]. Both of the men had black bags with them, which contained rubber gloves [*Id.* ¶ 30]. The defendant's bag also contained a digital camera, food, a cell phone charger, a stocking cap, and a monocular scope [*Id.*]. He had $1,500 and the key to a Lincoln vehicle on his person [*Id.*]. A later search of the Pathfinder revealed a black stocking cap, gloves, and two cell phones with the batteries removed, wrapped in plastic [*Id.* ¶ 32].

Once the defendant was in the custody of NCSHP, he constantly fidgeted in his handcuffs, and the officer consequently suspected that he was attempting to conceal an item in his hands [*Id.* ¶ 29]. Officers seized a balled up sheet of paper from the defendant's hands, which had handwritten notes of addresses, later identified as bank locations, along with names of individuals later confirmed to be bank employees [*Id.*]. The paper also included South Carolina license tag numbers and the following phrases: "FIND CEO," "FIND CARS AT BRANCH," and "CALL, WATCH IT CLOSE" [*Id.*].

The NCSHP Trooper involved in the previous chase identified the driver on November 25 as the same man who was operating the car on September 3 [*Id.* ¶ 31]. He did not, however, positively identify the defendant as the September 3 passenger [*Id.*].

Agent Rory Poynter subsequently sought a search warrant for Southern Comfort based on the foregoing information [*Id.* ¶ 1]. In the supporting affidavit, he testified under oath that, "based on [his] training and experience, . . . criminals rely heavily on cellular phone communication and often times will communicate via text, have co-conspirator contact information, take photographs and video, and utilize their cellular phones for mapping/GPS purposes" [*Id.* ¶ 33]. In conclusion, Agent Poynter stated that "perpetrators of crimes will utilize similar methods, or Modus Operandi, when committing crimes specifically when they have eluded capture from previous crimes" [*Id.* ¶ 34]. Consequently, according to Agent Poynter, "[t]he events [that] occurred on November 25, 2015 demonstrate a willingness to flee from law enforcement to avoid prosecution and/or to destroy evidence and show Modus Operandi of similar characteristics to the aforementioned offenses" [*Id.*]. A United States Magistrate Judge in the Western District of North Carolina issued the search warrant for Southern Comfort, located at 380 Allison Drive, based on Agent Poynter's affidavit [Doc. 33-1].

In his Motion to Suppress Evidence Obtained at 380 Allison Drive [Doc. 33], the defendant argues that all evidence resulting from the search of Southern Comfort should be suppressed because the affidavit supporting the search warrant "lack[ed] any

constitutional nexus between the crimes alleged, the individuals involved, and the places and the things to be searched and seized" [*Id.* at 1].

After hearing oral argument on the motion and reviewing exhibits submitted by the parties, Magistrate Judge Shirley determined that law enforcement searched 380 Allison Drive pursuant to a valid search warrant [Doc. 65 p. 2]. He, therefore, recommended that the defendant's motion to suppress be denied [*Id.*]. Magistrate Judge Shirley declined to address the issue of whether the good-faith exception to the exclusionary rule applied in this case, however, because he determined that the search warrant was supported by probable cause [*Id.* at 20–21].

The defendant has objected to the R&R, arguing that Magistrate Judge Shirley based his analysis "on erroneous facts that are not supported by the record and are not contained within the four corners of the supporting affidavit" [Doc. 76 p. 2]. The defendant argues that a "careful reading of the affidavit reveals that there is not a nexus between the bank robberies alleged in the supporting affidavit and [the defendant]" [*Id.*]. Furthermore, according to the defendant, "there is no nexus between the bank robberies alleged in the supporting affidavit and the rental cabin at 380 Allison Drive" [*Id.*]. The defendant also objects to the R&R's finding that "the information provided in the supporting affidavit was not stale" [*Id.*]. Lastly, the defendant asserts that the R&R "incorrectly determined that the [d]efendant failed to make the 'strong showing' necessary to look beyond the four corners of the affidavit relative to a material misrepresentation or omission" [*Id.*]. The defendant does not object to the portion of the

9

R&R addressing "illegally gained information," which is predominantly addressed in a prior R&R [Doc. 58]. The Court will not, therefore, address this section of the R&R.

The government responded in opposition to the defendant's objections and additionally requested that the Court, in the alternative, deny the defendant's motion to suppress based on the good-faith exception to the exclusionary rule [Doc. 81]. The defendant replied to this response, focusing on his contention that the good-faith exception does not apply in this case [Doc. 86].

## II.    Standard of Review

The Court reviews *de novo* those portions of the R&R to which the defendant has objected. 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b). Accordingly, the Court considers the R&R, the motions to suppress, the parties' underlying and supporting briefs, the defendant's objections, the government's response to those objections, and the defendant's reply, all in light of the applicable law.

## III.    Analysis

The defendant has objected to the majority of Magistrate Judge Shirley's recommendations. Specifically, the defendant first contends that the R&R relies on "erroneous facts" outside the four corners of the affidavit [Doc. 76 p. 2]. Thus, this Court's foregoing recitation of the background in this case is strictly based on the affidavit, giving no deference to the R&R's statement of facts.

The defendant's additional objections relate to three main arguments, similar to those made by the defendant in his original motion to suppress [Doc. 33]: (1) lack of

nexus, (2) staleness, and (3) material misrepresentation or omission by the affiant [Doc. 76 p. 2]. Accordingly, the Court will proceed by evaluating each of these objections in turn, and it will then address whether the good-faith exception applies to the case at hand.

### A.      Nexus

The Fourth Amendment states that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. amend. IV. Thus, the Fourth Amendment requires that an affidavit submitted in support of a search warrant "indicate a nexus between the place to be searched and the evidence sought," *United States v. Hawkins*, 278 F. App'x 629, 634 (6th Cir. 2008), and "[t]he belief that the items sought will be found at the location to be searched must be 'supported by less than *prima facie* proof but more than mere suspicion.'" *United States v. Bethal*, 245 F. App'x 460, 464 (6th Cir. 2007) (quoting *United States v. Johnson*, 351 F.3d 254, 258 (6th Cir. 2003)); *see United States v. Abboud*, 438 F.3d 554, 571 (6th Cir. 2006) ("To demonstrate probable cause to justify issuance of a search warrant, an affidavit must contain facts that indicate a fair probability that evidence of a crime will be located on the premises of the proposed search."). In other words, the connection between the place to be searched and the items to be seized must not be "vague, generalized, or insubstantial." *United States v. Carpenter*, 360 F.3d 591, 595 (6th Cir. 2004). Thus, "[t]he critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific things to be searched for and seized are

11

located on the property to which entry is sought." *Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978) (internal quotation omitted).

A nexus between a suspect and the premises to be searched can be inferred in certain circumstances, depending upon "the type of crime being investigated, the nature of things to be seized, the extent of an opportunity to conceal the evidence elsewhere and the normal inferences that may be drawn as to likely hiding places." *United States v. Savoca*, 761 F.2d 292, 298 (6th Cir. 1985). Where the nexus is inferred, the supporting affidavit must also contain an "additional fact that permitted the magistrate to draw the inference that evidence of wrongdoing would be found in the defendants' homes," such as "the independently corroborated fact that the defendants were known drug dealers at the time the police sought to search their homes." *United States v. McPhearson*, 469 F.3d 518, 524 (6th Cir. 2006). An issuing court "may give considerable weight to the conclusion of experienced law enforcement officers regarding where evidence of a crime is likely to be found and is entitled to draw reasonable inferences about where evidence is likely to be kept, based on the nature of the evidence and the type of offense." *United States v. Caicedo*, 85 F.3d 1184, 1192 (6th Cir. 1996) (internal quotations and citations omitted). *But see United States v. Schultz*, 14 F.3d 1093, 1098 (6th Cir. 1994) ("While an officer's training and experience may be considered in determining probable cause, it cannot substitute for the lack of evidentiary nexus in this case, prior to the search, between the [place to be searched] and any criminal activity." (internal quotations and citations omitted)).

12

In the R&R, Magistrate Judge Shirley determined that direct evidence links the bank robberies and kidnappings on April 28 and July 7 to the cabin at 380 Allison Drive [Doc. 65 p. 6]. Judge Shirley also found that the affidavit provided a nexus between the two men involved in the September 3 chase and Southern Comfort [*Id.* at 7]. Finally, Judge Shirley determined in the R&R that direct evidence provided a nexus between the defendant and the other white male, who were renting and residing at Southern Comfort, and the bank robberies and kidnappings set forth in Agent Poynter's affidavit [*Id.* at 8]. The R&R concluded that the issuing magistrate judge could have reasonably inferred that evidence from the robberies could be found at Southern Comfort [*Id.* at 10]. Consequently, Judge Shirley found that the supporting affidavit provided a sufficient nexus between the items sought, evidence from and instrumentalities of the robbery and attempted robbery, and the place to be searched, Southern Comfort [*Id.* at 11].

### 1.      Defendant's Objections

In objecting to this portion of the R&R, the defendant argues that the R&R "fails to connect [the robberies] to the rental cabin in any way" [Doc. 76 p. 17]. The defendant notes that he was not renting a cabin from PVR at the time of the April 28 incident, and he did not rent the Rebel Ridge Cabin until twenty days after the July 7 occurrence [*Id.*]. Furthermore, the defendant asserts that the R&R "does not explain why law enforcement believed that the September 3 North Carolina chase was related to the April 28 and July 7 Tennessee incidents" [*Id.*]. The defendant admits that "the court could reasonably tie the GPS device to the cabin at 124 Rebel Ridge Road," but he argues that the court could not,

13

however, "reasonably leap from that inference to the inference that the two individuals on September 3 were the same two individuals renting [Southern Comfort]" [*Id.* at 18].

In support of this argument, the defendant asserts that "[t]here is nothing inherently suspicious about a GPS device" and that the rental agency's description of the renters as being white males in their 30s is too vague to establish probable cause that these men were the same individuals as those who fled on September 3 [*Id.* at 18–19]. Additionally, the defendant states that the balled up piece of paper provided no connection to the Tennessee bank robberies, and the items found in the defendant's bag were not used in the robberies [*Id.* at 22–23]. Consequently, according to the defendant, "[a]ny inference by the issuing judge that the items would be used in future crimes would contradict the facts presented in the affidavit that developed the alleged 'common scheme or plan'" [*Id.* at 23].

### 2. Legal Standard

In reviewing the validity of a search warrant, courts should not "engage in line-by-line scrutiny of the warrant application's affidavit." *United States v. Williams*, 544 F.3d 683, 686 (6th Cir. 2008) (citing *Bethal*, 245 F. App'x at 465). Instead, courts should "take a totality of the circumstances approach in their review of the affidavit." *Id.* "[T]he duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed." *Illinois v. Gates*, 462 U.S. 213, 238–39 (1983). A reviewing court should accord great deference to the magistrate's

14

determination, for reasonable minds may differ as to the determination of probable cause. *United States v. Leon*, 468 U.S. 897, 914 (1984).

The magistrate's finding of probable cause should be overturned, however, if this decision was based on a knowingly or recklessly false affidavit. *Id.* Additionally, the reviewing court should find the warrant invalid if the magistrate acted as a "rubber stamp," rather than a "neutral and detached" decision-maker. *Id.* Lastly, "courts will not defer to a warrant based on an affidavit that does not 'provide the magistrate with a substantial basis for determining the existence of probable cause.'" *Id.* at 915 (citing *Gates*, 462 U.S. at 239). "If the magistrate's probable cause determination was based on an improper analysis of the totality of the circumstances, or the warrant was improper in some other respect, a reviewing court may properly conclude the warrant was invalid" and, consequently, exclude fruits stemming from the search. *United States v. Carney*, 661 F. Supp. 2d 732, 739 (W.D. Ky. 2009).

### 3. Application

Here, the affidavit submitted by Agent Poynter demonstrated a sufficient nexus between Southern Comfort and the alleged crimes for the issuing magistrate to reasonably make a finding of probable cause. This nexus becomes apparent when several verified facts and logical inferences are pieced together. Specifically, the affidavit provides facts that establish a direct link between: (1) the September 3 incident and the November 25 incident, based on similarities between the two events' Modus Operandi; (2) the November 25 incident and the attempted robbery and successful robbery

15

perpetrated in Tennessee, pursuant to the note found in the defendant's possession during his arrest and items contained in the defendant's bag; and (3) the September 3 incident and Southern Comfort, by means of the GPS device found in the abandoned vehicle and the FBI's interview with the PVR employee. Based on these links, the issuing magistrate judge could have reasonably inferred a nexus between the November 25 incident and Southern Comfort, and, consequently, between the bank robberies and Southern Comfort. Facts connecting the property and the offenses were not too vague, generalized, or insubstantial to establish probable cause. *Carpenter*, 360 F.3d at 595.

The affiant provided facts that established "more than [a] mere suspicion" that items connected to the bank robberies and kidnappings would be found at Southern Comfort. *Bethal*, 245 F. App'x at 464. Although the magistrate's finding of a nexus between the items sought and Southern Comfort required him to make logical inferences, this does not make the link more "vague" or "generalized." *Carpenter*, 360 F.3d at 595. A complex nexus does not automatically amount to a vague or generalized connection. Furthermore, relevant factors, as set forth in *Savoca*, allowed the issuing magistrate in this case to infer a nexus between the items sought and the place to be searched, and the Court will evaluate each of these factors in turn. *See Savoca*, 761 F.2d at 298 (asserting that a nexus between a suspect and the premises to be searched can at times be inferred, depending upon "the type of crime being investigated, the nature of things to be seized, the extent of an opportunity to conceal the evidence elsewhere and the normal inferences that may be drawn as to likely hiding places").

16

First, as to the type of crime being investigated, the offenses were ongoing conspiracies, which took extensive planning and coordination. "[W]ith continuing criminal operations, any issue of staleness, or the lack of a direct known link between the criminal activity and residence, becomes minimal." *United States v. Newton*, 389 F.3d 631, 635–36 (6th Cir. 2004) (citing *United States v. Greene*, 250 F.3d 471, 481 (6th Cir. 2001)), *vacated*, 546 U.S. 803 (2005). Here, FBI agents and local law enforcement conducted extensive investigation into the bank robberies and kidnappings, as well as the September 3 and November 25 incidents, and determined that these events were connected. They interviewed a PVR employee who described the men renting Southern Comfort in a manner consistent with the perpetrators of the bank robberies, as well as the September 3 and November 25 events. The attempted robbery and successful robbery involved similar Modus Operandi, including kidnapping bank executives' families. Officers conducted surveillance at the target location, where they witnessed men matching descriptions from each of the incidents coming and going from the cabin in stolen vehicles with stolen tags, which was consistent with the September 3 and November 25 chases.

Second, with regard to the nature of things to be seized, the items sought were likely used repeatedly during commission of the robberies, like the surveillance items found on the defendant and the driver on November 25. The suspects also had ample opportunity to conceal instrumentalities and evidence of the crimes committed, due to their prior evasion of law enforcement [Doc. 76-1 ¶ 34]. Finally, a reasonable person

17

could conclude that a cabin rented by the suspects, from whence they were witnessed coming and going, could have served as a likely hiding place for items used during the robberies and fruits obtained therefrom. Consequently, under Sixth Circuit precedent, the Court could infer a nexus between Southern Comfort and the items sought, based on a totality of the circumstances. *See Savoca*, 761 F.2d at 298.

Furthermore, the supporting affidavit contains multiple "additional facts," or "plus factors," as referred to by the defendant, which permitted the magistrate to draw the inference that evidence of wrongdoing would be found at Southern Comfort. *See McPhearson*, 469 F.3d at 524 (determining that, in cases of inferred nexuses, the affidavit must provide an "additional fact that permitted the magistrate to draw the inference that evidence of wrongdoing would be found in the defendants' homes"). Law enforcement independently corroborated that the driver who fled on September 3 was the same driver apprehended by the NCSHP on November 25, and the two events were strikingly similar overall. Police corroborated that the items found on the defendant, particularly the note found in his possession, linked him to the bank robberies and kidnappings. FBI agents studied data obtained from the GPS in depth and interviewed the PVR employee who rented the suspects cabins over an extended period of time. They interviewed victims of the kidnappings, one of whom from July 7 testified that that she heard the perpetrators use a GPS device. NCSHP officers conducted surveillance for multiple days on the last cabin rented by the suspects, and they witnessed white males—fitting descriptions from

18

the September 3 incident, the November 25 incident, and the bank robberies—coming and going from Southern Comfort in stolen vehicles with stolen tags.

In combination, the above facts provide sufficient "additional facts" for the issuing magistrate judge to have found probable cause to issue a warrant. *See United States v. Cobb*, 397 F. App'x 128, 133 (6th Cir. 2010) (affirming the inference of a nexus between a robber's residence and instrumentalities of the robberies because the affidavit "set forth sufficient facts to permit the issuing judge to infer a link between the evidence sought and [the defendant's] residence").

In his objection to this portion of the R&R, the defendant compares his case to *United States v. Savoca*, in which the Sixth Circuit vacated its prior ruling—concluding that the search warrant lacked probable cause—based on the good-faith exception set forth in *Leon* [Doc. 76 p. 13]. The court did not, however, vacate the rationale on which it based its finding that the search warrant was invalid. In making this determination of invalidity, the court relied upon two specific factors: (1) "the affidavit revealed that the crimes occurred 'over 2,000 miles from the motel room,'" and (2) "'[m]ore importantly, the affidavit did not specify the amount of time that had passed' since the crimes." *Savoca*, 761 F.2d at 294–95.

Here, in contrast, the crimes occurred within just over 100 miles from Southern Comfort, as opposed to 2,000 miles from the place to be searched in *Savoca*. 761 F.2d at 294–95. Furthermore, the affidavit in this case presented the magistrate with specific dates for the crimes committed, demonstrating that the crimes occurred approximately

seven months and five months, respectively, prior to the search of Southern Comfort. Thus, this case is differentiable from *Savoca*.

The defendant also compares his case to *United States v. Hatcher*, 473 F.2d 321 (6th Cir. 1973) [Doc. 76 pp. 13–14]. In *Hatcher*, the Sixth Circuit found that the search warrant was not based on probable cause and affirmed that "[t]he mere fact that two persons known to have been engaged in trafficking in narcotics were observed on the same premises cannot justify a search of the premises without something more." *Id.* at 323. The court noted, however, that the sum of money and gun in the defendant's custody could have qualified as the requisite "something more," had it been included in the underlying affidavit. *Id.* at 323–24.

Here, surveillance over the course of several days revealed that the suspects were utilizing Southern Comfort as a residence and base location. The underlying affidavit provided numerous factors—as discussed herein—that, in combination with the affiant's experience, establish probable cause to believe that instrumentalities or fruits of the robberies would be found at Southern Comfort. Additionally, in this case, the crimes at issue were part of an ongoing criminal conspiracy. Thus, the affidavit in question provides "something more," unlike the affidavit in *Hatcher*.

Additionally, although the defendant likens his case to *United States v. Washington*, 266 F. Supp. 2d 781 (S.D. Ohio 2003), in which the court declined to find a nexus between the place to be searched and the suspects, the court in *Washington* noted that, "[h]ad detectives continued surveillance of [the property] and observed the suspect

20

routinely departing the house en route to sell drugs, they may have established probable cause for a search warrant." *Id.* at 785. Here, the defendant was witnessed coming and going from Southern Comfort on multiple occasions, all in stolen vehicles with stolen plates. Furthermore, the Sixth Circuit reversed the lower court in *Washington* on appeal because it determined that the good-faith exception applied, which the Court will address in a later section of this opinion. *United States v. Washington*, 380 F.3d 236, 238 (6th Cir. 2004).

Finally, the defendant has not demonstrated that the magistrate judge's finding was based on a knowingly or recklessly false affidavit or that the magistrate judge acted merely as a rubber stamp, and—as previously determined—the defendant has failed to prove that the affidavit did not provide a "substantial basis" for a finding of probable cause or that the magistrate judge's determination was based on an improper analysis. *Leon*, 468 U.S. at 914.

Thus, based on the totality of the circumstances, giving appropriate weight to the affiant–officer's training and experience and according great deference to the issuing magistrate's determination, while still requiring an adequate nexus, this Court finds that the affidavit provided a sufficient link between the items sought and the place to be searched to make the magistrate's finding of probable cause reasonable. The search warrant was, therefore, valid, and the Court overrules the defendant's objection on this ground.

## B.    Staleness

The defendant also objects to the R&R's finding that the information presented in the underlying affidavit was not stale [Doc. 76 pp. 24–27]. "[I]n seeking to establish probable cause to obtain a search warrant, the affidavit may not employ 'stale' information, and whether information is stale depends on the 'inherent nature of the crime.'" *United States v. Brooks*, 594 F.3d 488, 493 (6th Cir. 2010) (quoting *Spikes*, 158 F.3d at 923). "[T]he critical question is whether the information contained in the affidavit, when presented to the . . . judge, established that there was a fair probability that [evidence] would still be found at [the location of the search]." *Abboud*, 438 F.3d at 572. A staleness test is not designed to "create an arbitrary time limitation within which discovered facts must be presented to a magistrate." *Spikes*, 158 F.3d at 923. When the challenger asserts that probable cause that once existed had grown stale before the warrant was issued, a court must look to facts and circumstances of each case. *Id.*

As appropriately relied upon by both parties, the following four-pronged *Spikes* test is utilized by courts within the Sixth Circuit when evaluating a claim of staleness: (1) "the character of the crime (chance encounter in the night or regenerating conspiracy?)," (2) "the criminal (nomadic or entrenched?)," (3) "the thing to be seized (perishable and easily transferable or of enduring utility to its holder?)," and (4) "the place to be searched (mere criminal forum of convenience or secure operational base?)." *Id.*

In the R&R, Magistrate Judge Shirley determined that the affidavit provided evidence of an "ongoing crime spree," and consequently, that the information in the

affidavit was not stale [Doc. 65 p. 12]. Specifically, Judge Shirley found that three of the four *Spikes* factors support this conclusion: (1) "the character of the crimes under investigation reveal them to require a high degree of planning and coordination"; (2) "[t]he types of items to be seized—firearms and ammunition, masks, tools, computers, tablets, and other electronic devices—were durable goods of enduring value"; and (3) "the Allison Drive cabin was the [d]efendant's base of operations, rather than a venue with which he had only passing ties" [*Id.*]. Judge Shirley admits, however, that the final *Spikes* factor does not apply because the defendant was "arguably more nomadic, than ensconced, as [he] had moved to a different rental cabin during the time frame covered by the affidavit" [*Id.*].

Objecting to this portion of the R&R, the defendant states that "[t]he information contained in the supporting affidavit is so far removed from the time of any alleged criminal activity that any probable cause for the Allison Drive cabin would be stale" [Doc. 76 p. 24]. Specifically, the defendant argues that the five months and seven months, respectively, between the robberies and the search, as well as the 100 miles separating the incidents and the cabin, make it "beyond reason" to infer that an ongoing conspiracy was occurring [*Id.*]. The defendant also asserts that "there was no information or indication that there was anything that would be of endearing value to the owner" [*Id.* at 26]. Thus, according to the defendant, the suspects and their criminal enterprise were entirely nomadic [*Id.*]. Finally, the defendant argues that the R&R's finding that Southern Comfort was the "base of operations" is "completely unsupported by the facts

set forth in the affidavit" and that the defendant's connection to the cabin was "passing at best" [*Id.*]. In sum, the defendant contends that the R&R "improperly analyzed the affidavit and the *Spikes* factors to erroneously conclude that the information was not stale" [*Id.* at 27].

The government has not objected to Judge Shirley's finding that the second *Spikes* factor—whether the criminal was nomadic or entrenched—goes toward a finding of staleness in this case. Thus, the Court will focus on the remaining three *Spikes* factors, which Judge Shirley determined point towards a finding of lack of staleness: (1) character of the crime, (2) thing to be seized, and (3) place to be searched. Each of these factors will be addressed in turn.

### 1. Character of the Crime

First, the alleged crimes in this case could not reasonably be characterized as "chance encounter[s] in the night." *Spikes*, 158 F.3d at 923. Rather, the bank robberies and kidnappings—as described in the affidavit—resemble a methodically planned, regenerating conspiracy.

"[E]vidence of ongoing criminal activity will generally defeat a claim of staleness." *Greene*, 250 F.3d at 48; *see Abboud*, 438 F.3d at 573 (finding that ongoing criminal activity at a given time may be sufficient to defeat a claim of staleness); *Newton*, 389 F.3d at 635–36 ("[W]ith continuing criminal operations, any issue of staleness, or the lack of a direct known link between the criminal activity and residence, becomes minimal."). Furthermore, courts permit greater lapses of time between the information

relied upon and the request for a search warrant when the evidence sought concerns a long-term criminal operation. *United States v. Thomas*, 605 F.3d 300, 309–10 (6th Cir. 2010); *see Spikes*, 158 F.3d at 923 (stating that "the length of time between the events listed in the affidavit and the application of the warrant, while clearly salient, is not controlling"). The indicia of criminal activity may remain for some time after the accused's last-reported criminal activity. *United States v. Canan*, 48 F.3d 954, 959 (6th Cir. 1995).

Here, the affidavit establishes that the criminal activity at issue was a long-term, ongoing operation. The attempted robbery of the Credit Union on April 28, 2015 highly resembled the robbery of SmartBank on July 7, 2015—both targeted bank executives and their families; both involved taking the executive's wife and child hostage, and blindfolding them, while ordering the executive to take money from the bank; both sets of perpetrators instructed the executive to keep his phone in his front shirt pocket while on a call with his wife's phone, which was controlled by the suspects, in order to monitor the executive's activity; and both sets of robbers utilized the victim's car to transport the hostage family [Doc. 76-1 pp. 2–6]. The similarities between these two events demonstrate that the events were very likely connected and that the criminal activity at issue was consequently an ongoing operation.

Additionally, as previously established, the affidavit presents facts that link the robberies to the chases on September 3 and November 25, which are in turn linked to Southern Comfort. The PVR employee stated that the white males renting cabins in the

Maggie Valley area at one point drove a Lexus, like the vehicle stolen from the family on April 28, 2015. Furthermore, NCSHP officers witnessed the suspects come and go from the cabin in stolen vehicles with stolen plates, adding to the appearance of an ongoing criminal conspiracy.

Therefore, although approximately five months and seven months had elapsed between the two incidents and the filing of the search warrant affidavit, the potential issue of staleness is minimal. *See Newton*, 389 F.3d at 635–36. It is appropriate for this Court to allow this lapse of time between the events at issue and the request for a search warrant because the affidavit establishes the ongoing nature of the crimes. *See Thomas,* 605 F.3d at 309–10; *Canan*, 48 F.3d at 959. Despite the defendant's contention that "[i]t is beyond reason to infer that there was an ongoing conspiracy based on the time and distance involved," the facts included in the affidavit establish otherwise [Doc. 76 p. 24]. Consequently, the Court finds that first *Spikes* factor—the character of the crime—weighs against a pronouncement of staleness.

### 2. Thing To Be Seized

The Court also finds that the things sought to be seized were of continuing worth to the defendant. Based on facts contained in the affidavit, items of enduring value—such as firearms, masks, and clothing—would be found at the defendant's current base of operations, Southern Comfort. These types of items are not perishable, but rather, would be of continuing utility to their owner.

26

"[A]n issuing judge may infer that a criminal suspect keeps the 'instrumentalities and fruits' of his crime in his residence." *Williams*, 544 F.3d at 688 (affirming the inference of a nexus between the defendant's home and the firearms he used in furtherance of drug trafficking because he could be expected to keep the instrumentalities of his crimes at his home, "[m]uch like a bank robber would keep the proceeds and instrumentalities of his robbery in his home"). Instrumentalities of ongoing robberies would not likely be disposed of by the perpetrators, particularly if similar items were used in each event. *See Cobb*, 397 F. App'x at 133 (affirming the inference that clothing worn during bank robberies and proceeds therefrom would still be at the residence six weeks after the last robbery and finding that the defendant, who took $100,000 from a bank robbery, would still have a significant portion of the funds in his control); *United States v. Pritchett*, 40 F. App'x 901, 906 (6th Cir. 2002) (finding that information from four months earlier was not stale because "[f]irearms are durable goods and might well be expected to remain in a criminal's possession for a long period of time").

Here, the affidavit described the following items to be seized: (1) firearms and ammunition, (2) clothing, masks, and other items potentially worn during the robberies, (3) cell phones, cameras, GPS devices, computers, tablets, and other electronic devices, (4) currency or other banking materials, (5) receipts, ledgers, maps, or other materials that could reveal details about the crimes committed, (6) stolen vehicles or tags, (7) rental agreements, documents, bills, or identification documents, (8) identification of victims, (9) crowbar and other burglary tools, (10) handcuffs, belly bands, and other restraining

27

devices, (11) gasoline or other fuel sources, (12) trace/forensic evidence, and (13) bags or other items that could be used to carry large amounts of money [Doc. 33-1 pp. 4–5].

Most of these types of items are not disposable—rather, they would be used repeatedly by robbers during the commission of the ongoing crimes. Although the exact same items were not used in the April 28 and July 7 incidents, as noted by the defendant [Doc. 76 p. 23], similar items were used, and overall parallels between the two events could have reasonably led the magistrate to conclude that the perpetrators would keep the instruments. Consequently, it is likely that these items would still be found at the cabin, even though the affidavit was drafted five and seven months, respectively, after the robberies occurred. *See Williams*, 544 F.3d at 688; *Cobb*, 397 F. App'x at 133.

The Court finds that the issuing judge could reasonably infer that the defendant would keep the instrumentalities and fruits of his crime—for instance, the clothes he wore before and during the robbery and the currency he took—for an extended period of time. *See Pritchett*, 40 F. App'x at 906. Thus, this *Spikes* factor also weighs against a finding of staleness.

### 3.    Place To Be Searched

Finally, the Court finds that the affidavit demonstrates that the place to be searched—Southern Comfort—served as an operational base for the defendant and his cohort. It appears, based on the facts set forth in the affidavit, that Southern Comfort was one of many PVR cabins used by the pair as a type of criminal headquarters. Although

28

the defendant moved between cabins in the Maggie Valley area, there are no facts contained within the affidavit that indicate these were fleeting forums of convenience.

The defendant notes that Magistrate Judge Shirley mistakenly stated that the defendant was at Southern Comfort for nineteen days, rather than ten days, and that the defendant was at the 124 Rebel Ridge Road cabin for five months, rather than three-and-a-half months [Doc. 76 p. 25]. While these objections are well-taken, the Court does not agree that the slight discrepancies in time periods dictate a different result. The defendant had begun renting properties from PVR in Maggie Valley in June 2015. Although he had only been renting Southern Comfort for ten days prior to issuance of the warrant, the defendant had been renting PVR cabins for over five months. Simply because the defendant had recently switched to another cabin—in the same geographic region, managed by the same company—does not transform this cabin into a "mere criminal forum of convenience." *Spikes*, 158 F.3d at 923. Indeed, Southern Comfort stood as the latest secure operational base in a string of PVR cabin bases. Consequently, the Court finds that the last *Spikes* factor also weighs against finding that information in the affidavit was stale.

In sum, the Court agrees with Magistrate Judge Shirley's conclusion that three of the four *Spikes* factors—the character of the crimes, the things to be seized, and the place to be searched—indicate a lack of staleness in this case. Thus, the Court determines that the information contained in the supporting affidavit is not "so far removed from the time of any alleged criminal activity that any probable cause for the Allison Drive cabin would

29

be stale" and, therefore, overrules the defendant's objection on this ground [Doc. 76 p. 24].

### C.    Omission or Misrepresentation

Finally, the defendant objects to Magistrate Judge Shirley's determination that the affidavit did not contain a material misrepresentation with regard to the race of one of the perpetrators of the April 28 kidnapping and attempted robbery [Doc. 76 pp. 27–30]. Judge Shirley determined that the defendant failed to make the *prima facie* showing required under *Franks v. Delaware*, 438 U.S. 154, 155, 164 (1978) in order for the defendant to attack the veracity of factual statements in the affidavit [Doc. 65 pp. 14–15].[5] The defendant did not, according to Judge Shirley, "even argue that Agent Poynter intentionally or recklessly stated that both men who engaged in the April 28 kidnapping and attempted robbery were white" [*Id.* at 19]. Judge Shirley did not permit an inference of intentional or reckless omission based on the supposed "central importance to the nexus determination" of the perpetrators' race [*Id.*]. Thus, in sum, the R&R concluded that the defendant did not make the strong showing necessary to permit the Court to look beyond the four corners of the affidavit [*Id.* at 20].

Objecting to this portion of the R&R, the defendant suggests that he has, in fact, requested a *Franks* hearing, although he neither directly requested a hearing in his previous filings, nor did he request a *Franks* hearing on June 2, 2016, before Judge

---

[5] Judge Shirley noted, however, that as of October 7, 2016, the defendant had not explicitly requested a *Franks* hearing [Doc. 65 p. 16 n.3].

Shirley [Doc. 76 p. 27 n.3]. Regardless of whether the defendant has requested a hearing, however, this Court finds that the defendant has failed to meet the two-prong test set forth in *Franks*.

Under the *Franks* test, the defendant must (1) make a substantial preliminary showing that specified portions of the affiant's statements are deliberately or recklessly false, and (2) demonstrate that the challenged statements are necessary to a finding of probable cause. *Franks*, 438 U.S. at 171; *United States v. Graham*, 275 F.3d 490, 505 (6th Cir. 2001). In order to mandate a hearing on this issue, "the challenger's attack must be more than conclusory." *Id.*; *United States v. Bennett*, 905 F.3d 931, 934 (6th Cir. 1990). "There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. . . . Allegations of negligence or innocent mistake are insufficient." *Franks*, 438 U.S. at 171.

While an alleged omission can warrant examination under *Franks*, "an affidavit which omits potentially exculpatory information is less likely to present a question of impermissible official conduct than one which affirmatively includes false information." *United States v. Atkin*, 107 F.3d 1213, 1217 (6th Cir. 1997). The Sixth Circuit has noted that *Franks* hearings are only justified in cases of omissions in "rare instances." *Mays v. City of Dayton*, 134 F.3d 809, 815 (6th Cir. 1998), *cert. denied*, 524 U.S. 942 (1998). "This is so because an allegation of omission potentially opens officers to endless conjecture about investigative leads, fragments of information, or other matter that might,

if included, have redounded to defendant's benefit." *Atkin*, 107 F.3d at 1217 (internal quotation omitted).

Similar to the requisite showing in cases of false statements, to merit a *Franks* hearing with regard to alleged omissions, "the defendant must make a preliminary showing that the affiant engaged in deliberate or reckless disregard of the truth in omitting the information from the affidavit." *Graham*, 275 F.3d at 506. Then the court must consider the affidavit in addition to the omitted portions and determine whether probable cause still exists. *Id.*

Here, the defendant argues that the affiant's statement that the two suspects from April 28 were white males "is inaccurate and is either a deliberate falsehood or, more likely, made with reckless disregard for the truth" [Doc. 76 p. 28]. The defendant fails, however, to introduce any proof that the statement was made either deliberately or with reckless disregard for the truth, other than Allison Ziegler's statement that one of the two perpetrators on April 28 was a black male [Doc. 33-2]. The defendant does not mention that Ms. Ziegler's husband said that one of the perpetrators was Hispanic, and her son stated that both men were white [Doc. 46 p. 30].

Thus, an "accurate" description of the April 28 perpetrators' characteristics depends on whose perspective the affiant replied upon. Demonstrating that the affiant chose to give greater weight to the son's statement than the mother's—or the father's— does not necessarily prove that the affiant deliberately, or even recklessly, submitted a false statement to the magistrate. *See United States v. Bergren*, No. C 12–00119 SI, 2014

32

WL 1217981, at *4 (N.D. Cal. Mar. 21, 2014) (finding that, even if the defendant demonstrated that certain witness statements were inconsistent with the confidential informant's statements included in the affidavit, that would not sustain the defendant's burden under *Franks* because "the affiant could well have concluded that the CI was trustworthy, and that the witness descriptions of the individuals the CI described as accompanying the defendant were irrelevant to the probable cause determination"). Thus, failure to include witnesses' contrasting descriptions does not automatically amount to a "reckless disregard for the truth," as claimed by the defendant [Doc. 76 p. 29], and it more likely qualifies as an omission of conflicting testimony, which renders the defendant's argument even less likely to warrant a hearing on the matter. *See Atkin*, 107 F.3d at 1217; *Mays*, 134 F.3d at 815.

Regardless of whether the affidavit's description of the April 28 perpetrators is analyzed as a false statement or an omission, however, the Court finds that a "correction" of the description—or inclusion of omitted testimony—does not defeat the affidavit's showing of probable cause. Describing one of the men from the April 28 incident as white, black, or Hispanic does not obliterate the nexus previously found by the Court. The defendant claims that "[h]ad the affidavit accurately reflected the fact that a white male suspect and a black male suspect were involved in the April 28 incident, the assertion that the individuals involved in the September 3 incident were connected to the East Tennessee robberies would have been gutted" [*Id.*]. As discussed herein, however,

33

the affidavit submitted additional facts linking the September 3 incident to the November 25 incident, which was in turn linked to the bank robberies.

The defendant also asserts that, "had that information been included in the affidavit, it would have completely undermined the assertion that the individuals at the Allison Drive cabin were connected to the East Tennessee robberies" [*Id.*]. Again, this argument ignores other links made between each of the events, irrelevant of the suspects' races. Furthermore, inclusion of Allison Ziegler's testimony in the affidavit would not have definitively established that one of the perpetrators was a black male. This reasoning fails to consider her son's testimony that the men were both white, as well as her husband's statement that one of the men was Hispanic. An arguably "accurate" description of the male perpetrators on April 28 would have read, "a masked white male and a masked male of an undetermined race," or a similar phrasing. This description, which takes into account the three conflicting witness statements, does not "completely undermine" the connection between the individuals at Southern Comfort and the perpetrators of the robberies [*Id.*].

In sum, despite the defendant's contention to the contrary, the description of the suspects in the April 28 incident is not "the basis for which all other assertions in the affidavit are connected" [*Id.*]. Inclusion of Allison Ziegler's description of the perpetrators does not discredit a finding of probable cause, as the affidavit provides various other links between the place to be searched and the items to be seized.

34

The Court consequently concludes that the defendant has failed to make a sufficient showing under the *Franks* test to warrant a hearing on the alleged false statement or omission by the affiant, and the Court will also overrule his objection on this ground.

### D.    Good-Faith Exception

In *United States v. Leon*, 468 U.S. 897 (1984), the Supreme Court established the good-faith exception to the exclusionary rule.   Under this exception, courts should decline to exclude evidence obtained by a police officer who conducted a search in reasonable reliance on a search warrant issued by a neutral, detached magistrate, which was later determined to be unsupported by probable cause.  *See id.* at 920–22 ("In most such cases, there is no police illegality and thus nothing to deter.  It is the magistrate's responsibility to determine whether the officer's allegations establish probable cause and, if so, to issue a warrant comporting in form with the requirements of the Fourth Amendment.").   Rather than resolving whether a Fourth Amendment violation has occurred, the exception involves a determination that the purpose of the exclusionary rule—deterrence of police misconduct—would not be served under the circumstances. *See id.* at 909 ("[If] . . . the exclusionary rule does not result in appreciable deterrence, then, clearly, its use in the instant situation is unwarranted.").

The Supreme Court in *Leon* noted, however, four situations in which application of the exception would be inappropriate: (1) "if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or

would have known was false except for his reckless disregard of the truth"; (2) if the "issuing magistrate wholly abandoned his judicial role"; (3) if the affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and (4) if the warrant was "so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid." *Id.* at 923.

In the R&R, Magistrate Judge Shirley declined to address whether the good-faith exception to the exclusionary rule applies in this case because he determined that probable cause existed to issue the search warrant [Doc. 65 p. 21]. Thus, Judge Shirley found no reason to reach the issue of whether the officers executed the search warrant in good faith [*Id.*].

The government, however, in its response to the defendant's objections [Doc. 81], argues that this Court "can and should reach the good faith issue" and that this Court should alternatively hold that the good-faith exception applies in this case [*Id.* at 8]. The defendant responded to this argument in its reply [Doc. 86], asserting that this Court should not apply the good-faith exception "because, under the circumstances, a reasonably well-trained officer would know that the affidavit was insufficient to establish probable cause" [*Id.* at 1]. Specifically, the defendant argues that "the affiant misled the magistrate to create the illusion of probable cause," and "the affidavit was so lacking in the indicia of probable cause that reliance on it was entirely unreasonable" [*Id.*]. The Court will, therefore, now address whether the good-faith exception to the exclusionary

36

rule applies in the current case, although Magistrate Judge Shirley declined to reach this issue in the R&R.

The Court concludes that, even if the magistrate judge erred in finding probable cause to issue the search warrant, which the Court has determined that he did not, evidence stemming from the search of Southern Comfort would still be admissible based on the good-faith exception. Officers in this case conducted a search in reasonable reliance on a warrant issued by a neutral, detached magistrate. In spite of the defendant's argument to the contrary, there was no "police illegality and thus nothing to deter" in this case. *Id.* at 920–21. Consequently, the primary purpose of the exclusionary rule would not be served by exclusion of evidence resulting from the search of Southern Comfort. *Id.* at 918–19. Furthermore, none of the exceptions set forth in *Leon* apply in this case. *See* 468 U.S. at 923.

First, as the Court previously determined, the issuing magistrate judge was not misled by false information either intentionally or recklessly included by Agent Poynter in the warrant affidavit. One of the three victims from the April 28 attempted robbery stated that the perpetrators were both white males, and Agent Poynter included this description in the affidavit [Doc. 76-1 p. 2]. The defendant argues that one of the suspects was a black male, strictly basing this assumption on another victim's first-hand account [Doc. 33-2]. The defendant presented no evidence that the affiant intentionally or recklessly misstated the suspect's description or omitted conflicting descriptions, other than merely pointing to the testimony of one witness whose inconsistent account Agent

37

Poynter failed to include in the affidavit [Doc. 86 pp. 3–4]. The existence of an inconsistent witness account does not necessarily mean that the description included in the affidavit was intentionally or recklessly false. Although the defendant argues that Agent Poynter swore to the facts of the affidavit "knowing that the description of 'two white males' was contrary to the description given by a victim of the April 28 incident" [*Id.* at 4–5], the defendant fails to acknowledge that Agent Poynter's description of the perpetrators was consistent with another victim's account. Thus, this Court finds that the magistrate was not misled by false statements either intentionally or recklessly included in the underlying affidavit.

Second, the defendant has presented no evidence that the issuing magistrate judge in this case "wholly abandoned his judicial role," and nothing in the record hints otherwise. *Leon*, 468 U.S. at 923. Thus, the second exception to *Leon* is inapplicable here.

Third, the affidavit in this case is not "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Id.* As previously determined by the Court, the affidavit provided a sufficient nexus between the items sought and the place to be searched to establish probable cause. Furthermore, the Court found that information included in the affidavit was not stale. Even if the warrant was declared invalid, however, the underlying affidavit was not so lacking in probable cause that reliance upon the warrant by officers would have unreasonable.

In order for this third exception to *Leon* to apply, the affidavit must have been "so vague as to be conclusory or meaningless." *Carpenter*, 360 F.3d at 596 (6th Cir. 2004). This is an even lower standard than the "substantial basis" required for a finding of probable cause. *See id.* at 595 ("If a lack of a substantial basis also prevented application of the *Leon* objective good faith exception, the exception would be devoid of substance." (quoting *United States v. Bynum*, 293 F.3d 192, 195 (4th Cir. 2002))); *see also Washington*, 380 F.3d at 241 ("*Carpenter* makes it clear that the 'so lacking in indicia' test is less demanding than the 'substantial basis' test. Thus, it is entirely possible that an affidavit could be insufficient for probable cause but sufficient for 'good-faith' reliance.").

In sum, application of the good-faith exception requires only a "minimally sufficient nexus," which, for all of the reasons discussed herein, the affidavit in this case provides. *Carpenter*, 360 F.3d at 596; *see United States v. Van Shutters*, 163 F.3d 331, 336 (6th Cir. 1998) (upholding a search under *Leon* where the affidavit connected the place to be searched to the illegal activity only by stating that the residence was "available" to the defendant); *Schultz*, 14 F.3d at 1098 (declining to exclude evidence based on the good-faith exception when the affidavit linked the place to be searched to the items sought only by stating that the officer's training and experience led him to believe that evidence would be located there).

The defendant argues that, while "this is not a typical 'bare bones' affidavit, it is similar in that it contains conclusory statements to connect the Tennessee bank robberies

39

to the North Carolina cabin and lacked any particularized incriminating facts" [Doc. 86 p. 5]. The defendant further states that, "[w]hile the criminal activity is described in great detail, it is never connected to Mr. Benanti or the cabin at 380 Allison Drive. While the Affidavit explains that Haywood County Sheriff's Office conducted some surveillance on the cabin, the surveillance never returns any evidence relating to bank robberies" [*Id.*]. As addressed herein in detail, however, the affidavit provides links between the September 3 event and the November 25 event, between the September 3 event and Southern Comfort, between the November 25 event and the robberies, and, consequently, between the robberies and Southern Comfort. Even if these links were not strong enough to support a finding of probable cause, which the Court has concluded that they are, they would at minimum be sufficient for a reasonable officer to have relied upon the search warrant in good faith.

Last, the final exception to *Leon* does not apply here because the warrant was not "so facially deficient" that the executing officers could not have reasonably assumed its validity. *Leon*, 468 U.S. at 923. The warrant clearly described the place to be searched and listed the items to be seized in great detail [Doc. 33-1 pp. 3–5]. Thus, nothing on the face of the warrant made it so deficient that it was unreasonable for the officers to rely upon it in good faith. Therefore, none of the four exceptions to *Leon* apply in this case.

The defendant, in his opposition to application of the good-faith exception, has drawn analogies and distinctions between this case and multiple Sixth Circuit cases. First, the defendant likens his case to *United States v. Weaver*, 99 F.3d 1372 (6th Cir.

1996), in which the court determined that the officer did not rely in good faith on the invalid warrant because the affidavit was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Id.* at 1380 (quoting *Leon*, 468 U.S. at 915). The affiant in *Weaver* had received a tip from a known confidential informant that the defendant was possibly conducting a marijuana sales operation, and the informant had learned of this operation from a third, anonymous individual. *Weaver*, 99 F.3d at 1374–75. The informant then attempted to purchase marijuana from the defendant, but the detective–affiant did not conduct surveillance of this transaction. *Id.* at 1375. After the drug transaction, the informant told the police that he believed the defendant was growing marijuana at the defendant's residence, but the informant personally saw no indication of such an operation. *Id.* The detective–affiant took no steps to corroborate the informant's story. *Id.*

The detective then applied for a search warrant, based strictly on information received from the informant and using predominantly boilerplate language in the affidavit. *Id.* The Sixth Circuit found that, "[a]s presented, the combined boilerplate language and minimal handwritten information provide few, if any, particularized facts of an incriminating nature and little more than conclusory statements of affiant's belief that probable cause existed regarding criminal activity." *Id.* at 1379. In finding that the affidavit did not present sufficient facts to support a finding of probable cause, the court noted that the detective "possessed only [the informant's] tip linking [the defendant] to possible drug activities, yet undertook no substantive independent investigative actions to

41

corroborate his informant's claims, such as surveillance of the [defendant's] residence for undue traffic or a second controlled purchase made with officers viewing." *Id.* The bare bones affidavit was so lacking in particular facts that the court found that the *Leon* good-faith exception did not apply. *Id.* at 1380. The Sixth Circuit reasoned that, "[w]ith little firsthand information and no personal observations, [the detective] should have realized that he needed to do more independent investigative work to show a fair probability that this suspect was either possessing, distributing, or growing marijuana." *Id.* Thus, the court stated, "We believe a reasonably prudent officer would have sought greater corroboration to show probable cause and therefore do not apply the *Leon* good faith exception on the facts of this case." *Id.* at 1381.

Here, in contrast, the affiant relied in no part upon the statements of anonymous informants. All facts set forth in the affidavit are grounded in police investigative work and surveillance. The affidavit in this case does not utilize boilerplate language. It relies upon the affiant's personal knowledge and the collective knowledge of law enforcement working in conjunction, rather than unsubstantiated statements made by informants. Agent Poynter and his co-workers conducted independent investigative work in this case, and Agent Poynter relied upon personal as well as substantiated knowledge when drafting the affidavit. Thus, the affidavit in this case, unlike in *Weaver*, is not "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Leon*, 486 U.S. at 915.

The defendant also attempts to differentiate this case from *Schultz* and *Van Shutters* [Doc. 86 pp. 6–7]. In *Schultz*, the Sixth Circuit held that, while the affiant–officer's "training and experience" was insufficient alone to establish a nexus between the items sought and the place to be searched, "the connection was not so remote as to trip on the 'so lacking' hurdle." 14 F.3d at 1098. In *Van Shutters*, the court concluded that, "even assuming that the district court's probable cause determination was incorrect," the affidavit was not "'so lacking' as to preclude application of the good faith exception." 163 F.3d at 337–38.

The defendant attempts to draw distinctions between his case and the foregoing cases by arguing that the affiant failed to conduct any independent corroboration of facts linking the defendant to the criminal activity or the location to be searched [Doc. 86 p. 7]. The defendant acknowledges, however, that the affidavit includes an instance where the defendant was seen leaving the cabin's driveway while law enforcement was conducting surveillance of Southern Comfort [*Id.*]. Additionally, the defendant fails to recognize other links between the defendant and criminal activity and between the criminal activity and the place to be searched, as the Court has repeatedly addressed. These include the GPS found in the abandoned vehicle on September 3 that led police to the string of PVR cabins, the statement of a victim that the kidnappers utilized a GPS device on July 7, the similarities between the September 3 event and the November 25 event, the notes in the defendant's possession on November 25 containing bank addresses and phrases

resembling pieces of bank robbery plans, the defendant's presence in the stolen vehicle that had departed from Southern Comfort on November 25, and so forth.

Thus, after reading the warrant in a "practical, common sense manner," *Weaver*, 99 F.3d at 1378, the Court finds that "only a police officer with extraordinary legal training would have detected any deficiencies." *Van Shutters*, 163 F.3d at 337. Indeed, the underlying affidavit in this case contains greater detail—corroborated by extensive police investigation—linking the place to be searched and the items sought than the affidavits in *Schultz* and *Van Shutters*. As previously noted, the affidavit establishes a nexus irrespective of the affiant's training and experience, and the affidavit relies in no part on informants' tips. It describes the criminal activities in great detail, lists items used by the suspects during execution of the offenses, and depicts the places to be searched with particularity. *See Van Shutters*, 163 F.3d at 337 (taking these factors into account in determining that the good-faith exception applied). Thus, the affidavit at hand does not qualify as a "bare bones" affidavit, which "states suspicions, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge." *Weaver*, 99 F.3d at 1378. Rather, the affidavit could have been reasonably relied upon by the officers conducting the search of Southern Comfort. This Court consequently finds that, although the warrant in this case was valid, evidence found pursuant to it should not be excluded at trial regardless of the warrant's sufficiency, based on the good-faith exception.

IV.    **Conclusion**

Accordingly, upon a careful and *de novo* review of the record and the law, the Court finds that the recommendations contained in the R&R are correct.  Additionally, the Court finds that the evidence obtained from 380 Allison Drive pursuant to the search warrant would be admissible pursuant to the good-faith exception regardless of the search warrant's validity.  Thus, the defendant's objections [Doc. 76] are **OVERRULED**.  The Court also finds that further oral argument on this motion to suppress is not warranted, and the defendant's request for oral argument [Doc. 76] is, therefore, **DENIED**.

The Court **ACCEPTS in whole** the R&R [Doc. 65] and incorporates it into this Memorandum Opinion and Order.  The Court hereby **DENIES** the defendant's Motion to Suppress Evidence Obtained at 380 Allison Drive ("Southern Comfort") [Doc. 33] and **DENIES as moot** the defendant's Omnibus Motion to Suppress All Subsequent Search Warrants [Doc. 34] because evidence seized during the search of Southern Comfort was not unconstitutionally obtained.

IT IS SO ORDERED.

s/ Thomas A. Varlan
CHIEF UNITED STATES DISTRICT JUDGE